No. 24-10707

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

National Association for Gun Rights, Incorporated; Texas Gun Rights, Incorporated; Patrick Carey; James Wheeler; Travis Speegle,

*Plaintiffs-Appellees,*

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas
District Court Case No. 4:23-cv-830 (Hon. Reed O'Connor)

## OPENING BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
 *Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
 *United States Attorney*

MARK B. STERN
BRAD HINSHELWOOD
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7256*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-7823*

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument. The Bureau of Alcohol, Tobacco, Firearms and Explosives has for nearly 50 years consistently determined that devices that operate like the ones at issue here qualify as machineguns under federal law. The district court here held the devices are not machineguns and issued a broad injunction barring enforcement of virtually all federal firearms laws with respect to those devices as to a category of unknown individuals and businesses. The government believes oral argument would provide substantial assistance to the Court.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT.......................................................i

TABLE OF AUTHORITIES...............................................................................iii

INTRODUCTION ..........................................................................................1

STATEMENT OF JURISDICTION ....................................................................2

STATEMENT OF THE ISSUES........................................................................3

STATEMENT OF THE CASE ..........................................................................3

    A.    Statutory Background.................................................................3

    B.    Prior Proceedings.....................................................................7

SUMMARY OF ARGUMENT..........................................................................11

STANDARD OF REVIEW .............................................................................13

ARGUMENT ..............................................................................................14

I.    The Forced Reset Triggers at Issue Are Machineguns .........................14

    A.    The Supreme Court's *Cargill* Decision Confirms ATF's Longstanding View That Devices of This Type Are Machineguns.........15

    B.    The District Court Misread *Cargill* ...........................................22

II.    The Relief the District Court Ordered Was Inappropriate.................26

    A.    The District Court Erred in Extending Relief to Unidentified Individuals and Entities ...........................................................26

    B.    The Injunction is Overbroad Insofar as it Enjoins Criminal Prosecutions............................................................................34

CONCLUSION ............................................................................................40

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979) ........................................................... 36

*Cargill v. Garland,*
57 F.4th 447 (5th Cir. 2023) ............................................. 21

*Deaver v. Seymour,*
822 F.2d 66 (D.C. Cir. 1987) ...................................... 35, 38

*Douglas v. City of Jeannette (Pa.),*
319 U.S. 157 (1943) .................................................... 13, 34

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
129 F.3d 826 (5th Cir. 1997) ............................................ 29

*Garland v. Cargill,*
602 U.S. 406 (2024) ................. 2, 5, 11, 12, 15, 16, 17, 18, 19, 20, 21, 22, 23

*Gettman v. DEA,*
290 F.3d 430 (D.C. Cir. 2002) .......................................... 31

*Gill v. Whitford,*
585 U.S. 48 (2018) ...................................................... 29, 33

*Hunt v. Washington State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ............................................... 28-29, 29

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .................................................... 28, 38

*Madsen v. Women's Health Ctr., Inc.,*
512 U.S. 753 (1994) ......................................................... 33

*Maxmed Healthcare, Inc. v. Price,*
860 F.3d 335 (5th Cir. 2017) ............................................ 13

*MedImmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007) ......................................................... 33

*National Rifle Ass'n of Am. v. Magaw,*
132 F.3d 272 (6th Cir. 1997) ............................................ 36

*NLRB v. Teamsters, Chauffers, Helpers & Taxicab Drivers, Local Union 327,*
  419 F.2d 1282 (6th Cir. 1970) ........................................ 28

*Schmidt v. Lessard,*
  414 U.S. 473 (1974) .................................................... 28

*Scott v. Schedler,*
  826 F.3d 207 (5th Cir. 2016) .......................................... 14

*Steffel v. Thompson,*
  415 U.S. 452 (1974) .................................................... 36

*Stolt-Nielsen, S.A. v. United States,*
  442 F.3d 177 (3d Cir.) ............................................. 35, 38

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .................................................... 29

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .................................................... 36

*United States v. Carter,*
  465 F.3d 658 (6th Cir. 2006) .......................................... 23

*United States v. Cox,*
  342 F.2d 167 (5th Cir. 1965) .......................................... 35

*United States v. Jokel,*
  969 F.2d 132 (5th Cir. 1992) .......................................... 18

*United States v. Nixon,*
  418 U.S. 683 (1974) .................................................... 35

*United States v. Rare Breed Triggers, LLC,*
  690 F. Supp. 3d 51 (E.D.N.Y.), *appeal filed,*
  No. 23-7276 (2d Cir. Oct. 5, 2023) ............... 1, 6, 15, 21, 25, 32, 33

*Viasat, Inc. v. FCC,*
  47 F.4th 769 (D.C. Cir. 2022) ......................................... 30

*Younger v. Harris,*
  401 U.S. 37 (1971) ................................................. 35, 37

*Zimmerman v. City of Austin,*
  881 F.3d 378 (5th Cir. 2018) .......................................... 29

**Statutes:**

Administrative Procedure Act (APA):
    5 U.S.C. § 702 .................................................................................... 37
    5 U.S.C. § 703 .................................................................................... 37
    5 U.S.C. § 705 .................................................................................... 37

Firearms Owners Protection Act,
    Pub. L. No. 99-308, 100 Stat. 449 (1986) ........................................ 5
    18 U.S.C. § 921(a)(24) ....................................................................... 4
    18 U.S.C. § 922(g) .................................................................... 26, 39
    18 U.S.C. § 922(o) ...................................................................... 4, 32
    18 U.S.C. § 922(o)(2)(B) .................................................................. 4
    18 U.S.C. § 924(a)(2) ....................................................................... 32

Gun Control Act of 1968,
    Pub. L. No. 90-618, sec. 201, § 5845(b), 82 Stat. 1213, 1231 ....... 4
    26 U.S.C. § 5845(b) ....................................................... 1, 3, 4, 8, 11, 14

National Firearms Act,
    26 U.S.C. ch. 53 .............................................................................. 3

18 U.S.C. § 1345 ...................................................................................... 6

28 U.S.C. § 1291 ...................................................................................... 3

28 U.S.C. § 1331 ...................................................................................... 2

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ........................................................................ 2

Fed. R. Civ. P. 65(d)(1)(C) ...................................................................... 28

**Legislative Materials:**

H.R. Rep. No. 73-1780 (1934) ................................................................ 3

H.R. Rep. No. 90-1956 (1968) (Conf. Rep.) ........................................... 4

H.R. Rep. No. 99-495 (1986) ................................................................... 5

**Other Authorities:**

*Bump-Stock-Type Devices*,
  83 Fed. Reg. 66,514 (Dec. 26, 2018) ............................................................ 25

Nat'l Ass'n for Gun Rights, *Join National Association for Gun Rights*,
  https://perma.cc/FR8S-3XF5 ................................................................... 30

Superseding Indictment,
  *United States v. Berrios-Aquino*, No. 22-cr-00473 (D.P.R. Apr. 20, 2023) ............. 32, 34

Tex. Gun Rights, *Join TXGR Today!*, https://perma.cc/3HFS-A7ZK ......................... 30

**INTRODUCTION**

This case concerns two replacement triggers for AR15-type rifles: the FRT-15 and Wide Open Trigger (WOT). These devices replace the standard trigger on an AR15-type rifle, and with these devices equipped, the shooter can engage the trigger once, apply continuous and steady pressure to the trigger, and fire repeatedly while the mechanics of the device automatically push the trigger slightly forward between shots.

