# No. 24-10707

# United States Court of Appeals
## for the
# Fifth Circuit

---

NATIONAL ASSOCIATION FOR GUN RIGHTS, INCORPORATED; TEXAS
GUN RIGHTS, INCORPORATED; PATRICK CAREY; JAMES WHEELER;
TRAVIS SPEEGLE,

*Plaintiffs-Appellees*,

— v. —

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES
DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of Texas (Fort Worth)
No. 4:23-cv-830 (Hon. Reed O'Connor)

---

## BRIEF FOR *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY SUPPORT FUND, AND MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANTS-APPELLANTS

---

IAN SIMMONS
DAVID K. ROBERTS
DANIELLE N. SIEGEL
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300

*Attorneys for Amici Curiae*

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Defendants-Appellants

Merrick Garland, U.S. Attorney General

United States Department of Justice

Bureau of Alcohol, Tobacco, Firearms, and Explosives

Counsel for Defendants-Appellants

Brian M. Boynton

Leigha Simonton

Mark B. Stern

Brad Hinshelwood

Plaintiffs-Appellees

National Association for Gun Rights, Inc.

Texas Gun Rights, Inc.

Patrick Carey

James Wheeler

Travis Speegle

<u>Counsel for Plaintiffs-Appellees</u>

Gary Lawkowski

Whitney A. Davis

Glenn D. Bellamy

<u>*Amici Curiae* on this Brief</u>

Brady Center to Prevent Gun Violence

Giffords Law Center to Prevent Gun Violence

Everytown for Gun Safety Support Fund

March For Our Lives

<u>Counsel for *Amici Curiae*</u>

Ian Simmons

David K. Roberts

Danielle N. Siegel

<u>Counsel for *Amicus* Brady Center to Prevent Gun Violence</u>

Douglas N. Letter

Shira Lauren Feldman

<u>Counsel for *Amicus* Giffords Law Center to Prevent Gun Violence</u>

Esther Sanchez-Gomez

David Pucino

Counsel for *Amicus* Everytown for Gun Safety Support Fund

Eric Tirschwell

Aaron Esty

Everytown Law

Counsel for *Amicus* March For Our Lives

Ciara Wren Malone

*Amici* Brady Center to Prevent Gun Violence, Giffords Law Center to Prevent Gun Violence, Everytown for Gun Safety Support Fund, and March For Our Lives each state that they do not have a parent corporation and that no publicly held company owns 10% or more of their stock.

/s/ Ian Simmons
Ian Simmons

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ...............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................................2

ARGUMENT ...............................................................................6

    I.     The FRT-15 Converts a Semiautomatic Firearm Into a Machinegun by Removing the Disconnector, Modifying the Hammer, Adding a Novel Trigger Lobe and Locking Bar, and Requiring an M16's Bolt Carrier. .........................................6

    II.    *Cargill* Confirms That the FRT-15 Is a Machinegun Because, Unlike a Bump Stock, the FRT-15 Fires Multiple Rounds Automatically When a Shooter Engages the Trigger Once. ...............15

    III.   ATF's Classifications of the FRT-15 and Similar Devices as Machineguns Reflect the Serious Threat They Pose to Public Safety. .........................................................................24

CONCLUSION ...........................................................................30

CERTIFICATE OF SERVICE ...............................................................31

CERTIFICATE OF COMPLIANCE ............................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akins v. United States*,
  312 F. App'x 197 (11th Cir. 2009) ......................................................20

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) ........................................................ 21, 23

*Garland v. Cargill*,
  602 U.S. 406 (2024) ................................................................ passim

*United States v. Camp*,
  343 F.3d 743 (5th Cir. 2003) ...................................................... 22, 23

*United States v. Cash*,
  149 F.3d 706 (7th Cir. 1998) ..........................................................2

*United States v. Rare Breed Triggers, LLC*,
  690 F. Supp. 3d 51 (E.D.N.Y. 2023) ............................................. passim

**Statutes**

18 U.S.C. § 921(a)(24) ...................................................................16

26 U.S.C. § 5845(b) ........................................................... 2, 3, 7, 16

Pub. L. No. 73-474, 48 Stat. 1236 (1934) .............................................2

Pub. L. No. 99-308, 100 Stat. 449 (1986) ..............................................2

**Other Authorities**

Ballard Brown, Tanya, *Report Critiques Orlando Police Response to Pulse
Nightclub Shooting*, NPR (Dec. 18, 2017) ...........................................29

Bernstein, Jonathan & Gray, Mark, *Five Years Since the Route 91 Massacre No
One Knows a Damn Thing*, Rolling Stone (Sept. 21, 2022) ..........................27

Collins, Dave, *Are Forced-Reset Triggers Machine Guns?  ATF and Gun Rights
Advocates at Odds in Court Fights*, AP (Aug. 24, 2023) .............................28

Despart, Zach, *"He Has a Battle Rifle": Police Feared Uvalde Gunman's AR-15*,
Texas Tribune (Mar. 20, 2023) ..........................................................29

Goodman, J. David, *Aware of Injuries Inside, Uvalde Police Waited to Confront
Gunman*, N.Y. Times (June 9, 2022) ...................................................27

H.R. Rep. No. 73-1780 (1934) .........................................................28