Since at least 1975, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has repeatedly classified devices that operate similarly to the FRT-15 and WOT as machineguns because such devices allow a shooter to fire "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). After a manufacturer made and distributed these devices on a nationwide scale, the government took enforcement action, obtaining a preliminary injunction against further distribution in a suit in the Eastern District of New York. *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51 (E.D.N.Y.), *appeal filed*, No. 23-7276 (2d Cir. Oct. 5, 2023). That court issued the injunction after concluding that the government "is likely to succeed on the merits" of its claim that the devices at issue here are machineguns. *Id.* at 88.

The district court here upended that decades-old understanding, granting a preliminary injunction barring essentially any enforcement of the firearms laws against the FRT-15 and WOT, two recent forced-reset triggers ATF has

determined are machineguns. The district court believed that these devices are not machineguns under the Supreme Court's decision in *Garland v. Cargill*, 602 U.S. 406 (2024), and that ATF's treatment of these devices flowed from the 2018 rule that classified non-mechanical bump stocks as machineguns.

The court was mistaken in all respects. As noted, ATF's treatment of devices of this type as machineguns long predates the 2018 bump stock rule. The Supreme Court's application of the machinegun definition in *Cargill* reinforces, rather than undermines, that longstanding view. As the Court explained in *Cargill*, the hallmark of an ordinary semiautomatic rifle is that for each shot the shooter must "engage the trigger and then release the trigger to allow it to reset." 602 U.S. at 421. The entire point of the devices at issue here is to relieve the shooter of any need to "release and reengage" the trigger or "take[] pressure off" the trigger for each shot. *Id.* at 411, 420. Because a shooter may "fire multiple shots while engaging the trigger only once," *id.* at 420 n.4, these devices are machineguns.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.96. The district court granted plaintiffs' motion for summary judgment on July 23, 2024, ROA.3663-3726, and issued a final judgment on July 24, ROA.3727-29. The government filed a notice of appeal on August 1. ROA.3733-34; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). After the district court issued an order on August 20

extending the deadline for compliance with aspects of its judgment, ROA.4043-57, the government filed a second notice of appeal on September 4, ROA.4650-52. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the devices at issue here are machineguns under federal law because they convert a weapon to fire "automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. § 5845(b).

2. Whether the district court erred in granting overbroad and unworkable relief, including to unidentified members of organizations not known to defendants or the court.

## STATEMENT OF THE CASE

### A.     Statutory Background

**1.** The National Firearms Act of 1934, 26 U.S.C. ch. 53, was the first major federal statute to impose requirements on persons possessing or engaged in the business of selling certain firearms, including machineguns. As the House Report for the legislation explained, Congress concluded that "there is no reason why anyone except a law officer should have a machine gun" and that "[t]he gangster as a law violator must be deprived of his most dangerous weapon, the machine gun." H.R. Rep. No. 73-1780, at 1 (1934).

The Act, in its present form, defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more

than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The definition also encompasses parts that can be used to convert a weapon into a machinegun. A "machinegun" thus includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.*; *see* Gun Control Act of 1968, Pub. L. No. 90-618, sec. 201, § 5845(b), 82 Stat. 1213, 1231; H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.) (noting that the Gun Control Act expanded the definition of "machinegun," one of the "gangster-type weapons" covered by the National Firearms Act, to include parts).

In 1986, Congress generally barred the sale and possession of new machineguns, making it "unlawful for any person to transfer or possess a machinegun" unless a governmental entity is involved in the transfer or possession. 18 U.S.C. § 922(o).[1] In enacting the ban, Congress incorporated the definition of "machinegun" provided in the National Firearms Act, *id.* § 921(a)(24), and recognized that the ban would provide "benefits for law enforcement" in light of "the need for more effective protection of law enforcement officers from the proliferation of

---

[1] Congress excluded from the ban machineguns that were lawfully possessed prior to the effective date of the Firearms Owners' Protection Act (May 19, 1986). *See* 18 U.S.C. § 922(o)(2)(B).

machine guns." H.R. Rep. No. 99-495, at 2, 7 (1986); *see* Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986).

**2.** This case concerns two devices—the FRT-15 and WOT—which are part of a broader class of devices sometimes referred to as "forced reset triggers." The FRT-15 and WOT replace the standard trigger assembly on a semiautomatic rifle. The operation of these devices is described in greater detail below, but the salient point is that these devices allow a shooter to engage the trigger once and apply continuous pressure while the weapon fires repeatedly. Thus, the shooter has no need to "release and reengage" the trigger or "take[] pressure off" the trigger for each shot, as is required with a standard semiautomatic rifle trigger. *Garland v. Cargill*, 602 U.S. 406, 411, 420 (2024). Instead, after the shooter's initial engagement of the trigger, these devices use the travel of the weapon's "bolt carrier" to automatically cause the trigger to move forward slightly between shots while the shooter maintains pressure on the trigger. *See infra* pp. 19-21.

The FRT-15 and WOT are not the first devices ATF has encountered operating on the same basic mechanical principles. ATF first addressed a similar device in 1975 and concluded that it was a machinegun. *See* ROA.2706-10, ROA.2714. ATF reached the same conclusion with a device in 1994, and again with other devices in 2004, 2005, 2006, and 2017. *See* ROA.2742-44, ROA.2760-61, ROA.2784-85, ROA.2820-22, ROA.2888-96. Similarly, ATF classified the AR1—a

predecessor device to the FRT-15—as a machinegun in 2018.  ROA.2233-45.  ATF also reached the same conclusion in multiple examinations of devices seized in investigations with respect to both the FRT-15 and the WOT.  *See, e.g.*, ROA.2259-64, ROA.2327-33, ROA.2342-51.

As part of its effort to address manufacture and sale of FRT-15s and WOTs, the government brought suit in the Eastern District of New York under the Fraud Injunction Act, 18 U.S.C. § 1345, against Rare Breed Triggers, LLC—the manufacturer of the FRT-15—and related individuals and entities.  The court granted the United States a preliminary injunction, concluding that "the Government . . . is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun" and that Rare Breed likely deliberately misled its customers about whether these devices would be considered legal.  *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51, 75, 101 (E.D.N.Y. 2023).