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Hermann, Peter & Zausmer Weil, Julie, *School Was in Sniper's 'Crosshairs,' But Link Is Unclear, D.C. Chief Says*, Washington Post (Apr. 26, 2022)........................27

S. Rep. No. 73-1444 (1934) ....................................................................................26

# INTEREST OF *AMICI CURIAE*

Brady is the nation's longest-standing nonpartisan, nonprofit organization dedicated to counteracting gun violence through education, research, legal advocacy, and political action. Giffords Law Center is a law and policy organization serving lawmakers, advocates, gun-violence survivors, and others who seek to reduce gun violence and guard the safety of their communities. Everytown for Gun Safety Support Fund is the education, research, and litigation arm of Everytown for Gun Safety, the largest gun-violence prevention organization in the nation, with millions of supporters across the country. March For Our Lives is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun-violence prevention policies. *Amici* have filed dozens of *amicus* briefs in firearms-related cases, offering historical, doctrinal, technical, and policy research that might not be presented otherwise. *Amici* seek to improve community safety by supporting common-sense gun laws and policies. In furtherance of that goal, *Amici* have filed numerous briefs in cases involving ATF regulations of firearms and related devices, including devices ATF has classified as machineguns.[1]

---

[1] This brief is filed with the consent of all parties. No party or party's counsel authored this brief in whole or part; no party or party's counsel contributed money to fund this brief's preparation or submission; and no person—besides Brady, Giffords Law Center, Everytown for Gun Safety Support Fund, and March For Our Lives—contributed money to fund this brief's preparation or submission.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Nine decades ago, Congress passed the National Firearms Act ("NFA") to regulate machineguns and other firearms. Pub. L. No. 73-474, 48 Stat. 1236 (1934). The NFA initially required civilians to register new and existing machineguns, Pub. L. No. 73-474, §§ 5, 14, but Congress later imposed an all-out ban on civilian ownership of newly manufactured machineguns, Pub. L. No. 99-308, 100 Stat. 449 (1986). Sale and possession of new machineguns is also illegal. The NFA defined "machinegun" by its essential features: if a firearm can shoot "automatically … more than one shot … by a single function of the trigger," it is a machinegun. Pub. L. No. 73-474, § 1(b). But over time, manufacturers began to circumvent the statute— including by producing components that made semiautomatic weapons function as machineguns, such as the "drop-in" auto sear. That led Congress to broaden the NFA to prohibit devices that "convert[] a weapon into a machinegun." Pub. L. No. 99-308, § 109(a), *codified at* 26 U.S.C. § 5845(b). This makes sense: if a device turns a semiautomatic gun into a machinegun, that device is a machinegun. *See, e.g.*, *United States v. Cash*, 149 F.3d 706, 707–08 (7th Cir. 1998) (drop-in auto sear).

The devices at issue here—the FRT-15 and the Wide Open Trigger (WOT)— are "drop-in" trigger systems for AR-15-type rifles. ROA.1998.[2] They "are easily

---

[2] Because "[t]he WOT is a copy of the FRT-15," ROA.1998, and the devices "operate on the same mechanical principles," ROA.3667, we refer to the devices collectively as the FRT-15.

installed" with "no special skills or tools." *Id.* These devices make no externally "visible modification to the firearm." ROA.2007. But as shown in the diagrams and discussion below, these devices turn semiautomatic rifles into machineguns. That is their sole purpose. To achieve rapid, continuous fire with an AR-15 rifle outfitted with an FRT-15, "the shooter need only pull the FRT-15 trigger once and maintain rearward pressure …, requiring no additional input from the shooter"—the device does the rest. *Rare Breed Triggers*, 690 F. Supp. 3d at 65. The FRT-15 therefore enables the weapon to fire "automatically more than one shot … by a single function of the trigger." 26 U.S.C. § 5845(b). Indeed, the rate of fire of an FRT-15-equipped weapon can *exceed* that of a military M16 rifle (which all agree is a machinegun) in fully automatic mode. ROA.2007.

The FRT-15 converts a semiautomatic weapon into an automatic one (making the device a "machinegun" under federal law) because it differs entirely from the trigger assembly of a standard AR-15 in both design and function. Specifically:

- The FRT-15 lacks a disconnector, which is the part in a standard AR-15 trigger assembly that catches the hammer after a shot is fired and prevents the hammer from falling forward to fire a second shot until the shooter has released pressure from the trigger. The FRT-15 trigger

---

*See also United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51, 59 n.1 (E.D.N.Y. 2023) (parties agreed WOT "is identical to the FRT-15").

function therefore resembles that of the M16 in which the disconnector is "depressed" in automatic mode, so that it does not catch the hammer.

- The FRT-15 employs two reshaped parts: a hammer with a distinct shape that is designed to interact with the device's other parts, one of which is the device's unique enlarged upper trigger "lobe" (where the disconnector would be on a standard AR-15 trigger assembly). After a shooter pulls the trigger in an FRT-15-equipped rifle, the hammer contacts the lobe, which in turn pushes the trigger lever (the portion that a shooter pulls) forward into the shooter's finger while the shooter maintains the same pressure on the trigger.

- The FRT-15 adds a novel "locking bar" not found in the trigger assembly of a standard AR-15 or M16. This part momentarily holds the trigger in place after a shot is fired until a second round has been chambered, and thus "serves the same function" as an auto sear—the very part of an M16 that enables it to fire automatically. ROA.2391.