Rare Breed and others distributed tens of thousands of these devices before the New York preliminary injunction issued.  ROA.2001-02.  ATF has consequently undertaken efforts to educate the public and to recover devices already distributed to the public.  ATF has pursued those efforts not by urging prosecution of individual possessors of these devices—some of whom, as noted, may have been deceived into purchasing them—but instead by encouraging the voluntary abandonment of the devices.  ROA.2003.  Given the significant number of devices believed to have been

distributed to the public, ATF has prioritized recovery of devices from individuals with criminal histories, from distributors, and from individuals who have purchased large quantities of forced reset triggers (which may be indicative of plans to distribute). ROA.2004. To date, the government has not brought any criminal prosecutions against individuals contacted through the retrieval process based solely on possession of an FRT-15 or WOT.

### B. Prior Proceedings

**1.** Plaintiffs are three individuals and two organizations. Among the individuals, Patrick Carey asserts that he turned over two FRT-15s to ATF after he was advised that ATF views them as machineguns under federal law, but states that he wishes to purchase such devices in the future. ROA.122-23. James Wheeler states that he personally owns an FRT-15 and that he is co-owner of a firearms business that owns two additional FRT-15s. ROA.126-27. Travis Speegle states that he owns 10 FRTs and intends to purchase more. ROA.128-29.

All three individuals are also members of two plaintiff organizations—the National Association for Gun Rights, Inc. (NAGR) and Texas Gun Rights (TGR). ROA.1281-83. Other members of those organizations also submitted declarations outlining their possession of these devices. ROA.1261-62; ROA.1266-67; ROA.1271-72; ROA.1277-78.

**2.**  Plaintiffs urged that ATF's classification of these devices as machineguns is inconsistent with the statutory definition of machinegun and sought declaratory and injunctive relief.  ROA.38.  Plaintiffs also sought a preliminary injunction.  The district court granted a temporary restraining order, ROA.796-822, and then a preliminary injunction, ROA.1295-1339.  The government appealed and sought a stay pending appeal from this Court, which was denied by a divided panel.  Unpublished Order, *National Ass'n for Gun Rights v. Garland*, No. 23-11138 (Nov. 30, 2023) (ROA.2138).  Shortly before oral argument in the preliminary injunction appeal was to be held in this Court, the district court granted summary judgment to plaintiffs, ROA.3663-3726, and entered final judgment, ROA.3727-29.  The government thus dismissed its appeal from the preliminary injunction as moot.  *See* Order, *National Ass'n for Gun Rights*, No. 23-11138 (5th Cir. July 26, 2024) (ROA.3730-31).

The district court at final judgment held that the FRT-15 and WOT are not machineguns because they do not enable a weapon to fire "more than one shot . . . by a single function of the trigger."  26 U.S.C. § 5845(b).  The district court read the Supreme Court's decision in *Cargill* to establish "that the definition is solely concerned with the mechanical operation of the trigger rather than the actions of the user," ROA.3700, and concluded that "the operative mechanical function of the trigger is to release the hammer," ROA.3704.  Thus, in the court's view, these devices are not machineguns because "[f]or each and every round fired, the trigger moves forward

into its reset state and is depressed to release the hammer from its sear surface."
ROA.3703-04.

The district court further held that all plaintiffs have standing and further held
that the organizations have standing to represent all of their asserted members,
whether or not those members had been identified to the court or had established
standing in their own right. ROA.3674-85. The court also held that it could enter an
injunction barring the initiation of criminal prosecutions. ROA.3685-90.

The district court vacated "Defendants' unlawful classification of FRTs as
machineguns"; granted declaratory relief related to ATF's "determination that FRTs
are 'machineguns'"; and entered a permanent injunction barring defendants from
taking actions "implementing or enforcing against the parties in this lawsuit . . . the
ATF's expanded definition of 'machinegun' to FRTs," including "[i]nitiating or
pursuing criminal prosecutions for possession of FRTs" and "[i]nitiating or pursuing
criminal prosecutions for representing to the public of potential buyers and sellers
that FRTs are not machineguns." ROA.3727-28. The court specified that its
injunctive relief extended to "the Individual Plaintiffs and their families, the
Organizational Plaintiffs and their members, and the downstream customers of any
commercial member of an Organizational Plaintiff to the extent that it does not
interfere with other courts," ROA.3728, although it excluded from the injunction

"any individual prohibited from possessing firearms under 18 U.S.C. § 922(g)," ROA.3722.

In addition, while the court expressly refused to "trench upon the authority" of the E.D.N.Y. court to adjudicate the *Rare Breed Triggers* litigation, ROA.3721, and expressly limited its injunction so as not to "interfere with . . . the E.D.N.Y. Lawsuit's civil jurisdiction over the Rare Breed parties," ROA.3725, ROA.3728, the court further specifically enjoined the defendants "from pursuing criminal proceedings or criminal enforcement actions against" the parties subject to the *Rare Breed* injunction, ROA.3728.[2]

The Court ordered defendants to return "all FRTs and FRT components confiscated or seized pursuant to their unlawful classification within thirty (30) days of this decision," and directed ATF to send "remedial notices correcting their prior mailing campaign that 'warned' suspected FRT owners that possession of FRTs and FRT components was purportedly illegal." ROA.3728.

The government appealed and sought a stay pending appeal from the district court. As relevant here, the government explained that compliance with the

---

[2] Despite the district court's declaration that its order does not trench on the on the authority of the district court in the *Rare Breed* litigation, the defendants in that case have asserted that the district court's relief here renders the E.D.N.Y. litigation moot and have asked the Second Circuit to order the case dismissed. *See* Motion, *United States v. Rare Breed Triggers, LLC*, No. 23-7276, Dkt. No. 64.2 (2d Cir. Sept. 25, 2024).

10

requirement to return devices to members of the plaintiff organizations was not feasible both because defendants do not know the identities of the members of the plaintiff organizations and because of the steps required to conduct returns.  The district court denied the stay motion, but recognizing that the "practical considerations" raised by the government were "well-taken," extended the time to comply with the return requirement and the notice-mailing requirement to February 22, 2025.  ROA.4056-57.  It further provided that in the meantime ATF would be required to return devices only to members of the plaintiff organizations who "who specifically request the return of their FRT devices and provide sufficient documentation to the ATF."  ROA.4057.

## SUMMARY OF ARGUMENT

The FRT-15 and WOT—the replacement trigger devices at issue here—are machineguns because they enable a weapon to fire "automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  As the Supreme Court explained in *Garland v. Cargill*, 602 U.S. 406 (2023), on a semiautomatic rifle with a standard trigger mechanism, "[f]or each shot, the shooter must engage the trigger and then release the trigger to allow it to reset."  *Id.* at 421.  On a machinegun, by contrast, a shooter may "fire multiple shots while engaging the trigger only once," *id.* at 420 n.4, with no need to "release pressure from the trigger," *id.* at 421.