Notably, the FRT-15 also requires replacing an AR-15's original bolt carrier with one from an M16. As shown below, the M16 bolt carrier has an additional contact surface that trips the weapon's auto sear (in an M16) or the locking bar (in a weapon outfitted with an FRT-15), and "serves no purpose" in an otherwise standard AR-15—meaning the only reason to have an M16 bolt carrier is to facilitate

automatic fire. ROA.2434. Unsurprisingly, then, since ATF began encountering devices mechanically similar to the FRT-15 some 50 years ago, it has consistently classified them as machineguns.

The Supreme Court's recent decision in *Garland v. Cargill*, 602 U.S. 406 (2024), only strengthens this conclusion. The very reasons that *Cargill* gave for holding that non-mechanical bump stocks (which replace the standard stock at the rear of a rifle) are not machineguns make clear that the FRT-15 *is* a machinegun. Unlike a bump stock—where the external device is fitted to a weapon with a "standard trigger mechanism" and "[t]he firing cycle remains the same" when using the device, *id.* at 416, 421—the FRT-15 replaces the trigger assembly and alters the firing cycle to enable continuous fire with a single trigger pull.

Further, unlike a bump stock, where a shooter seeking to maintain repeated fire must manually apply constant forward pressure to the front grip of the weapon with the nontrigger hand, a shooter with an FRT-15-equipped rifle need only pull and hold the trigger. In short, as one court explained, the analysis that courts have employed in concluding that non-mechanical bump stocks are not machineguns is "[n]ot only … distinguishable for a number of reasons, but … in fact provides further grounds to find that the FRT-15 is a machinegun." *Rare Breed Triggers*, 690 F. Supp. 3d at 85.

The district court's ruling here is as dangerous as it is incorrect. If this Court allows it to stand, every American will be less safe. ATF's classifications are grounded in the agency's recognition that the FRT-15 poses an immense threat to public safety, even as the device reduces a weapon's accuracy and renders it *less* useful for valid civilian purposes. FRT-15s have already turned up in numerous violent crimes and in the hands of individuals barred from possessing firearms. What is more, several mass shooters have used or attempted to use various devices to achieve a rapid rate of fire. And law enforcement officers responding to mass shootings in which the shooters used even *unmodified* AR-15s have sometimes hesitated to engage the shooter because of their dangerous nature. By allowing would-be mass shooters, members of crime cartels, and others to obtain ready access to FRT-15s, the district court's decision portends more and more tragedies.

*Amici* agree with the reasoning in the Government's brief, and also urge the Court to reverse the district court's judgment.

## ARGUMENT

### I. The FRT-15 Converts a Semiautomatic Firearm Into a Machinegun by Removing the Disconnector, Modifying the Hammer, Adding a Novel Trigger Lobe and Locking Bar, and Requiring an M16's Bolt Carrier.

The sole purpose of the FRT-15 is to convert semiautomatic AR-15-type rifles into automatic weapons and thus, as a legal matter, "machineguns." The M16 achieves automatic fire via its auto sear. Conversely, a standard AR-15 rifle lacks

an auto sear.  After each shot, the weapon's disconnector catches its hammer, preventing the hammer from firing another shot until the shooter releases pressure from the trigger.  The design of the FRT-15 differs fundamentally from the standard AR-15 trigger assembly because it (1) lacks a disconnector, (2) has an enlarged "lobe" where the disconnector would normally be, (3) features a distinctly shaped hammer, (4) adds a locking bar, and (5) must be paired with the bolt carrier of an M16.  These design features permit a shooter to fire continuously merely by pulling the trigger and holding it.  The FRT-15 therefore is "designed and intended solely and exclusively" to "convert[] a weapon into a machinegun."  26 U.S.C. § 5845(b).

The distinctive design of the FRT-15 means that it operates differently than a standard AR-15 trigger assembly.[3]  In a standard AR-15, the shooter starts the firing cycle by pulling the trigger, which releases the hammer, which strikes the firing pin. ROA.2393, 2417.

---

[3] Detailed descriptions of the operation of an AR-15, M16, and FRT-15 (and comparisons between them) are found at *Rare Breed Triggers*, 690 F. Supp. 3d at 62–65.

**Figure 1 (ROA.2417).**



Once struck, the firing pin discharges the cartridge primer, which ignites the gunpowder to generate a high-pressure gas that discharges the bullet from the weapon. ROA.2393, 2418. As the bullet propels forward, some of the gas enters a tube, which pushes the bolt carrier rearward and unlocks the bolt assembly that begins to depress the hammer. ROA.2394, 2418–2419.

**Figure 2 (ROA.2418).**



As the bolt carrier continues rearward, it continues to depress the hammer and ejects the spent cartridge case from the chamber. ROA.2420.

**Figure 3 (ROA.2420).**



The disconnector then captures and "retain[s] the hammer in a cocked position for the remainder of the operating cycle." ROA.2421.

**Figure 4 (ROA.2421).**

AR15 Semiautomatic

✓ FIRING
✓ UNLOCKING
✓ EXTRACTING
✓ EJECTING
✓ COCKING

The action spring then pushes the bolt carrier forward as the lugs of the bolt feed a new cartridge from the magazine into the chamber. ROA.2421, 2425. The shooter can then fire another round by manually releasing and re-pulling the trigger to restart this cycle. ROA.2426.