11

The devices at issue here are precisely designed to operate with no need for the shooter to "release and reengage" the trigger or "take[] pressure off" the trigger for each shot. *Cargill*, 602 U.S. at 411, 420. Instead, a shooter simply engages the trigger once and continues to apply pressure—just as with an M16 or other machinegun— while the mechanics of the devices automatically push the trigger slightly forward for each shot. These devices are machineguns because a single engagement of the trigger begins an automatic cycle of fire.

While those points demonstrate that summary judgment should not have been granted to plaintiffs, if this Court disagrees, the district court's judgment should be narrowed in multiple respects. The district court granted relief—including a permanent injunction—that runs to "members" of two plaintiff organizations, as well as to the "downstream customers" of commercial members of those organizations. But neither the government nor the district court knows who those purported members or downstream customers are, and plaintiffs have refused to provide the government with a list of members.

That state of affairs is irreconcilable with basic principles of fair notice that apply to all injunctive relief, and is a product of the district court's disregard of bedrock Article III standing principles. The district court's relief runs to all purported members of these organizations—as well as certain family members of plaintiffs and downstream customers of commercial members of the organizations—despite the

absence of any showing that those unknown members and non-parties have standing. And the district court granted this relief to the organizations despite the absence of any evidence that they are actually membership organizations that can seek to represent their members in any event.

Other aspects of the district court's relief are equally inappropriate. The requirement to return devices to plaintiffs suffers from the same basic problem: that the government does not know to whom the obligation runs. The district court's order that the government send remedial notices to individuals who previously received communications stating the government's view that these devices are machineguns not only grants relief that applies solely to non-parties—relief that plaintiffs lack standing to seek—but also threatens to create confusion to the extent other courts disagree with the district court's view here (as one district court already has). And the district court's injunction against initiating criminal prosecutions cannot be squared with the "familiar rule that courts of equity do not ordinarily restrain criminal prosecutions." *Douglas v. City of Jeannette (Pa.)*, 319 U.S. 157, 163 (1943).

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. *Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 340 (5th Cir. 2017). The entry of a permanent injunction is reviewed for abuse of discretion, with findings of fact reviewed for clear error and

issues of law reviewed de novo. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (per curiam).

## ARGUMENT

### I. The Forced Reset Triggers at Issue Are Machineguns

At issue here are two replacement triggers for semiautomatic rifles—the FRT-15 and the WOT. As the district court correctly observed, there is no factual dispute about how these devices operate. ROA.3664 n.1. These devices replace the standard trigger on an AR-15-type rifle. When installed in such a rifle, these devices allow a shooter to engage the trigger, maintain continuous pressure on the trigger, and fire repeatedly without disengaging the trigger and with no other action by the shooter.

A weapon is a machinegun if it fires "automatically more than one shot, without manual reloading, by a single function of the trigger," and a device separately satisfies the definition if it is "designed and intended[] for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b). The district court did not question that a rifle with the devices at issue here installed operates "automatically." The sole question is thus whether these devices operate "by a single function of the trigger."

Over a nearly 50-year period, ATF has repeatedly and consistently concluded that devices that operate on similar mechanical principles are machineguns. ATF first addressed a similar device in 1975, concluding that it was a machinegun. ROA.2706-10, ROA.2714. ATF addressed similar devices in 1994, 2004, 2005, 2006, and 2017,

14

each time concluding that the devices at issue were machineguns.  ROA.2742-44, ROA.2760-61, ROA.2784-85, ROA.2820-22, ROA.2888-96; *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51, 68-69 (E.D.N.Y. 2023) (discussing 2006 classification).  And ATF reached the same conclusion in 2018 with a device known as the AR1—an immediate predecessor of the FRT-15.  ROA.2233-45.

The Supreme Court's recent decision in *Garland v. Cargill*, 602 U.S. 406 (2024), which addressed the "machinegun" definition in § 5845(b), confirms the correctness of ATF's longstanding treatment of devices like the ones at issue here as machineguns.  With these devices, a single engagement of the trigger automatically produces multiple shots, with no need for the shooter to "engage the trigger and then release the trigger to allow it to reset."  *Cargill*, 602 U.S. at 421.

### A.     The Supreme Court's *Cargill* Decision Confirms ATF's Longstanding View That Devices of This Type Are Machineguns

**1.**  In *Cargill*, the Supreme Court explained that "a 'trigger' is an apparatus, such as a 'movable catch or lever,' that 'sets some force or mechanism in action,'" and that the term "function" means "the mode of action by which [an object] fulfils its purpose."  602 U.S. at 416.  Thus, "[t]he phrase 'function of the trigger' … refers to the mode of action by which the trigger activates the firing mechanism."  *Id.*  This

analysis examines the entire "trigger assembly" and its relationship to the "mechanics of the firing cycle." *Id.*

The Supreme Court explained that on an unmodified semiautomatic rifle with a standard trigger assembly, "[f]or each shot, the shooter must engage the trigger and then release the trigger to allow it to reset" before the rifle will fire a subsequent shot. *Cargill*, 602 U.S. at 421; *accord id.* at 410. The shooter's engagement of the trigger begins a mechanical process that fires a single shot. The trigger releases the hammer, which strikes the firing pin. The explosive force of the resulting shot forces the weapon's "bolt carrier" backwards, and the rearward travel of the bolt carrier forces the hammer down until the hammer is retained by the disconnector. The disconnector "will hold the hammer in that position for as long as the shooter holds the trigger back, thus preventing the firearm from firing another shot." *Id.* at 420. "[W]hen the shooter takes pressure off the trigger and allows it to move forward … the hammer slips off the disconnector," positioning the gun to be fired again. *Id.* This "complete process … constitutes 'a single function of the trigger'" on such a weapon and "[a]ny additional shot fired after one cycle is the result of a separate and distinct 'function of the trigger.'" *Id.* at 421.

In *Cargill*, the Supreme Court applied the statutory definition to "non-mechanical bump stocks." Those devices do not alter—much less entirely replace—the trigger mechanism on a standard AR15-type semi-automatic rifle, and likewise do

not change the process required for the firing of a shot. *Cargill*, 602 U.S. at 421. They instead replace the stock—the "back part of the rifle that rests against the shooter's shoulder," *id.* at 411—on an ordinary semiautomatic rifle and allow the gun to slide back and forth in the device between shots. The movement results from the combination of the recoil of each shot and the shooter's forward pressure on the barrel of the weapon. While the shooter's finger remains stationary on the device's "ledge," the recoil of each shot causes the trigger to separate from the shooter's finger as the gun travels backwards; the shooter's forward pressure then slides the gun forward again so that the trigger strikes the shooter's finger. *Id.* at 412. Such devices are not machineguns because "[w]ith or without a bump stock, a shooter must release and reset the trigger between every shot." *Id.* at 415; *accord id.* at 421 ("[T]he shooter must release pressure from the trigger and allow it to reset before reengaging the trigger for another shot."). Those devices only "accelerate the rate of fire by causing these distinct 'function[s]' of the trigger to occur in rapid succession." *Id.* at 415.