**Figure 5 (ROA.2425).**



The FRT-15 functions differently, allowing a shooter to continue the AR-15's firing cycle without manually releasing and reengaging the trigger. In an FRT-15-equipped rifle, which requires an M16-type bolt carrier, ROA.2427, there is no disconnector, and as the bolt carrier moves rearward, it comes into contact with the device's uniquely shaped hammer, ROA.2421. This causes the hammer to contact the unique enlarged upper lobe of the trigger, which temporarily "pushes the trigger forward while the pressure of the original trigger pull is maintained." *Id.*

## Figure 6 (ROA.2421).



## Figure 7 (ROA.2427).



The bolt carrier then strikes the locking bar—mirroring how the bolt carrier of an M16 strikes an auto sear—and returns the trigger to its rearward position. ROA.2422, 2427, 2434. While the shooter continues to maintain pressure on the trigger, the firing cycle continues as the bolt carrier moves forward and feeds a new cartridge into the chamber. ROA.2422. "[T]he trigger rapidly pushes against the

shooter's finger over the course of automatic firing." *Rare Breed Triggers*, 690 F.

Supp. 3d at 88.

**Figure 8 (ROA.2422).**



**Figure 9 (ROA.2434).**



With the FRT-15 installed, operating in the manner described above, an AR-

15 can achieve a rate of fire that *exceeds* that of a fully automatic M16—all while

the "shooter maintains a single, constant pull of the trigger."  ROA.2402.

The creator and patentholders of the FRT-15 are aware of the device's properties. The device was invented by nonparty Jeffrey Rounds, who obtained a patent for the device in 2019. *Rare Breed Triggers*, 690 F. Supp. 3d at 65. He had previously patented another device called the AR-1. The FRT-15's internal firing mechanism "is functionally indistinguishable from the AR-1." *Id.* at 66. In 2017, Rounds sought ATF's formal opinion on whether the AR-1 constituted a machinegun; in 2018, the agency advised that the device was a machinegun because it employed "a trigger that is mechanically forced forward during a cycle of operation or firing sequence, which results in more than one round being fired." *Id.* at 65.

Rounds later sold the patent rights to the FRT-15 to a newly formed company, Rare Breed Triggers, the owners of which "made a 'group decision' that they would not submit the FRT-15 to the ATF for classification" before starting to sell the device in 2020. *Id.* at 67–68. They did so despite knowing that the FRT-15 and AR-1 had "functionally indistinguishable" trigger mechanisms and that the AR-1's trigger mechanism is what prompted ATF to classify it as a machinegun years earlier—all the while concealing information about the AR-1 from their customers and assuring them of the FRT-15's legality, thereby putting customers at risk of felony charges and ensuing disarmament. *Id.* at 58, 67, 91–94, 101, 120.

In July 2021, ATF issued a cease-and-desist letter to Rare Breed Triggers. In March 2022, ATF executed a search warrant on the company that manufactured and fulfilled orders for the devices, seizing FRT-15s and component parts. *Id.* at 72. But one pallet of the devices was not recovered. Upon discovering this, Rare Breed Triggers' president Lawrence DeMonico asked the manufacturer to send the devices; when it refused on the ground that ATF planned to take possession of the devices, DeMonico flew to Salt Lake City, loaded the pallet into a U-Haul, then switched vehicles, ultimately driving "hundreds of miles to New Mexico before the ATF intercepted him" and seized the devices. *Id.* at 72–73; *see also id.* at 116–18.

The federal government later sued the company and its officers in the U.S. District Court for the Eastern District of New York. In 2023—following "extensive briefing" and oral argument, as well as a two-day hearing that included "lay and expert testimony" and the introduction of exhibits "concerning the history, mechanics, and comparative functionality of the FRT-15"—the court recognized that there were no material factual disputes and entered a preliminary injunction against the defendants' sales of the FRT-15 and similar devices. *See id.* at 62, 88, 122–23. The court held that the government "has demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun." *Id.* at 75; *see also id.* at 88 ("this result is plainly consistent with" *Cargill* and other cases). The case is currently on appeal. *See* No. 23-7276 (2d Cir.).

The court made other disturbing findings about the defendants' conduct. Among them, it found that after they received ATF's cease-and-desist letter and had an earlier stock of devices seized by the agency, they began to ship devices using "fictitious return addresses" bearing "false company names with the same initials" when shipping via the U.S. Postal Service, which was "very likely" an effort "to avoid Government detection" and "hinder the Government from tracking their products' whereabouts." 690 F. Supp. 3d at 112–15. The court further found that defendants continued to use a "digital shredding policy" for orders—even after ATF obtained a court order to confiscate FRT-15s—in an effort "to thwart ATF's jurisdiction to seize" the devices. *Id.* at 115–16.

That court's finding that the FRT-15 is a machinegun aligns with decades of regulatory precedent. The FRT-15 and AR-1 were not the first devices to alter a semiautomatic rifle's trigger assembly using the mechanical principles described above. ATF first encountered comparable devices in the 1970s. Since then, it has consistently concluded—in the course of analyzing some 17 devices—that these devices are machineguns. ROA.1999–2000.

## II. *Cargill* Confirms That the FRT-15 Is a Machinegun Because, Unlike a Bump Stock, the FRT-15 Fires Multiple Rounds Automatically When a Shooter Engages the Trigger Once.