The Court contrasted non-mechanical bump stocks with machineguns with "auto sears." An auto sear—a common component of many machineguns, such as M16-type machineguns—allows a shooter to "fire multiple shots while engaging the trigger only once," because the auto sear "catches the hammer as it swings backwards, but will release [the hammer] again once a new cartridge is loaded if the trigger is being held back." *Cargill*, 602 U.S. at 420 n.4. More specifically, with an auto sear, the

recoil of the first shot drives the bolt carrier backwards, and the bolt carrier depresses the hammer, which is retained on the auto sear until a new cartridge is safely loaded. *E.g.*, ROA.1137-40. By delaying release of the hammer while the weapon reloads, the auto sear "effectively tim[es] the hammer to fall" once the weapon has reloaded, ROA.1140, avoiding malfunctions that would result if the hammer released too early, *e.g.*, ROA.1106. As the bolt carrier returns forward when the weapon is safely loaded, the auto sear is contacted by the "'trip' surface" of the bolt carrier, automatically releasing the hammer from the auto sear and firing another shot. ROA.1141. Machineguns with auto sears require a bolt carrier engineered to include this trip surface, which serves no purpose on a weapon with a standard semiautomatic trigger assembly. ROA.1038, 1099.

**2.** *Cargill* underscores the correctness of ATF's longstanding treatment of devices like the ones at issue here as machineguns. As the Court explained, the dispositive consideration is "how many shots discharge when the shooter engages the trigger." *Cargill*, 602 U.S. at 422. This understanding—and the Court's explication of the terms "trigger" and "function"—mirrors the longstanding view of this Court and others that a trigger fundamentally serves "to initiate the firing sequence" of a weapon. *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam).

Unlike non-mechanical bump stocks, the FRT-15 and WOT entirely replace a firearm's trigger assembly. Most significantly, unlike a rifle equipped with a non-

mechanical bump stock, these devices have no disconnector—the component of a standard semiautomatic rifle trigger that "hold[s] the hammer" and prevents the firing of further shots until "the shooter takes pressure off the trigger and allows it to move forward." *Cargill*, 602 U.S. at 420. As a result, these devices do not require the shooter to "release and reengage" the trigger or "take[] pressure off" the trigger for each shot. *Id.* at 411, 420. Instead, as plaintiffs' expert explained, the weapon will continue to fire "even if the shooter does not lessen his rearward pressure on the trigger." ROA.4099-4100. ATF testing confirmed the same by applying first a plastic zip tie and then a metal cable tie to the trigger to apply continuous pressure and observing that the weapon fired repeatedly, with no need to disengage between shots. *E.g.*, ROA.954, ROA.3064-65.

With these devices, the shooter's initial engagement of the trigger causes a shot to be fired and the weapon's bolt carrier to travel backwards. As on an unmodified semiautomatic rifle, the rearward travel of the bolt carrier presses the hammer down. But rather than having the hammer be retained by the disconnector, the hammer is forced directly onto the trigger sear surface. ROA.1105-06. The pressure from the hammer pushes down on the trigger to force the trigger forward, where the trigger is held in place by the locking bar. ROA.1105-06. The locking bar restrains the movement of the trigger, thereby briefly holding the hammer in place while the bolt carrier is still traveling. This brief delay is critical to the operation of the weapon:

releasing the hammer too early could result in a malfunction. ROA.1105-06. As the bolt carrier returns forward, it strikes the locking bar, thus automatically releasing the trigger (and the hammer) and firing another shot. ROA.1107-08. That firing cycle will continue as long as the shooter's engagement of the trigger continues. In this respect, these weapons are indistinguishable from military M16-type rifles or similar weapons all agree are machineguns, which likewise allow a shooter to engage the trigger once and fire repeatedly without disengaging the trigger. *Cargill*, 602 U.S. at 420 n.4.

The devices at issue here are thus practically and legally indistinguishable from a machinegun equipped with an auto sear. Recall that an auto sear fulfills two purposes that enable automatic fire: it retains the hammer and also times the hammer's subsequent release for when a new cartridge is loaded and ready to fire by interacting with the trip surface of the bolt carrier. The locking bar on these devices serves the same two purposes by timing the release of the hammer until the locking bar interacts with the trip surface of the bolt carrier "in the same manner that [the trip surface] interacts with an automatic sear." ROA.1099. Indeed, for these devices to work on an AR15-type rifle, the shooter must use a weapon equipped with the bolt carrier for an M16-type machinegun that includes this trip surface. *E.g.*, ROA.1038, 1099, 1110, 1136. The difference between the locking bar and the auto sear is that the auto sear directly physically retains the hammer (on the auto sear's "shelf,"

20

ROA.1140), while the locking bar retains the hammer indirectly by momentarily restraining the trigger while the hammer rests on the trigger sear surface. But that difference does not change the status of the devices: with both types of firing mechanism, the hammer is automatically and repeatedly released by a single engagement—"single function"—of the trigger.

That conclusion is further reinforced by *Cargill*'s discussion of the statutory definition as a whole. As the Court observed, "Congress defined a machinegun by what happens 'automatically' 'by a single function of the trigger,'" and "[s]imply pressing and holding the trigger down on a fully automatic rifle … is what causes the trigger to function in the first place." *Cargill*, 602 U.S. at 425; *accord Cargill v. Garland*, 57 F.4th 447, 463 (5th Cir. 2023) (en banc) (plurality opinion) ("[T]he act of pulling and holding the trigger is one function, and that function produces more than one shot."). The same is true here: as the *Rare Breed Triggers* court observed, "the repetitive mechanism in the FRT-15 is entirely self-executing until the shooter releases the trigger, notwithstanding the fact that the trigger mechanically pushes against the shooter's finger throughout the process." 690 F. Supp. 3d at 84.

In sum, these devices are machineguns because the shooter engages the trigger just once to initiate the firing sequence, and that single engagement begins an automatic cycle of fire that is the product of "a single function of the trigger."

21

## B. The District Court Misread *Cargill*

**1.** The district court read *Cargill* as establishing that the statutory "definition is solely concerned with the mechanical operation of the trigger rather than the actions of the user," ROA.3700, and concluded that "the operative mechanical function of the trigger is to release the hammer," ROA.3704. Thus, in the court's view, these devices are not machineguns because "[f]or each and every round fired, the trigger moves forward into its reset state and is depressed to release the hammer from its sear surface," which the district court regarded as multiple separate "functions" of the trigger. ROA.3703-04.