Under federal law, "[t]he term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one

shot … by a single function of the trigger."  26 U.S.C. § 5845(b); *see* 18 U.S.C.
§ 921(a)(24).[4]  Thus, the definition contains two elements: "single function of the
trigger" and "automatically."  The FRT-15 falls well within the definition of a
machinegun, because a weapon outfitted with this device will fire repeatedly and
automatically when a shooter engages the trigger once with a continuous pull of the
trigger.  The Supreme Court's recent decision in *Garland v. Cargill*, 602 U.S. 406
(2024), which addressed whether non-mechanical bump stocks were machineguns,
only reinforces this conclusion.

Start with the first definitional element: "single function of the trigger."  In
*Cargill*, the Court explained that "a 'trigger' is an apparatus, such as a 'movable
catch or lever,' that 'sets some force or mechanism in action,'" and that the term
"function" refers to "the mode of action by which [an object] fulfils its purpose."  *Id.*
at 415–16 (citations omitted).  It follows that "[t]he phrase 'function of the trigger'
... refers to the mode of action by which the trigger activates the firing mechanism."
*Id.* at 416.  This analysis examines the entire "trigger assembly" and its relationship
to the "mechanics of the firing cycle."  *Id.*  Whether a device satisfies this definition

---

[4] A "machinegun" "also include[s] … any part designed and intended solely and
exclusively, or combination of parts designed and intended, for use in converting a weapon into a
machinegun, and any combination of parts from which a machinegun can be assembled if such
parts are in the possession or under the control of a person."  26 U.S.C. § 5845(b).

thus "hinges on how many shots discharge when the shooter engages the trigger." *Id.* at 422.

In an AR-15 equipped with an FRT-15, a shooter may discharge multiple shots by engaging the trigger only once. It accomplishes this with a trigger assembly that differs from a standard AR-15's trigger assembly. It omits the disconnector, adds an enlarged upper lobe in place of the disconnector, alters the hammer's shape, and adds a unique locking bar. Further, the FRT-15 requires replacing an AR-15's original bolt carrier with the same one needed to enable automatic fire in the M16.

***Disconnector, trigger lobe, and hammer***. "[U]nlike a trigger in a standard semi-automatic weapon[,] the FRT-15 has no disconnector." *Rare Breed Triggers*, 690 F. Supp. 3d at 64. For this reason, it also uses a different hammer than a standard AR-15; the FRT-15's hammer contains one sear surface rather than a standard AR-15's two (one of which interacts with the disconnector in the unmodified weapon). ROA.2390; *see also* Figures 1, 4 & 6, *supra*. In a standard AR-15, after a shot is fired, the rearward-moving bolt carrier pushes down the hammer, which is caught by the disconnector. ROA.2397. This action prevents the hammer from falling forward and striking the firing pin again until the shooter has released pressure from the trigger. ROA.2397, 2399–2400.

Conversely, in a weapon outfitted with an FRT-15, once a shot is fired, the bolt carrier pushes down the hammer, which "also pushes down on the" enlarged

upper lobe of the "trigger, which forces it forward." ROA.2397, 2432. This "slightly forward" movement of the trigger occurs "as an automatic consequence of the FRT-15 design without any further action required by the shooter." *Id.* This achieves the same mechanical effect as an M16 fired in automatic mode, in which its disconnector is "depressed" so that it does not catch the hammer. *Rare Breed Triggers*, 690 F. Supp. 3d at 63.

***Locking bar***. The FRT-15 also employs a locking bar, which is absent from both a standard AR-15 and an M16. *Id.* at 64; *see also* Figures 1, 8 & 9, *supra*. After a shot is fired, the locking bar momentarily holds the trigger in place so that the trigger does not release the hammer, which strikes the firing pin, until a successive round has been chambered (which would cause a malfunction). 690 F. Supp. 3d at 64. Specifically, the locking bar holds the trigger until the bolt, returning forward after a shot, rotates the top of the locking bar forward, which allows the trigger to move again. By the time the trigger may move, another round has been chambered and, "as long as the shooter has simply maintained rearward pressure on the trigger, the trigger releases the hammer, [and] the hammer strikes the firing pin," causing successive shots to be fired. *Id.* Put simply, "the 'locking bar' serves the same function as an automatic sear in a typical machinegun—to capture a fire control component until the additional surface on an M16-type bolt carrier contacts it and

releases the fire control component to automatically fire a subsequent shot." ROA.2391.

***M16 bolt carrier***. An FRT-15 "require[s] that an M16-type machinegun bolt carrier be utilized to function as designed." ROA.2428; *see* ROA.2399 (explaining "necessity of an M16-type machinegun bolt carrier"). This bolt carrier differs from that used in a standard AR-15 in that it "incorporates a contact surface that is unnecessary on AR15-type semiautomatic firearms because this surface is designed to 'trip' the automatic sear in standard M16-type machineguns." ROA.2391; *see also* Figures 7, 8 & 9, *supra*. This "M16-type machinegun carrier trips both the 'locking bar' on the FRT-15 equipped firearm and the automatic sear on the M16-type machinegun to effect automatic fire," ROA.2428, and "serves no purpose in semiautomatic AR15-type firearms," ROA.2434. In short, then, the same part that enables automatic fire in the M16 is necessary to use the FRT-15. And that part enables repeated fire by interacting with the FRT-15's unique locking bar just as it does with the M16's auto sear, the other part of the M16 that is needed for automatic fire.