*Cargill* did not embrace the rule the district court adopted. The Court instead repeatedly emphasized that with a semiautomatic weapon a shooter "must release and reengage the trigger to fire another shot," while with a machinegun "a shooter can fire multiple times, or even continuously, by engaging the trigger only once." 602 U.S. at 410-11; *id.* at 411-12, 415, 421. The district court did not address this language, or the Court's explanation that the "complete process" of "a 'single function of the trigger'" includes not only the initial engagement of the trigger but also the subsequent disengagement of the trigger by "tak[ing] pressure off" the trigger. *Id.* at 420-21. Nor did the district court consider the role of the disconnector in a standard semiautomatic rifle, much less the mechanical and legal consequences that follow from the absence of that component in these devices. *Id.*

*Cargill* thus does not suggest that a device is not a machinegun because the trigger moves automatically for each shot. And it does not call into question decisions holding that such devices are machineguns. In *United States v. Carter*, for example, the Sixth Circuit considered a firearm that lacked a standard trigger and would fire repeatedly if a shooter manually pulled back and released the bolt. Once the bolt was released it "would go forward [stripping] a cartridge off out of the magazine into the chamber and it would fire" and the bolt would then "retract" and go forward to fire again with no further engagement by the shooter. 465 F.3d 658, 665 (6th Cir. 2006) (per curiam). The bolt is the "trigger" on such a weapon because it initiates firing, but the repeated automatic movements of that trigger—even though necessary to fire the weapon and "reset" the trigger between shots—do not change its status as a machinegun. *Cargill* likewise declined to address any other device, including mechanical bump stocks such as the Akins Accelerator, in which a spring repeatedly and automatically forced the trigger against the shooter's stationary finger for each shot fired. *Cargill*, 602 U.S. at 411 n.1.

Under the district court's reasoning, in contrast, an individual could modify a machinegun so that its trigger slightly moved in conjunction with each shot fired and thereby take it outside the scope of the statute. Imagine a variant on the devices here, for example, where the shooter engaged the trigger and then removed their finger while the weapon used the travel of the bolt carrier to cause the trigger to move and

release the hammer each time a shot was fired. On the district court's view, such a weapon would not be a machinegun, even though only a single engagement of the trigger is necessary for the weapon to fire repeatedly and the weapon operates entirely autonomously after that single engagement. There is no basis for concluding that Congress intended that arbitrary result. Instead, the weapon would still be a machinegun because it fires repeatedly after the trigger is engaged once, even though the trigger moves for each shot fired.

The same reasoning applies here. As noted, there is no point at which the trigger is disengaged (or "released") to be re-engaged for another shot. Instead, after the initial engagement of the trigger, the weapon fires repeatedly as a result of the automatic operation of the device. The subsequent movements of the trigger are not the result of separate and distinct "engagements" or "functions," but are rather the result of an automatic mechanical process after the shooter engages the trigger once.

**2.** The district court's failure to recognize key distinctions between the devices at issue here and the bump stocks at issue in *Cargill* is underscored by its mistaken belief that ATF's understanding of these devices was the outcome of the same rulemaking that concluded that non-mechanical bump stocks were machineguns and led to the Supreme Court's decision in *Cargill*. *See, e.g.*, ROA.3664, ROA.3666-68, ROA.3707-08, ROA.3712-13. The district court stated, for example, that it was three years after ATF "broadened its interpretation of the statutory definition" in the 2018

24

bump-stock rulemaking that ATF "appl[ied] the revised definition of 'machinegun' to FRTs." ROA.3667.

That was manifestly incorrect, and the bump stock rule has no bearing on whether the statute applies to the devices at issue here. The bump stock rule was promulgated in December 2018 and marked the first time that ATF concluded that non-mechanical bump stocks were machineguns. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018).

In contrast, ATF has regarded devices of the kind at issue here as machineguns since first encountering one in 1975, and reached the same conclusion in 1994, 2004, 2005, 2006, and 2017. Indeed, in August 2018—four months before the bump stock rule was promulgated—ATF concluded that the AR1, the almost identical predecessor device to the FRT-15, was a machinegun. ROA.2233-45. That history was crucial to the district court's conclusion in *Rare Breed Triggers* that the manufacturer of the FRT-15 likely misled their customers about whether these devices would be regarded as machineguns under the statute. *See* 690 F. Supp. 3d at 91-101. And ATF's expert gave uncontradicted testimony in district court in this case that devices of this type have been classified as machineguns since 1975, ROA.4111, and that his own conclusion that the FRT-15 was a machinegun did not depend on the 2018 bump stock rule, ROA.4150-51.

The district court never addressed past ATF determinations regarding devices of the kind at issue, the *Rare Breed Triggers* court's conclusions, or the uncontradicted testimony of ATF's expert. Nor have plaintiffs ever disputed that the devices addressed by ATF in the past are materially similar to the devices at issue here. Plaintiffs and the district court fundamentally erred in their application of the Supreme Court's decision addressing a significantly different device that is the subject of a very different regulatory history.

## II. The Relief the District Court Ordered Was Inappropriate

For the reasons discussed, the district court's judgment should be reversed in full because the devices at issue here are machineguns under the statute. Were this Court to reach a different conclusion, however, the district court's judgment should be narrowed in significant respects because it exceeds the court's Article III powers and disregards basic principles of equity.

### A. The District Court Erred in Extending Relief to Unidentified Individuals and Entities

**1.** The district court enjoined the government from taking a host of actions—including bringing criminal prosecutions, initiating civil enforcement actions, or "[o]therwise interfering in the possession, sale, manufacture, transfer, or exchange" of these devices—"against the parties." ROA.3727-28. The district court was explicit that this injunction extends to all members of NAGR and TGR who are not barred from possessing firearms under 18 U.S.C. § 922(g), the "downstream customers" of

26

any "commercial member" of these organizations, and the "families" of the individual plaintiffs. ROA.3728.

The district court also imposed two affirmative requirements on the government. It required the government to "return to all parties . . . all FRTs and FRT components confiscated or seized." ROA.3728. And it required the government to "mail remedial notices correcting their prior mailing campaign that 'warned' suspected FRT owners that possession of FRTs and FRT components was purportedly illegal." ROA.3729. The district court has required compliance with these obligations by February 22, 2025. ROA.4057.

These prohibitions and affirmative obligations apply to unidentified persons who are not parties to this suit. NAGR and TGR purport to litigate on behalf of all their members—who, by their account, number in the tens of thousands and include individuals and businesses. ROA.25-26. Although plaintiffs insist that the government's obligations under the injunction extend to all these individuals and businesses, they identified to the district court only a few members of these two organizations through declarations, *e.g.*, ROA.1261-62, ROA.1266-67, ROA.1271-72, ROA.1277-78, and the government is independently aware of only a few dozen more, ROA.3660-61. Plaintiffs have declined to provide the government with a list of their members, and the government thus has no way of knowing the organization members to whom the injunction actually applies or of identifying in advance who was a

27

member at the time this suit was brought (as required for standing). *E.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992).

The problem is compounded because the injunction extends well beyond the organizations' purported membership to the "families" of the individual plaintiffs and the "downstream customers" of the (unidentified) "commercial members" of the organizations. ROA.3728. The practical result is that the government is subject to a permanent injunction that applies to a host of individuals and entities unknown to the government or the court, making compliance a practical impossibility.