It is equally clear that the FRT-15 meets § 5845(b)'s definition of "automatically." In *Cargill*, the Court reasoned that "[i]f something more than a 'single function of the trigger' is required to fire multiple shots, the weapon does not satisfy the statutory definition." 602 U.S. at 424. As explained above, a shooter

armed with an FRT-15-equipped weapon need not do anything but pull and hold the trigger to fire repeated shots. ROA.4099–4100. The shooter need not "release and reengage" the trigger, *Cargill*, 602 U.S. at 411, nor is any other manual input needed. *Rare Breed Triggers*, 690 F. Supp. 3d at 65. The weapon will continue to fire "even if the shooter does not lessen his rearward pressure on the trigger." ROA.4099–4100. And as with an M16 in automatic mode, "[s]imply pressing and holding the trigger down … is not manual input in addition to a trigger's function—it is what causes the trigger to function in the first place." *Cargill*, 602 U.S. at 425.

The Supreme Court's decision in *Cargill* confirms what common sense dictates: the FRT-15 is a machinegun. *Cargill* involved certain types of bump stocks, which are accessories that replace a rifle's stock (the part of the rifle that rests against the shooter's shoulder) with "a plastic casing that allows every other part of the rifle to slide back and forth." 602 U.S. at 411–12. Specifically, the Court held that "non-mechanical" bump stocks are not machineguns.[5] It emphasized that "bump firing does not require any additional equipment" and that "[a] bump stock does not alter the basic mechanics of bump firing"; it simply "make[s] the technique easier." *Id.* at 411–12. That is, "[n]othing changes when a semiautomatic rifle is equipped with

---

[5] "Non-mechanical" bump stocks lack the internal spring of their mechanical relatives. In the latter device, this spring forces the rifle (and with it the trigger) forward after recoil. *See Cargill*, 602 U.S. at 411 n.1. The Supreme Court did not address mechanical devices, *see id.*, but the spring has prompted ATF to classify—and courts to uphold—mechanical bump stocks as machineguns. *See Akins v. United States*, 312 F. App'x 197, 200–01 (11th Cir. 2009).

a bump stock": the "firing cycle remains the same" and "[b]etween every shot, the shooter must release pressure from the trigger and allow it to reset." *Id.* at 421. The device "merely reduces the amount of time that elapses between separate 'functions' of the trigger." *Id.*

Further, *Cargill* stressed that "[b]ump firing is a balancing act," *id.* at 411, and that operating a non-mechanical bump stock requires a shooter to "actively maintain just the right amount of forward pressure on the rifle's front grip with his nontrigger hand," *id.* at 424. Because this "ongoing manual input" is needed, a bump stock does not "automatically" enable repeated fire. *Id.* By contrast, an FRT-15 enables repeated fire without this "balancing act"; as explained, a shooter need only initiate a firing cycle by putting sufficient pressure on the trigger and then maintaining that pressure. *See Rare Breed Triggers*, 690 F. Supp. 3d at 65, 85–86.

Crucially, *Cargill* examined the entire "trigger assembly," and considered firearms that employ a "standard trigger mechanism" in which "the trigger is a curved metal lever." 602 U.S. at 416. Further, in *Cargill* "'[n]o party disputed that the legally relevant trigger' … 'is anything other than the traditional trigger' on a semi-automatic weapon." *Rare Breed Triggers*, 690 F. Supp. 3d at 86 (quoting *Cargill v. Garland*, 57 F.4th 447, 462 (5th Cir. 2023) (en banc); alterations omitted)).

By contrast, the design of the FRT-15 differs from that of a traditional trigger assembly in multiple respects and requires an M16's bolt carrier. *Supra* at 17–19.

That is, "[t]he FRT-15 is a *mechanical* device that automatically 'resets' the trigger to repeat the firing cycle until the shooter releases the trigger shoe." *Rare Breed Triggers*, 690 F. Supp. 3d at 86 (emphasis original). "[U]nlike the non-mechanical bump stock at issue in *Cargill*, the mechanical functionality of an FRT-15 means that even a novice shooter need only maintain finger pressure on the trigger shoe to achieve rapid sequential fire." *Id.*

On this point the district court went astray. It first adopted an artificially narrow definition of the function of a trigger ("to release the hammer," ROA.3664) at odds with *Cargill*'s formulation ("the mode of action by which the trigger activates the firing mechanism," 602 U.S. at 416). The district court then deemed it a "key fact[]" that the trigger in an FRT-15-equipped weapon "release[s] the hammer … for every round fired." ROA.3698. The court's parsing exercise is irrelevant. Indeed, this Court rejected an indistinguishable argument in *United States v. Camp*, 343 F.3d 743 (5th Cir. 2003). *Camp* involved a semiautomatic weapon modified with a switch that, when pushed, activated an electric motor that caused the weapon's factory-made trigger to cycle back and forth "in rapid succession … until either the shooter released the switch or the loaded ammunition was expended." *Id.* at 744.

This Court needed only one sentence to dispatch the defendant's argument. The defendant asserted that the weapon's "original trigger is the operative one" and that, "because it functioned each time the rifle was fired," the weapon was not a

machinegun. *Id.* at 745. "To accept this contention," the Court explained, "would allow transforming firearms into machine guns, so long as the original trigger was not destroyed." *Id.* Yet under the approach of the district court here, the *Camp* device would not be a machinegun, because the "original trigger" still moved forward and backward with each shot fired.