The injunction thus departs from the bedrock principle that injunctive relief must be specifically described "to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam); *see* Fed. R. Civ. P. 65(d)(1)(C) (requiring that every injunction "describe in reasonable detail . . . the act or acts restrained or required"). To comply with an injunction, the enjoined party must be aware of to whom the injunction applies. *See NLRB v. Teamsters, Chauffers, Helpers & Taxicab Drivers, Local Union 327*, 419 F.2d 1282, 1283-84 (6th Cir. 1970) (per curiam) (injunction improper where it "provides no means of defining the people for whom protection is sought").

The unworkable scope of the injunction follows from the district court's failure to apply bedrock principles regarding associational standing. Organizations may "assert the claims of [their] members." *Hunt v. Washington State Apple Advert. Comm'n*,

28

432 U.S. 333, 342 (1977). Thus, to establish standing, organizations must identify an injured member or members whose claims they press. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Neither NAGR nor TGR has ever asserted that all of its members have standing to bring this suit.[3] Members who have no intention of ever possessing, manufacturing, or transferring the devices at issue here would plainly lack standing. *See Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) (explaining that a "serious intention to engage in conduct proscribed by law" is necessary to establish standing). Such members thus have no claim the organizations could possibly assert on their behalf. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").

Moreover, NAGR and TGR have not shown that they are actually membership organizations that can represent their members in the first place. They have failed to identify "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor have they demonstrated that their members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (quotation marks omitted); *see Hunt*, 432 U.S. at 344-45. Ensuring that members actually "guide [the]

---

[3] In fact, they have made clear that not all members would have standing: NAGR, which claims to have "over 3,000 members in the Northern District of Texas," ROA.25, reported that a "poll" of "a subset of its members" in that district identified just 55 members who "self-reported that they currently own or wish to own a forced reset trigger," ROA.3461.

activities" of an organization that asserts claims on their behalf, *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022), not only ensures a proper party for Article III purposes, but also provides important protections for members when an organization purports to press their claims.

None of the declarations submitted by members of the organizational plaintiffs describe their relationship to the organization "beyond a bare assertion of membership." *Viasat*, 47 F.4th at 782; *see* ROA.1261, ROA.1266, ROA.1271, ROA.1277, ROA.1281-83. Any individual may apparently "join" these organizations by making donations through their websites, and neither organization lists voting rights or other powers of control as benefits of membership, instead emphasizing that members receive newsletters or perks such as hats or bags. Nat'l Ass'n for Gun Rights, *Join National Association for Gun Rights*, https://perma.cc/FR8S-3XF5; Tex. Gun Rights, *Join TXGR Today!*, https://perma.cc/3HFS-A7ZK.

Nor have these organizations demonstrated that "members" have any control over the organizations. For example, neither organization submitted its bylaws, instead offering declarations describing those bylaws as providing for "two classes of members, voting members and supporting members." ROA.3462, ROA.3463. "Supporting members" are individuals who "either make a financial contribution above" some unspecified "level" to the groups or have some unidentified "relationships with the organization" or with unidentified "affiliated groups."

ROA.3462, ROA.3463.  And those "supporting members" are apparently permitted to vote on referenda proposed by each organization's board, but the declarations nowhere suggest that such referenda have occurred or that the organizations are in any way bound by the result of those referenda, much less that the "supporting members" in any way elect the leadership of the organizations.  ROA.3462, ROA.3464.  Simply labeling individuals who make a financial contribution and receive a newsletter as "members" in the absence of any meaningful control over the organization cannot suffice; were it otherwise, any entity could claim standing by relabeling, for example, magazine subscribers as "members."  *See Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002).

**2.**  The district court acknowledged the "administrability difficulties" created by the injunction's application to numerous unknown individuals and entities, noting that plaintiffs had complained to the court about ATF's contact with some possessors. ROA.3720.  The court then noted that "Defendants respond that they cannot possibly know who is covered by the preliminary injunction '*before* ATF is aware of the person's membership status' and that 'they have no means of knowing, prior to receiving a notice from Plaintiff, that they have contacted an individual or entity covered by the Preliminary Injunction.'"  ROA.3720.  The court then declared that "[v]acatur of the ATF's unlawful action classification of FRTs as machineguns should prevent any such harms."  ROA.3720.

It is unclear how vacatur would address plaintiffs' purported concern regarding contact with their members. But, in any event, there is nothing to vacate. No rule sets forth ATF's understanding of the statute as applied to these devices. Instead, the record here contains seven separate internal ATF investigation reports or other documents concluding that the FRT-15 or WOT are machineguns. *See* ROA.2259, ROA.2327, ROA.2342, ROA.2387, ROA.3047, ROA.3271, ROA.3294. And as noted, ATF reached similar conclusions with respect to other devices that operate on similar mechanical principles in the decades before this suit.

A statement that a particular device is a machinegun reflects ATF's understanding of the statute, and to the extent the government has engaged in enforcement actions regarding these devices, it has been on the basis that such devices are machineguns under the statute. *See, e.g.*, *Rare Breed Triggers*, 690 F. Supp. 3d at 75 (holding that "the Government has demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies the *statutory definition* of a machinegun" (emphasis added)); Superseding Indictment, *United States v. Berrios-Aquino*, No. 22-cr-00473 (D.P.R. Apr. 20, 2023) (charging defendant with violation of 18 U.S.C. §§ 922(o) and 924(a)(2) for possession of an FRT-15). That is why the district court believed it necessary to separately enter other relief beyond the vacatur. ROA.3716, ROA.3718, ROA.3720. Vacatur of the "classification" thus has no bearing on whether the government may continue to enforce the statute as to non-parties and cannot solve

the fundamental problem that the government is not aware of to whom the injunction applies.

Indeed, in bringing this suit, plaintiffs asserted that ATF had engaged in enforcement actions based on ATF's understanding of the statute and seeking pre-enforcement review of that understanding, requesting a declaratory judgment and an injunction. ROA.32-35, ROA.38; *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007). Plaintiffs themselves did not describe ATF's statements about how the agency interprets the statute as reflecting final agency action and in fact recognized that examination reports and other documents state only "the opinion of the ATF" about whether these devices are machineguns under the statute. ROA.34.

The requirement to mail "remedial notices" extends not only to unknown organization members but also to non-members who are strangers to this litigation. Such relief is patently overbroad: the district court did not explain how such relief remedied any injury to the plaintiffs or was necessary to give the parties complete relief. *See Gill*, 585 U.S. at 73; *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). On the contrary, such relief threatens to mislead recipients who are not parties to this litigation. Notwithstanding the view of the district court here, the district court in *Rare Breed Triggers*, 690 F. Supp. 3d at 75, concluded to the contrary, and if the Second Circuit ultimately agrees with that court, it will be governing law in that circuit. As noted, plaintiffs, presumably anticipating just such a conflict, have

already sought to vacate the *Rare Breed* preliminary injunction on the basis of the

decision here, and have done so notwithstanding the district court's express disclaimer

of any intent to interfere with the E.D.N.Y. case. The issue also may be actively

litigated in other jurisdictions considering criminal prosecutions or forfeiture actions

involving non-parties. *See, e.g.*, Superseding Indictment, *Berrios-Aquino*, No. 22-cr-

00473 (Apr. 20, 2023). Sending a remedial notice to nonparties who are not protected

by the district court's injunction, and who reside in jurisdictions that may ultimately

disagree with the district court's determination (or a holding from this Court, if it

affirms), could leave those individuals with the misimpression that possessing, selling,

or manufacturing FRT-15s and WOTs is without legal risk. Such notices would

require follow-up communications if, for example, the Supreme Court or another

circuit holds that FRT-15s and WOTs are machineguns, generating further confusion.