The district court likewise missed the mark by equating the FRT-15 with the non-mechanical bump stocks at issue in *Cargill*. ROA.3706. "The FRT-15 is much more akin to the trigger mechanism in *Camp* than to a non-mechanical bump stock," because "it replaces a semi-automatic rifle's standard trigger and allows for rapid sequential fire as long as the shooter simply pulls and holds the trigger." *Rare Breed Triggers*, 690 F. Supp. 3d at 86. Indeed, even the *Cargill* plaintiff, who challenged ATF's rule classifying non-mechanical bump stocks as machineguns, conceded that "forced reset triggers" pose "harder cases" because "there may be a question as to what exactly the trigger is and then how does that trigger function." Tr. of Oral Arg. at 82, *Garland v. Cargill*, No. 22-976 (U.S. Feb. 28, 2024).[6]

In sum, as the Eastern District of New York concluded after examining this Court's decision in *Cargill*, which like the Supreme Court concluded that non-

---

[6] Similarly, when *Cargill* was pending en banc before this Court, a plurality explained that the outcome "might well be different if we were considering a semi-automatic weapon equipped with a *mechanical* bump stock" and that "[i]t could be the case that a switch activating a mechanical bump stock would be the legal trigger." 57 F.4th at 462 (emphasis original).

mechanical bump stocks are not machineguns, the decision's "analysis of the distinctions between various firearm-modification devices in fact provides further grounds to find that the FRT-15 is a machinegun." *Rare Breed Triggers*, 690 F. Supp. 3d at 85; *see id.* at 88.

## III. ATF's Classifications of the FRT-15 and Similar Devices as Machineguns Reflect the Serious Threat They Pose to Public Safety.

Americans have not yet been subjected to the devastation that a mass shooter using an FRT-15 or mechanically similar device can unleash in mere seconds. That may well be because the ATF's consistent classifications of these devices as machineguns for the last 50 years has meant that they "generally were not commercially available to the general public." ROA.2001. Even so, in the few years since the FRT-15 was launched, tens of thousands of these unregistered devices have already been sold, and not all Americans have been spared crimes involving FRT-15s. Despite the likelihood that criminal activity involving FRT-15s is underreported, ROA.2007–2008, FRT-15s and similar devices have been recovered "in numerous criminal settings"—including in connection with drug trafficking and a shooting targeting an unmarked police vehicle—and have been distributed to those barred from possessing firearms, ROA.2008–2010; *see* ROA.3744–3745.

The district court's sweeping ruling, if left to stand, would result in widespread availability of FRT-15-equipped weapons directly from an assortment of online and brick-and-mortar retailers. It would also boost a gray market of bootleg and 3D-

printed imitation devices. These devices can be expected to spread quickly among criminal organizations, aspiring mass shooters, and other illicit channels—possibly even terrorists. Police would be outgunned. And ordinary Americans seeking to participate in public life, enjoy a concert or festival, run everyday errands, or even attend grade school would be exposed to even greater peril.

There can be no doubt of the high demand for the FRT-15 and copycat devices. The seller of the FRT-15 sold some 100,000 of the devices between 2020 and 2022, bringing in $39 million. *Rare Breed Triggers*, 690 F. Supp. 3d at 58. Indeed, ATF's efforts to test the FRT-15 were delayed "for several months" because the seller "sold out … almost instantly every time the product was back in stock." *Id.* at 70. More recently, other companies have begun selling copycat devices, ROA.2003, prompting the FRT-15 patentholder to complain that "infringers … are taking what should be [its] market share." Motion at 1, *United States v. Rare Breed Triggers, LLC*, No. 23-7276 (2d Cir. Sept. 25, 2024), ECF 65.1. The growing capabilities, accessibility, and affordability of 3D printing will enable the production of even more imitation devices, and websites have already offered 3D printing downloads for devices described as forced-reset triggers. ROA.3745.

Criminal actors have sought out the FRT-15 and other devices to convert semiautomatic weapons into machineguns or otherwise achieve the same rate of fire. There has been "a national, escalating trend" of machinegun conversion devices

"used in the commission of violent crimes or being received from individuals and criminal organizations." ROA.2011. The use of these devices in criminal activity echoes the very patterns that prompted Congress to regulate machineguns 90 years ago. *See* S. Rep. No. 73-1444, at 1–2 (1934) ("[The] law violator must be deprived of his most dangerous weapon, the machine gun."); *see also id.* (explaining that machineguns were the "weapon of choice" for armed gangsters in the 1920s and 1930s).

Of course, many incidents forming this recent "escalating trend" involve devices other than the FRT-15, including devices that no one disputes qualify as machineguns under federal law. But if the district court's decision stands, it may well drive members of criminal organizations, mass shooters, and others to use an FRT-15 rather than another device to achieve the extreme rate of fire they seek.