That confusion is entirely unnecessary given that the mailing campaign provides no

actual relief to the plaintiffs here.

**B.      The Injunction is Overbroad Insofar as it Enjoins Criminal Prosecutions**

The injunction also impermissibly restrains criminal prosecutions. "It is a

familiar rule that courts of equity do not ordinarily restrain criminal prosecutions."

*Douglas v. City of Jeannette (Pa.)*, 319 U.S. 157, 163 (1943). This Court, too, has

recognized that "as an incident of the constitutional separation of powers, . . . courts

are not to interfere with the free exercise of the discretionary powers of the attorneys

of the United States in their control over criminal prosecutions." *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) (en banc). That limitation reflects the respective constitutional roles of the Judiciary and the Executive Branch, as "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). And it reflects the rule that "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution" is not an injury "considered 'irreparable' in the special legal sense of that term." *Younger v. Harris*, 401 U.S. 37, 46 (1971).

Courts have thus consistently declined to enjoin federal criminal prosecutions. *See, e.g.*, *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 183 (3d Cir.), as amended (May 16, 2006) (reversing injunction against indictment predicated on prior immunity agreement); *Deaver v. Seymour*, 822 F.2d 66, 68-71 (D.C. Cir. 1987) (holding that a putative defendant who asserted that appointment of the Independent Counsel was unconstitutional could not obtain pre-indictment injunctive relief). Indeed, to the extent courts have enjoined criminal proceedings at all, it has only been where a party has asserted *constitutional* claims where the exercise of certain constitutional rights would be chilled, most commonly in the First Amendment context. *See Stolt-Nielsen*, 442 F.3d at 183; *Deaver*, 822 F.2d at 69. Plaintiffs here, however, do not bring a constitutional challenge, and cannot assert any chill to constitutional rights that could possibly qualify for such an exception.

The district court acknowledged that this case did not present a constitutional issue, but suggested that it involves an issue of "comparable gravity" because a "liberty interest" was at stake. ROA.3687. But a "liberty interest" is at stake in every criminal prosecution. And the district court cited no case in which a court of appeals or the Supreme Court has endorsed an injunction remotely like the one it issued here. It cited (ROA.3685-86) several cases in which plaintiffs sought only declaratory—not injunctive—relief, and even then in the context of constitutional claims. *See Steffel v. Thompson*, 415 U.S. 452, 458-59 (1974) (addressing whether declaratory judgment would be appropriate in case with no remaining claim for injunctive relief); *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (discussing pre-enforcement review "under the Declaratory Judgment Act"). Other cited cases (ROA.3685-86) addressed standing, not the appropriate remedy, and in any event involved First Amendment claims against state statutes. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (discussing requirements for demonstrating an Article III injury in context of First Amendment claim); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298-304 (1979) (same). None of these cases involved issuance of an injunction against prospective federal criminal prosecutions based on the assertion that such prosecutions would be based on a mistaken understanding of the relevant statute.

The district court believed that the Administrative Procedure Act (APA) empowered it to enjoin criminal prosecutions. ROA.3688-89. That was plainly mistaken. The APA's grant of authority to review agency action expressly does not "affect[] other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702. As just discussed, the rule against enjoining criminal prosecutions is one such well-established "equitable ground" for denying relief, predating the APA itself. It is thus unsurprising that the district court could not identify a single case in the nearly 80 years since the enactment of the APA that enjoins a federal criminal prosecution in circumstances comparable to those here.

The other provisions of the APA on which the district court relied (ROA.3688-89) likewise do not displace this background rule. 5 U.S.C. § 703 provides that "agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement," underscoring that review of agency action may be had in a criminal proceeding after an indictment is brought. And 5 U.S.C. § 705 provides that "to the extent necessary to prevent irreparable injury" a court may "issue all necessary and appropriate process . . . to preserve status or rights." Again, whether an injunction is "necessary and appropriate" is answered by reference to the longstanding equitable rule that courts do not enjoin criminal prosecutions, *see id.* § 702, and the possibility of a criminal prosecution is not an irreparable injury in any event, *Younger*, 401 U.S. at 46.

Those provisions simply underscore that injunctive relief is not available to prevent a prosecution, insofar as they demonstrate the lack of irreparable injury from a criminal prosecution and the availability of an adequate remedy at law in the event a prosecution occurs. *See Stolt-Nielsen*, 442 F.3d at 187; *Deaver*, 822 F.2d at 69.

Finally, the district court's singling out of parties to the *Rare Breed Triggers* litigation for limited injunctive relief against prospective criminal prosecutions, ROA.3728, is particularly improper. Although standing must be shown "with the manner and degree of evidence required" at summary judgment, *Lujan*, 504 U.S. at 561, and is "determined as of the commencement of suit," *id.* at 570 n.5, plaintiffs did not identify the *Rare Breed* parties as members in their complaint and offered no evidence at summary judgment that those parties were members of NAGR or TGR at the time the suit was filed, instead providing evidence only that they were members at the time summary judgment was sought, ROA.1990. Relief running to those parties would thus be inappropriate in any event.

* * * * *

In sum, this Court should vacate the preliminary injunction in its entirety. If it determines not to do so, it should direct that the injunction be limited to organization

members who identify themselves to ATF and should vacate the remedial notice requirement and the injunction as it applies to criminal prosecutions.

At a minimum, the Court should address the February 2025 deadline for returning weapons to organization members. The district court acknowledged the significant difficulties posed by the return requirement in extending the deadline for compliance and requiring members seeking return of devices to identify themselves and provide "sufficient documentation." ROA.4057. This Court should make clear that even after the expiration of the district court's deadline, the return requirement cannot apply as to members of the plaintiff organizations that have not identified themselves to ATF and provided both adequate documentation of their membership at the time the suit was brought and adequate information to permit ATF to run a background check to determine if the individual is prohibited from possessing a firearm under 18 U.S.C. § 922(g).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

October 2024

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,330 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**ADDENDUM**

# TABLE OF CONTENTS

26 U.S.C. § 5845(b) ............................................................................................................A1

**26 U.S.C. § 5845(b)**

**§ 5845. Definitions**

    **(b) Machinegun.**--The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.