Moreover, in recent years several mass shooters have used or attempted to use an assortment of devices to achieve the same rate of fire as an FRT-15 and thereby inflict even greater harm. Most notoriously, a shooter perched in a hotel window above the Las Vegas strip used several rifles outfitted with bump stocks to fire more than 1,000 rounds into a concert crowd over 11 minutes, killing a total of 60 people and wounding nearly 500 more in what remains the deadliest mass shooting in U.S.

history.[7]  Another shooter used three rifles modified to fire automatically to target the Edmund Burke School in Washington, D.C., where shortly before classes ended he sprayed more than 200 rounds from what police called a "sniper's nest" across the street.[8]  And the Uvalde school shooter purchased a "hellfire" trigger (which can likewise achieve an M16's rate of fire) before murdering 19 elementary school students and two teachers—the deadliest school shooting in Texas history.[9]

It is no surprise that the FRT-15 and other devices used to so dramatically increase a weapon's rate of fire are prized by nefarious actors.  Simultaneously, these devices render weapons *less* useful for lawful purposes like self-defense and target shooting.  As explained, an AR-type firearm equipped with an FRT-15 can maintain a rate of fire that is similar to—and even faster than—a machinegun like the M16.  *See* ROA.2007 (firearm equipped with FRT-15-type device averaged rate of fire of 933 rounds per minute, while M16-type firearm averaged rate of fire of 879.4 rounds per minute).  And the device "allow[s] a shooter to maintain this rate of fire irrespective of the shooter's training, skill, or stamina."  *Id.*

---

[7] *See* Jonathan Bernstein & Mark Gray, *Five Years Since the Route 91 Massacre No One Knows a Damn Thing*, Rolling Stone (Sept. 21, 2022), https://www.rollingstone.com/music/music-features/las-vegas-shooting-route-91-country-festival-1234593953/.

[8] Peter Hermann & Julie Zausmer Weil, *School Was in Sniper's 'Crosshairs,' But Link Is Unclear, D.C. Chief Says*, Washington Post (Apr. 26, 2022), https://www.washingtonpost.com/dc-md-va/2022/04/25/bowser-dc-shooting-school-vanness/.

[9] J. David Goodman, *Aware of Injuries Inside, Uvalde Police Waited to Confront Gunman*, N.Y. Times (June 9, 2022), https://www.nytimes.com/2022/06/09/us/uvalde-shooting-police-response.html.

Meanwhile, using an FRT-15 makes it more difficult to fire accurately. Weapons equipped with FRT-15s and other devices that accelerate the rate of fire often fire "in an indiscriminate and uncontrolled fashion," making them difficult to "control for even the most experienced marksmen." ROA.1999. It is for these reasons that Americans who own firearms for ordinary purposes like target shooting, hunting, and lawful self-defense have no functional use for an FRT-15. A device that makes a firearm less accurate does not improve the user experience in any of those scenarios. But it does increase the devastation that a shooter can inflict when targeting a crowd of people. As one law professor explained, there appear to be "two reasons" why a person would want an FRT-15: "One is if you want to do a whole lot of damage out in society, ... [a]nd the other is because some people find this loads of fun."[10] These sentiments reflect the judgment of Congress when it enacted the National Firearms Act—"there is no reason why anyone except a law officer should have a machine gun." H.R. Rep. No. 73-1780, at 1 (1934).

Significantly, law enforcement officers are often unable to respond effectively to the threat posed by the FRT-15 and similar devices. Indeed, reporting indicates that some officers who responded to the Uvalde shooting—some of whom themselves were armed with AR-15s—concluded that "immediately confronting the

---

[10] Dave Collins, *Are Forced-Reset Triggers Machine Guns? ATF and Gun Rights Advocates at Odds in Court Fights*, AP (Aug. 24, 2023), https://apnews.com/article/forced-reset-triggers-rifles-machine-guns-atf-a17b5aaeda285a780286e209683955b6.

gunman would be too dangerous" for them.[11]  And police responding to mass shootings perpetrated with unmodified AR-15-type weapons—including at Marjory Stoneman Douglas High School in Parkland, Florida, and Pulse Nightclub in Orlando, Florida—delayed confronting the gunmen out of concern for their own safety.[12]  Enabling ready access to these devices would make it yet more challenging for police to effectively and swiftly engage mass shooters.

The district court's ruling threatens to unleash devices that make already dangerous weapons still more deadly.  Neither the text of § 5845(b) nor *Cargill* mandates this result.  Rather, they compel reversal of the decision below.

---

[11] *See* Zach Despart, *"He Has a Battle Rifle": Police Feared Uvalde Gunman's AR-15*, Texas Tribune (Mar. 20, 2023), https://www.texastribune.org/2023/03/20/uvalde-shooting-police-ar-15/.

[12] *Id.*; *see* Tanya Ballard Brown, *Report Critiques Orlando Police Response to Pulse Nightclub Shooting*, NPR (Dec. 18, 2017), https://www.npr.org/2017/12/18/571760004/report-critiques-orlando-police-response-to-pulse-nightclub-shooting (reporting that "first responders were ill-equipped to protect themselves against the gunman" and that "armor issued to patrol officers offered little protection from the shooter's weapons").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Dated: October 8, 2024

Respectfully submitted,

O'MELVENY & MYERS LLP

/s/ Ian Simmons
Ian Simmons
David K. Roberts
Danielle N. Siegel
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300

*Counsel for Amici Curiae Brady Center to Prevent Gun Violence, Giffords Law Center to Prevent Gun Violence, Everytown for Gun Safety Support Fund, and March For Our Lives*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Ian Simmons
Ian Simmons

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,276 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ Ian Simmons
Ian Simmons

*Counsel for Amici Curiae*