No. 24-10707

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.; PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees,*
*v.*
MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants,*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
CASE NO. 4:23-CV-00830 (HON. REED O'CONNOR)

_____

**APPELLEES' BRIEF**

_____

WHITNEY DAVIS
Eggleston King Davis, L.L.P.
102 Houston Avenue
Suite 300
Weatherford, TX 76086

GLENN D. BELLAMY
Wood Herron & Evans, L.L.P.
600 Vine Street
Suite 2800
Cincinnati, OH 45202

GARY M. LAWKOWSKI
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

# CERTIFICATE OF INTERESTED PERSONS

Appellees certify that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Plaintiffs/Appellees**

1. National Association for Gun Rights, Inc. and its members, including, without limitation: Rare Breed Triggers, LLC; Rare Breed Firearms, LLC; Lawrence DeMonico; Cole Leleux; and Kevin Maxwell.
2. Texas Gun Rights, Inc. and its members;
3. Patrick Carey;
4. James Wheeler;
5. Travis Speegle.

**Counsel for Plaintiffs/Appellees**

WHITNEY DAVIS
Eggleston King Davis, L.L.P.
102 Houston Avenue
Suite 300
Weatherford, TX 76086

DAVID WARRINGTON
GARY M. LAWKOWSKI
JONATHAN M. SHAW
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

MICHAEL A. COLUMBO
Dhillon Law Group, Inc.
177 Post Street
Suite 700
San Francisco, CA 94108

GLENN D. BELLAMY
Wood Herron & Evans, L.L.P.
600 Vine Street
Suite 2800
Cincinnati, OH 45202

**Prior Counsel for Plaintiffs/Appellees**

BENJAMIN SLEY

JULIAN WHITLEY

**Amicus Organizations**

BRADY CENTER TO PREVENT GUN VIOLENCE

GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE

EVERYTOWN FOR GUN SAFETY SUPPORT FUND

MARCH FOR OUR LIVES

*/s/Gary M. Lawkowski*
Gary M. Lawkowski

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES ................................................................................... vi

INTRODUCTION ................................................................................................... 1

SUMMARY OF THE ARGUMENT ...................................................................... 3

ARGUMENT ........................................................................................................... 5

   I.   FRTs are Not Machineguns .......................................................................... 5

      a.   How Triggers Operate ........................................................................... 5

      b.   The Government Misreads *Cargill* by Focusing on Shooter Input .......... 9

          i.   The Government's Focus on Shooter "Engagement" and "Continuous Pull" of the Trigger is Shooter Input by Another Name ..................................................................................... 10

          ii.   The Government's Reference to Initiating a Firing Sequence is a Reference to Shooter Input by Another Name .............................. 12

          iii.   The Government's Zip-Tie Test is Irrelevant ................................... 13

      c.   A Locking Bar is Not an Auto Sear ...................................................... 14

      d.   FRTs Also Do Not Operate "Automatically" ......................................... 16

      e.   The Government's Focus on the ATF's Prior Classifications is Both Misleading and Immaterial ................................................................. 17

   II.   The Associational Plaintiffs Have Standing ................................................. 19

      a.   The Associational Plaintiffs Have Established that at Least One Member Has Standing, as Required for Associational Standing ............ 20

   b.  The Government Seeks to Apply the Wrong Test to Traditional
       Membership Organizations .......................................................21

III. The Government's "Administrability" Concerns are Caused by Its Own
     Intransigence, Not the District Court's Order ................................23

   a.  The Government Disregards the Nationwide Consequences of
       Vacatur..................................................................................24

       i.   Vacatur Applies to Everyone, Not Just the Named Parties ..............24

       ii.  Having Previously Premised Enforcement Actions on ATF
            "Classifications," the Government Cannot Now Feign
            Ignorance of Their Existence or Import .............................................27

   b.  Vacatur Includes Families and Downstream Customers of Members
       of the Associational Plaintiffs, And Even If It Did Not, Their
       Protection Is Necessarily Incidental to the Protection of Members........29

   c.  The District Court Appropriately Enjoined Prospective Criminal
       Enforcement .........................................................................30

   d.  The District Court's Order to Send Remedial Notices is Not
       Overbroad .............................................................................34

   e.  Injunctive Relief Properly Extends Beyond Persons Who Were
       Members of the Associational Plaintiffs at the Time the Complaint
       was Filed...............................................................................35

CONCLUSION ...................................................................................37

CERTIFICATE OF SERVICE ...............................................................39

CERTIFICATE OF COMPLIANCE......................................................40

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner*,
   387 U.S. 136 (1967)............................................................................32

*Axon Enterprise, Inc. v. Federal Trade Commission*,
   598 U.S. 175 (2023)............................................................................31

*Babbitt v. United Farm Workers National Union*,
   442 U.S. 289 (1979)............................................................................30

*Bevis v. City of Naperville, Illinois*,
   657 F. Supp. 3d 1052 (N.D. Ill. 2023)................................................20

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) ..........................................................1, 24

*Christian Employers Alliance v. Azar*,
   No. 3:16-CV-309, 2019 WL 2130142 (D.N.D. May 15, 2019) ..........36

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
   144 S. Ct. 2440 (2024) (Kavanaugh, J., concurring in the judgment)................25

*Data Marketing Partnership, LP v. United States Department of Labor*,
   45 F.4th 846 (5th Cir. 2022) ..............................................................25

*Deaver v. Seymour*,
   822 F.2d 66 (D.C. Cir. 1987)..............................................................31

*FEC v. Cruz*,
   142 S. Ct. 1638 (2022)........................................................................33

*Franciscan Alliance, Inc. v. Becerra*,
   47 F.4th 368 (5th Cir. 2022) ................................................ 33, 36, 37

*Franciscan Alliance, Inc. v. Becerra*,
   553 F. Supp. 3d 361 (N.D. Tex. 2021) ...............................................36

*Friends of the Earth, Inc. v. Chevron Chemical Corp.*,
   129 F.3d 826 (5th Cir. 1997) ..............................................................22

*Garland v. Cargill*,
   602 U.S. 406 (2024)..................................................................................... passim

*Garland v. Cargill*,
   602 U.S. at 406 (Sotomayor, J., dissenting) ........................................19

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in
   part))...............................................................................................................18

*Hunt v. Washington Street. Apple Advertising Commission*,
   432 U.S. 333 (1977)..................................................................................20

*Kiakombua v. Wolf*,
   498 F.Supp.3d 1 (D.D.C. 2020) ................................................... 25, 26

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..................................................................................37

*Luwisch v. American Marine Corp.*,
   956 F.3d 320 (5th Cir. 2020) ...................................................... 14, 22

*National Association for Gun Rights v. Grisham*,
   No. 1:23-cv-00771-DHU-LF, 2023 WL 5951940 (D.N.M. Sept. 13, 2023) .......20

*O.A. v. Trump*,
   404 F.Supp.3d 109 (D.D.C. 2019)..........................................................33

*Reaching Souls International Inc. v. Azar*,
   No. CIV-13-1092-D, 2018 WL 1352186 (W.D. Okla. March 15, 2018)............36

*Shaughnessy v. Pedreiro*,
   349 U.S. 48 (1955)....................................................................................32

*Steffel v. Thompson*,
   415 U.S. 452 (1974)..................................................................................30

*Stolt-Nielsen, S.A. v. United States*,
   442 F.3d 177 (3d Cir. 2006) ...................................................................31

*Students for Fair Admission, Inc. v. University of Texas at Austin*,
   37 F.4th 1078 (5th Cir. 2022) .................................................................22

*Students for Fair Admission, Inc. v. University of Texas at Austin*,
No. 1:20-CV-763-RP, 2021 WL 3145667 (W.D. Tex. Jul. 26, 2021) .................23

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
143 S. Ct. 2141 (2023) ...........................................................................20

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) .............................................................................21

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .............................................................................30

*Texas Gun Rights, Inc. v. ATF*,
No. 4:23-cv-00578-O, 2023 WL 8352316 (N.D. Tex. Oct. 4, 2023)...................20

*United States v. Carter*,
465 F.3d 658 (6th Cir. 2006) ...............................................................13

*United States v. Rare Breed Triggers, LLC*,
690 F.Supp.3d 51 (E.D.N.Y. 2023) ......................................................28

*Wilson v. Thompson*,
593 F.2d 1375 (5th Cir. 1979) .............................................................33

## Statutes

18 U.S.C. § 921(a)(24).............................................................................1

26 U.S.C. § 5845(b) .............................................................................1, 6

5 U.S.C. § 702 .....................................................................................32

5 U.S.C. § 706 .....................................................................................28

## Other Authorities

The Federalist No. 47 (James Madison) (Clinton Rossiter ed., 1961) ...................37

## INTRODUCTION

This case is about the Government's efforts to enforce the law as it wished it to be rather than the law as written by Congress.

A forced-reset trigger ("FRT") is a device that forcibly returns a firearm's trigger to its reset state, enabling a typical user to fire a weapon faster. The district court found the following *undisputed* "key facts" about a weapon equipped with an FRT:

- "[T]he trigger moves forward into its reset state and is depressed to release the hammer from its sear surface for every round fired," ROA.3698;

- "[T]he trigger in an FRT-equipped firearm must reset after every round fired," ROA.3698–99; and

- "[A] shooter who attempts to prevent the reset by holding the trigger in a fully depressed position will cause the weapon to malfunction," ROA.3699.

Congress defined the term "machinegun" as a device that fires multiple rounds "automatically" by a "single function of the trigger." *See* 26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(24). A plurality of this Court reviewed the statutory language and concluded that "single function of the trigger" referred to the mechanical process by which a gun is fired, finding "the statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger." *Cargill v. Garland*, 57 F.4th 447, 460 (5th Cir. 2023) (en banc) (pl. op.).

The Supreme Court agreed. *Garland v. Cargill*, 602 U.S. 406 (2024). It affirmed the judgment of this Court and found "the phrase 'function of the trigger' … refers to the mode of action by which the trigger activates the firing mechanism," which, on weapons with a curved metal lever as a trigger, "means the physical trigger movement required to shoot the firearm." *Id.* at 416. It clarified that in a semi-automatic weapon, "[f]or each shot, the shooter must engage the trigger and then release the trigger to allow it to reset. Any additional shot fired after one cycle is the result of a separate and distinct 'function of the trigger.'" *Id.* at 421.

The Government seeks to disregard these conclusions selectively. It would prefer to focus on whether the shooter must "take pressure off" the trigger in between shots by making what the Government deems acceptably large finger movements. *See, e.g.*, Opening Br. at 2. But this is nothing more than shooter input by another name—it has no bearing on the *mechanical* function of the trigger.

*Cargill*'s interpretation of the statutory language is fatal to the Government's arguments and dispositive of this case. The undisputed "key facts" identified by the district court "demonstrate that an FRT-equipped firearm must function for each and every round fired" and thus is not a "machinegun." ROA.3699.

Given that FRTs are not machineguns, the Government's concerns about the district court's remedies miss the mark. The ATF's classification of FRTs as machineguns was properly vacated. The Government should not be enforcing its

2

*ultra vires* interpretation against anyone, but at minimum, it was properly enjoined from enforcing it against the parties in this case. Similarly, the Government seized private property based on an unlawful, now-vacated classification. Having done so, it was properly required to return illegally seized FRTs to plaintiffs in this case.

The judgment of the district court is correct and should be affirmed.

## SUMMARY OF THE ARGUMENT

**1.** FRTs are not "machineguns." The trigger on a weapon equipped with an FRT mechanically functions for every round fired. To wit, the trigger moves to release the hammer for every round fired. The trigger resets after each round is fired. And—unlike an M16—if all a shooter does is hold the trigger in its rearward state (which will prevent the forced reset), the weapon will malfunction.

The Government's attempts to distinguish *Cargill* are unavailing. The Government's focus on a shooter's "continuous pressure" on the trigger is nothing more than a focus on shooter input by another name. And *Cargill* firmly rejected shooter input as the key variable.

Likewise, the Government's focus on the "locking bar" is a red herring. Unlike an auto sear, a locking bar does not alter the trigger's role in the firing cycle. An auto sear bypasses the trigger, effectively removing it from the firing cycle. A locking bar does not. In a firearm equipped with an FRT, the trigger releases the hammer for each and every shot and must reset between each and every shot. In an

automatic weapon, by contrast, the trigger moves only for the first shot, does not reset between each subsequent shot, and plays no role in releasing the hammer for subsequent shots.

**2.** The district court properly found that the associational plaintiffs have standing. The Government's insinuation that *all* members of an associational plaintiff must have standing for relief to flow to members of the association is contrary to law and, if adopted, would functionally eviscerate associational standing as a concept.

Next, the Government applies the wrong test in claiming that the associational plaintiffs are not membership organizations. The associational plaintiffs are traditional membership organizations whose membership status is defined in their respective corporate documents. As such, they are not subject to the "indicia of membership" test.

**3.** Remedies are considered only after a determination on the merits in Plaintiffs' favor. Thus, any discussion of remedies must be in the context that FRTs are *not* machineguns and the Government's contrary classification was unlawful. The Government's concerns about administrative difficulties are a product of its own intransigence in applying the judgment of the district court. The Government disregards the universal application of the district court's vacatur in seeking to apply

its *ultra vires* determination that FRTs are machineguns to persons who are not named parties in this case.

Because FRTs are not machineguns, the district court properly enjoined the Government from pursuing criminal enforcement proceedings against persons who are parties to this case.

Finally, the Government errs in suggesting—without analysis—that relief is limited only to persons who were members of the associational plaintiff groups at the time the complaint was filed. In past cases, this Court has properly extended relief to current and even future members of associational plaintiffs without transgressing the boundaries of Article III, and there is no bar to doing so in this case.

## ARGUMENT

### I.   FRTs are Not Machineguns

### a.  How Triggers Operate

Although there are many methods by which a trigger can initiate a firing sequence, the most common and well-known is through the release of a hammer. ROA.3664 ("The basic function of any trigger is to release the hammer."); ROA.4072:17–19 (ATF expert stating the function of an AR-15's trigger "is to release the hammer"). For example, in a semi-automatic trigger, a "trigger sear" interconnects with a notch of the hammer to retain the hammer in place. *See*

ROA.3664. When a shooter is ready to fire, the shooter pulls the trigger rearward, thus shifting the trigger sear away from the hammer notch, releasing the hammer, and allowing it to fall forward to strike the firing pin. *See id.* This results in a discharge of the cartridge and the subsequent rearward travel of the "bolt carrier" through the force of that discharge. *See* ROA.3664–65.

In a standard semi-automatic firearm, the rearward travel of the bolt carrier depresses the hammer back down, where a "disconnector" catches the top of the hammer and prevents the hammer from following the bolt carrier and falling forward again. *See* ROA.4179:11–16. The disconnector continues to hold the hammer fully rearward, preventing an additional discharge, until the trigger is allowed to be moved to its reset position by the trigger-return spring. *See* ROA.3365. Once the trigger is allowed to move forward, the trigger sear reengages the hammer as the disconnector releases the hammer, and the firing cycle is completed. *See id.* This re-engagement between the trigger sear and the hammer resets the firing cycle and prepares the weapon to be fired again. Put another way, one shot is fired per function of the trigger. *See id.*

In the case of a fully automatic trigger, or "machinegun" under Section 5845(b), the above sequence is significantly different when these weapons are set to automatic fire. *See* ROA.3706. Although the sequence begins with the shooter moving the trigger rearward to release the hammer from the trigger sear, it is not

necessary for the trigger to reset before the hammer can fall forward again. *Id*. Instead, after the first shot is fired, a component called an "auto-sear" takes over the function of retaining and releasing the hammer and begins performing these actions automatically, causing the weapon to fire repeatedly without any subsequent involvement of the trigger until either (1) the ammunition is spent, (2) the firearm malfunctions, or (3) the shooter releases the trigger and thus allows the trigger sear to reengage the hammer. ROA.3706–07. In this scenario, although there is still only one function of the trigger, multiple shots are (or can be) fired before the trigger reengages the hammer and the sequence is completed. ROA.3706.

An FRT is a device that forcibly returns the trigger to its reset state.[1] ROA. 3365. In a firearm fitted with an FRT, the process begins the same way as with a traditional semi-automatic trigger: The shooter actuates the trigger, the trigger sear disengages, and the hammer falls forward to strike the firing pin, discharging a shot and causing the bolt carrier group to travel rearward. *Id*.; ROA.3706. With an FRT, as the bolt carrier group travels rearward and pushes against the hammer, the hammer is, in turn, pushed into the top of the trigger and forcibly pivoted forward to its reset position, causing it to retain the hammer again. Unlike the above-described

---

[1] The Government suggests that this case is limited to two FRTs: the FRT-15 and WOT. *See* Opening Br. at 1 ("This case concerns two replacement triggers for AR15-type rifles: the FRT-15 and Wide Open Trigger (WOT)."). This is incorrect. The Complaint sought, and the judgment declared, *all* FRTs, as defined by the district court, not to be machineguns. *See* Complaint (ECF 1); ROA.3715–16.

process for a traditional semi-automatic trigger, an FRT has an additional safety mechanism known as a "locking bar." *See* ROA.3665; ROA.3706. As the district court found, it is undisputed that "[a] 'locking bar' mechanically locks the trigger in its reset state, preventing the user from moving the trigger rearward to function by releasing the hammer, until the bolt has returned to the in-battery position and the firearm is safe to fire." ROA.3665. "When firing multiple shots using an FRT, the trigger must still reset after each round is fired and must separately function to release the hammer by moving far enough to the rear in order to fire the next round." *Id.*

Three "key facts"—each "undisputed"—emerge from this description:

- "[T]he trigger moves forward into its reset state and is depressed to release the hammer from its sear surface for every round fired," ROA.3698;

- "[T]he trigger in an FRT-equipped firearm must reset after every round fired," ROA.3698–99; and

- "[A] shooter who attempts to prevent the reset by holding the trigger in a fully depressed position will cause the weapon to malfunction," ROA.3699.

Thus, like a bump stock, an FRT does not transform a semi-automatic gun into a machinegun. It merely "reduces the amount of time that elapses between separate 'functions' of the trigger." *Cargill*, 602 U.S. at 421. As with a bump stock, "[a] shooter must also actively maintain just the right amount" of pressure on the trigger:

too much pressure, the gun will malfunction; too little, it will not fire a second shot. *See id.* at 424. With a bump stock, the trigger is reset by a trigger spring and then moved into contact with a stationary finger, which causes the trigger to be actuated (engaged, *i.e.*, moved). With an FRT, the trigger is forcibly reset, and then trigger movement to release the hammer is caused by the shooter's finger engaging the trigger (moving toward the rear) each time a round is fired.

### b. The Government Misreads *Cargill* by Focusing on Shooter Input

*Cargill* is clear: It is the physical movement of the trigger that matters, not the movement of the trigger finger or the pull of the trigger. *Id.* at 422. *Cargill* found that "the phrase 'function of the trigger' … refers to the mode of action by which the trigger activates the firing mechanism," which, on weapons with a curved metal lever as a trigger, "means the physical trigger movement required to shoot the firearm." *Id.* at 416. The statute "does not define a machinegun based on what type of human input engages the trigger—whether it be a pull, bump, or something else[,] [n]or does it define a machinegun based on whether a shooter has assistance in engaging the trigger." *Id.* at 422.

In a semi-automatic weapon, "[f]or each shot, the shooter must engage the trigger and then release the trigger to allow it to reset. Any additional shot fired after one cycle is the result of a separate and distinct 'function of the trigger.'" *Id.* at 421. Shooter input is not and cannot be the test for determining whether a weapon is a

"machinegun." Thus, *Cargill* is clear: It is the physical movement of the trigger that matters, not the movement of the trigger finger or the pull of the trigger.

### i. The Government's Focus on Shooter "Engagement" and "Continuous Pull" of the Trigger is Shooter Input by Another Name

The Government seeks to smuggle the "pull" of the trigger through the back door by effectively redefining "engage" to mean a conscious pull. For example, the Government claims, "[W]ith these devices equipped, the shooter can engage the trigger once, apply continuous and steady pressure to the trigger, and fire repeatedly," Opening Br. at 1, and asserts that "the salient point is that these devices allow a shooter to engage the trigger once and apply continuous pressure while the weapon fires repeatedly. Thus, the shooter has no need to 'release and reengage' the trigger or 'take[] pressure off' the trigger for each shot." *Id.* at 5.

The Government's use of the term "engage" is inconsistent with *Cargill*. *Cargill* states that the shooter "engages the trigger by moving it backwards." (with reference to the lower arrow in Fig. 2).



*Cargill*, 602 U.S. at 418. In other words, as used in *Cargill*, to "engage" the trigger is to actuate it. It is not synonymous with a conscious pull of the trigger.

Nor could it be. *Cargill* acknowledges that "a shooter manually bump firing a semiautomatic rifle can achieve continuous fire by holding his trigger finger stationary and maintaining forward pressure with his nontrigger hand." *Id.* at 423. It does not matter that the trigger finger does not move. It does not matter that the pressure from the nontrigger hand—the force that actuates the trigger each time–is "maintained." Under *Cargill,* a firearm with a bumpstock is not a machinegun because the *trigger* still moves forward and backward for each and every shot, resetting in between. It is undisputed that this is how weapons equipped with FRTs work as well.

The Government's conflation of "engaging" the trigger with a "continuous pull" of the trigger gives the game away. The statute "does not define a machinegun based on what type of human input engages the trigger—whether it be a pull, bump, or something else." *Id.* at 422. Stripped down, the Government's criticism of the district court's application of *Cargill* is shooter input by another name. The district court correctly applied *Cargill*.

11

### ii.    The Government's Reference to Initiating a Firing Sequence is a Reference to Shooter Input by Another Name

The Government also seeks to reintroduce shooter input by claiming that "the shooter engages the trigger just once to initiate the firing sequence." Opening Br. at 21.

This just rehashes the Government's losing argument in *Cargill*, where it argued, "A bump stock allows a shooter to initiate a multi-shot bump-firing sequence with a single motion: either pulling the trigger or sliding the rifle forward in order to press the trigger against the stationary trigger finger. Once that bump-firing sequence begins, the weapon continues to shoot hundreds of rounds per minute without further manipulation of the trigger by the shooter." Brief for Petitioners at 15, *Garland v. Cargill*, 602 U.S. 406 (2024) (No. 22-976), 2023 WL 8836097, at *15.

*Cargill* explicitly and emphatically rejected this argument, stating, "Congress did not write a statutory definition of 'machinegun' keyed to when a firing sequence begins and ends." *Cargill*, 602 U.S. at 423. Indeed, *Cargill* criticized the ATF, noting, "ATF resists the natural implication of its reasoning, insisting that the bumping motion is a 'function of the trigger' only when it initiates, but not when it continues, a firing sequence." *Id*. The same may be said of the ATF's position in this case: It treats a shooter's rearward pressure on the trigger as a "function of the trigger" for the first shot but disregards it for each additional shot, even though each

12

additional shot results from the trigger being moved again by the shooter to release the hammer.

Together, these key passages distinguish FRTs from the more exotic examples and hypotheticals cited by the Government. Unlike the open-bolt gun described in *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006) (per curiam), Opening Br. at 23, a trigger equipped with an FRT *does not* move back and forth "automatically." And unlike the mythical, hypothetical trigger that moves and releases the hammer after a shooter removes his finger, a weapon equipped with an FRT will not continue to fire without an external force. As the district court found as a matter of fact, "[I]f all the shooter does is initially pull the trigger, the FRT-equipped firearm will only fire one round." ROA.3704. "With FRTs, an external force must be applied by the user to cause the trigger to function (or actuate) each time a shot is fired. The only force that moves the trigger rearward in an FRT comes from the user's finger." ROA.3708. The trigger in a weapon equipped with an FRT will only move if a shooter applies pressure. If a shooter does not apply pressure, it does not move.

### iii.    The Government's Zip-Tie Test is Irrelevant

Consistent with their focus on shooter input, Appellants again reference their infamous "zip tie" test. *See* Opening Br. at 19. But both the district court and this Court rejected this parlor trick. To wit, the district court found:

> In a machinegun, the trigger must be held in its rearmost position for the gun to fire automatically. The machinegun's trigger does not reset

in between each shot. *But in an FRT-equipped firearm, the trigger must still reset in between each shot—even when depressed in a rearward state by the zip tie.* Defendants' zip tie does not appear to hold the FRT trigger still in its most rearward position. *If it did, the weapon would malfunction and not fire subsequent shots. Instead, the elasticity in the zip tie allows for sufficient movement to allow for a trigger reset.* All this test establishes is that the trigger need not move to its most rearward position. It can still reset from sufficient rearward pressure and forward movement propelled by the stretched zip tie. In other words, the zip tie test fails to demonstrate that a single function of the trigger does not otherwise occur for each shot since the trigger's operative function is the reset of the hammer—not how the user or a zip tip pulls the trigger. The zip tie test is irrelevant to the statutory definition provided by Congress and as interpreted by *Cargill*.

ROA.3707 (emphasis added). The district court reached a similar conclusion at the preliminary injunction phase, which was quoted and cited favorably by this Court in rejecting the Government's Motion for an Emergency Stay. ROA.2142. The zip tie is a modification—the addition of a spring that is not part of the FRT to provide an external force to actuate the trigger.

Despite having multiple bites at this apple, the Government makes no effort to show that the district court's factual finding was clearly erroneous, yet effectively asks this Court to reject it. This Court should decline that invitation. *See, e.g.*, *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (clear error review applies to district court's factual findings).

### c.  A Locking Bar is Not an Auto Sear

The Government claims FRTs "are … practically and legally indistinguishable from a machinegun equipped with an auto sear" because they

replace the disconnector with a locking bar. Opening Br. at 20. This mischaracterizes what a locking bar and auto sear do to create a false equivalence.

An auto sear bypasses the trigger, effectively removing it from the firing cycle. In an automatic weapon equipped with an auto sear, the trigger moves only for the first shot, does not reset between each subsequent shot, and plays no role in releasing the hammer for subsequent shots.

The locking bar does not bypass the trigger. In fact, the locking bar mechanically locks the trigger in the reset position between each shot fired so that it has to be actuated separately for each shot fired. In a firearm equipped with an FRT, the trigger releases the hammer for each and every shot and must reset between each and every shot. Thus, the trigger mechanically functions for each and every shot in a weapon equipped with an FRT.

The district court correctly described and acknowledged this distinction, finding that the locking bar "does not alter the basic mechanical process where the trigger moves for every shot fired." ROA.3706. As the district court stated:

> Defendants agree that the trigger in an FRT-equipped firearm releases the hammer for every shot. By contrast, the auto sear in a fully automatic gun takes over to retain and release the hammer for all subsequent shots so that its trigger functions only once in a string of automatic fire…. An FRT-equipped firearm contains a locking bar that prevents a subsequent trigger function until the weapon is safe to fire again. But this is not the same as an auto sear. Unlike an auto sear, the locking bar still prevents firing until it is safe to do so again after unlocking the trigger.

*Id.* (footnotes and citations omitted).

The Government's focus on the locking bar is a red herring. The locking bar is not an auto sear. It does not bypass the trigger, which must still move for each and every shot, and it does not alter the "basic mechanical process" of firing a semi-automatic weapon where the trigger releases the hammer for each and every shot fired.

### d. FRTs Also Do Not Operate "Automatically"

The Government seeks to mislead this Court by falsely claiming, "The district court did not question that a rifle with the devices at issue here installed operates 'automatically.'"[2] Opening Br. at 14. The district court *rejected* this premise.

For example, the district court explained:

> [U]nlike a switch-activated device that takes over as the legal trigger of the weapon, FRTs do not alter the basic operation [of] the trigger: the trigger must still move sufficiently rearward for each shot based on external manual input from the shooter. This, in turn, activates the trigger's function—releasing and resetting the hammer …. This is critical because *the actuation is what causes the automatic function. FRTs do not include any internal spring or other means to assist actuation of the trigger.* With FRTs, an external force must be applied

---

[2] This is not the first time the Government has attempted this deception. The Government previously told this Court "no one doubts that [FRTs] operate 'automatically'" and "there is no dispute that when a shooter replaces the standard trigger on an AR-15-type rifle with an FRT-15 or WOT, the shooter can pull the trigger once and automatically fire repeatedly." Opening Br. at 20, *Nat'l Ass'n for Gun Rts. v. Garland*, No. 23-11138, ECF No. 54. Plaintiffs corrected the Government's misstatement in their Appellees' Brief. Appellees' Br. at 20, *Nat'l Ass'n for Gun Rts. v. Garland*, No. 23-11138, ECF No. 59.

by the user to cause the trigger to function (or actuate) each time a shot
is fired.

ROA.3708 (emphasis added).

The Government cannot wish away an element of the definition of
"machinegun" by claiming, "[t]he sole question is thus whether these devices
operate 'by a single function of the trigger.'" Opening Br. at 14. FRTs also do not
operate "automatically."

### e. The Government's Focus on the ATF's Prior Classifications is Both Misleading and Immaterial

The Government claims the district court erred because "the ATF has
regarded devices of the kind at issue here as machineguns since first encountering
one in 1975." *Id.* at 25.

Even on its own terms, this purported history is irrelevant. The Government
may not rewrite criminal statutes if it does so fast enough. A long history of being
wrong does not make the Government's interpretation correct now. *Cargill* clarified
how to interpret "automatically" "by a single function of the trigger." FRTs do not
meet the statutory definition as clarified in *Cargill*. Any prior ATF determination to
the contrary is immaterial because it applied an erroneous legal standard and has
now been vacated.

And the Government's claim should not be taken at face value because it
misleadingly omits that the Government has applied constantly shifting "tests" to

reach its preferred conclusions. The Government used at least five different interpretations of "single function of the trigger" prior to *Cargill*, including "single pull of the trigger and analogous motions,"[3] "constant rearward pressure,"[4] "continuous pull,"[5] "constant rearward pull" or "single function of the trigger means single pull of the trigger,"[6] and "initiation of the firing sequence" plus "constant rearward pressure."[7] Now that these avenues have been foreclosed by *Cargill*, the Government appears to be casting about for a sixth definition to evade the plain meaning of the Court's decision. As the Supreme Court noted, the "statutory definition of 'machinegun' does not include a firearm that shoots more than one round 'automatically' by a single pull of the trigger **AND THEN SOME**." *Cargill*, 602 U.S. at 424 (quoting *Guedes v. ATF*, 920 F.3d 1, 44 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in part)).

---

[3] *See* 27 C.F.R §§ 447.11, 478.11, 479.11.

[4] ROA.1561–626, ATF's FRT Report, July 15, 2021; ROA.1626–42, ATF's WOT Report, October 21, 2021.

[5] ROA.1561–626, ATF's FRT Report, July 15, 2021.

[6] ROA.1646–702, ATF's FRT Report, April 27, 2023, at 5; ROA.1748, Prelim. Inj. Hr'g. Tr. 162:1–4, *United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770 (E.D.N.Y. Aug. 1, 2023).

[7] ROA.1727, Prelim. Inj. Hr'g. Tr. 130:10–17.

To the extent there is any consistency in the Government's approach to FRTs, it is that the Government would like to ban them. But the Government is limited to the statute it has, not the one it wishes it had. As Justice Alito observed, "There is a simple remedy …. Congress can amend the law—and perhaps would have done so already if ATF had stuck with its earlier interpretation." *Id.* at 429. Congress has not done so, and the Government cannot do so by administrative fiat, whether today or any other time in its history.

This circuit's *en banc* plurality in *Cargill*—that the statute unambiguously excluded bump stocks—was affirmed by the Supreme Court. But the law of this circuit's *en banc* majority opinion—that if ambiguous, lenity applies—remains. In the event the statute is found to be ambiguous as applied to FRTs, then lenity applies to the Plaintiffs' favor. Justice Sotomayor expressed in her dissent a concern that the application of the statute may be ambiguous as to FRTs as a result of the majority's position. *Cargill*, 602 U.S. at 1635 n.7 (Sotomayor, J., dissenting).

## II.    The Associational Plaintiffs Have Standing

The district court correctly found that the National Association for Gun Rights and Texas Gun Rights have associational standing: each group has individual members who would otherwise have standing to sue in their own right, including the named individual plaintiffs, the interests each group seeks to pursue are germane to the organizational purposes—*inter alia*, defending the Second Amendment rights of

their members—and the relief requested—vacatur and permanent injunction does not require the participation of all of the organization's members. *See* ROA.3679–80; *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023); *Hunt v. Wash. St. Apple Advert. Comm'n.*, 432 U.S. 333, 342 (1977).

Tellingly, many courts have found that both of these associational plaintiffs have standing to bring claims on behalf of their members. *See, e.g.*, *Texas Gun Rts., Inc. v. ATF*, No. 4:23-cv-00578-O, 2023 WL 8352316, at *2 (N.D. Tex. Oct. 4, 2023) (finding the National Association for Gun Rights and Texas Gun Rights have associational standing to bring suit on behalf of their members); *Nat'l Assoc. for Gun Rts. v. Grisham*, No. 1:23-cv-00771-DHU-LF, 2023 WL 5951940, at *2 (D.N.M. Sept. 13, 2023) (describing NAGR as an organizational plaintiff bringing suit on behalf of its members); *Bevis v. City of Naperville, Ill.*, 657 F. Supp. 3d 1052, 1061 (N.D. Ill. 2023) (mem.) (finding associational standing).

### a. The Associational Plaintiffs Have Established that at Least One Member Has Standing, as Required for Associational Standing

In response, the Government first claims the court erred because "[n]either NAGR nor TGR has ever asserted that all of its members have standing to bring this suit," suggesting that they must do so to have standing. Opening Br. at 29. This is a frivolous argument that, if adopted, would effectively eliminate associational standing. In pressing this argument, the Government willfully misreads the cases it

cites. To wit, *Summers v. Earth Island Institute* states, "[O]ur prior cases … have required plaintiff-organizations to make specific allegations establishing that *at least one identified member* had suffered or would suffer harm." 555 U.S. 488, 498 (2009) (emphasis added). *Summers* requires organizations to identify at least *one or more individuals* who have been harmed rather than rely upon probabilistic assumptions; it does not require an organization to show that *every* member of the organization has been harmed. If it were otherwise, the third *Hunt* factor, evaluating whether a case required the participation of the individual members, would be nonsensical because *every* case would require the participation of the individual members.

The Government does not contest that the individual Plaintiffs have standing and acknowledges that the individual Plaintiffs are members of each associational Plaintiff. *See* Opening Br. at 7 ("All three individuals are also members of two plaintiff organizations—the National Association for Gun Rights, Inc. (NAGR) and Texas Gun Rights (TGR). ROA.1281-83."). This establishes that each associational plaintiff has at least one member with standing, which suffices to establish associational standing.

### b. The Government Seeks to Apply the Wrong Test to Traditional Membership Organizations

Next, the Government claims that the associational plaintiffs have not established that they are "membership organizations." Opening Br. at 29. In doing so, the Government applies the wrong test.

Both the National Association for Gun Rights and Texas Gun Rights have predetermined membership structures set forth in their bylaws and corporate resolutions, respectively. *See* ROA.3461–62 (Flugaur Declaration); ROA.3463–64 (McNutt Declaration); *see also generally Students for Fair Admission, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1085 (5th Cir. 2022) (finding an organization was a traditional membership organization where the organization "complied with its bylaws in creating members."). This makes them traditional membership organizations.[8]

Since the associational plaintiffs are traditional membership organizations, Defendants' reference to *Friends of the Earth, Inc. v. Chevron Chem. Co.¸* 129 F.3d 826 (5th Cir. 1997), and its analysis of "indicia of membership" is inapposite. *See Students for Fair Admission*, 37 F.4th at 1085. To wit, this Court found "*Friends of the Earth* is inapposite" when "[i]t is undisputed that [the associational plaintiffs] complied with [their] bylaws in creating [their] members. As the district court explained, '[plaintiff's] bylaws state that it will have members, whereas in *Friends*

---

[8] The district court made a credibility determination in concluding that Associational Plaintiffs are membership organizations, concluding that Plaintiffs' declaration supporting their status as membership organizations provides more than a "bare assertion of membership." *See* ROA.3681 n.65. Thus, the district court's finding that the associational plaintiffs are membership organizations is properly regarded as a finding of fact, subject to a clearly erroneous standard, rather than a finding of law. *Luwisch*, 956 F.3d at 326.

*of the Earth* the plaintiff's bylaws provided that its board of directors would set membership requirements—which they never did.'" *Id.* (quoting *Students for Fair Admission, Inc. v. Univ. of Tex. at Austin*, No. 1:20-CV-763-RP, 2021 WL 3145667, at *6 (W.D. Tex. Jul. 26, 2021)).[9]

Unlike the plaintiff in *Friends of the Earth*, the National Association for Gun Rights' bylaws provide membership criteria, which they have followed, while Texas Gun Rights' board of directors set explicit membership criteria through a board resolution, which they have followed. They are valid membership organizations that do not also need to satisfy the "indicia of membership" test, and the District Court did not clearly err in so finding.

## III. The Government's "Administrability" Concerns are Caused by Its Own Intransigence, Not the District Court's Order

The Government can easily comply with the district court's injunctive relief. It knows to whom it previously mailed threatening notices. It knows from whom it previously seized FRTs—indeed, it regularly publishes public notices of seizures. And it can avoid initiating enforcement actions against members of the associational plaintiffs by simply not initiating new enforcement actions that violate the injunction

---

[9] Even if it were not, the Associational Plaintiffs also have several "indicia of membership," including a clearly identified and defined membership structure and a procedure for members to influence organizational policy through referenda. *See* ROA.3461–62 (Flugaur Declaration); ROA.3463–64 (McNutt Declaration).

or applying the statutory interpretation found to be unlawful and vacated. The problem is not that the Government *cannot* comply with the court's order.

The problem is that it does not want to and, therefore, strains to read the order unreasonably narrowly. The supposed difficulties the Government claims to be encountering are entirely the result of their own willful refusal to accept the judgment of the district court that FRTs are not machineguns.

### a. The Government Disregards the Nationwide Consequences of Vacatur

The Government claims difficulty in refraining from initiating enforcement actions against members of the associational plaintiffs because it does not know who such members are. But this ignores that the Government could comply with the district court's order by not initiating enforcement actions against anyone. While the *injunction* is limited to the plaintiffs because they are the parties before the court, there is nothing that requires the Government to pursue enforcement actions against any other individuals. On the contrary, *vacatur* of the Government's classification of FRTs as machineguns functionally prohibits it from doing so.

### i. Vacatur Applies to Everyone, Not Just the Named Parties

The district court vacated "the ATF's classification of FRTs as machineguns." ROA.3713. The APA allows vacatur of unlawful agency *actions*, not just final rules, and "vacatur of an agency action is the default rule in this Circuit." *Cargill*, 57 F.4th at 472; *see also Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859

(5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy" for an agency action that is otherwise not in accordance with law.). The district court noted that vacatur has a nationwide effect. ROA.3715 ("Vacatur of the ATF's unlawful action—classification of FRTs as machineguns—achieves the same effect here as a nationwide injunction."). Thus, the effect of the court's vacatur is not limited to just the parties before the court.

This is consistent with the general principles of vacatur. As Justice Kavanaugh observed, vacatur "in the APA cannot reasonably depend on the specific party before the court. Either the APA authorizes vacatur, or it does not." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2461, 2469 (2024) (Kavanaugh, J., concurring in the judgment). The Supreme Court "has affirmed countless decisions" that "vacated the challenged agency rules rather than merely providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs." *Id.* at 2463.

Justice Jackson reached a similar conclusion (as a district court judge), finding "[i]t suffices to note here that the argument that a court can only vacate the agency's unlawful conduct with respect to the particular plaintiffs who have filed the legal action that is before it has no grounding in the Article III doctrine or in any federal statute of which this Court is aware." *Kiakombua v. Wolf*, 498 F.Supp.3d 1, 52 (D.D.C. 2020) (Jackson, J.) (mem.). Rather, "conceivably, any and every person who

25

might have otherwise been subjected to the government's unlawful conduct benefits from its vacatur." *Id.* at 53.

She harshly criticized exactly the approach the Government has taken in this case:

> It has apparently only been in recent years that federal agencies have consistently and audaciously demanded an entitlement to persist in the unlawful conduct despite a federal court's ruling declaring that conduct unlawful, which has manifested itself in the strange argument that Defendants have presented here—*i.e.*, that *precisely* because outsiders might benefit from a vacatur, the Court lacks the power to vacate the agency action and must instead craft a remedy that permits the agency to continue to act in flagrant violation of the law as the court has announced it to be with respect to anyone who has not been joined as a party in the case before the court.[] Yet, here as elsewhere, Defendants have failed to provide any persuasive reason why the potential incidental benefit that is conferred to the rest of humanity when a court addresses unlawful agency action by vacating the agency's conduct is sufficiently problematic, under the Constitution or otherwise, to justify limiting a federal court's traditional power to nullify the actions of the defendant when that challenged conduct violates the law."

*Id.* at 53–54.

Generally, "an administrative agency that is acting in good faith and in the public's interest can be expected to heed the implications of the federal court's ruling and desist voluntarily from engaging in conduct that the court has deemed unlawful." *Id.* at 53.

There is no administrative "difficulty" in refraining from pursuing enforcement actions against members of the associational plaintiffs. This can be easily accomplished by refraining from further unlawful enforcement actions.

Instead, there is an effort to defy the "expectation" that the Government desist from engaging in conduct the court deemed unlawful. This "audacious" "entitlement" "to continue to act in flagrant violation of the law" is not correct and does not justify the relief sought by the Government.

> ii. **Having Previously Premised Enforcement Actions on ATF "Classifications," the Government Cannot Now Feign Ignorance of Their Existence or Import**

The Government next seeks to deny the import of vacatur by disingenuously claiming "there is nothing to vacate," suggesting that its prior classifications are nothing more than "opinions" that are not final agency actions. *See* Opening Br. at 32, 33.

That is not what the Government told thousands of citizens—including Plaintiff Carey—in "warning notices" it mailed when it wanted to coerce them into surrendering their FRTs. Then, the Government had no difficulty claiming FRTs "*have been classified* as machineguns that were unlawfully manufactured" and "[p]ossession of these devices is a violation of law due to their illegal manufacture," while threatening "[c]ontinued possession of any of the devices could result in prosecution for criminal violations of Federal law."[10] ROA.1454–55 (Carey

---

[10] The Government characterizes these letters as "encouraging the voluntary abandonment of the devices." Opening Br. at 6. This is a bit like saying a robber "encourages the voluntary abandonment" of one's wallet. The Government

Declaration (emphasis added)).

It is also not what the Government has told sister courts. For example, the Eastern District of New York case is an enforcement action against individuals and companies for allegedly failing to tell consumers about ATF classifications. *See, e.g.*, *United States v. Rare Breed Triggers, LLC*, 690 F.Supp.3d 51, 59 (E.D.N.Y. 2023) ("The Government further alleges that Defendants have repeatedly misled their customers to believe that the FRT-15 is a legal, semi-automatic trigger, despite *the ATF's formal classification of the FRT-15 as a machinegun* and Defendants' knowledge that the ATF and the courts have *classified similar devices as machineguns*." (emphasis added)).

The APA allows a court to "hold unlawful and set aside agency *action*," not just its formally adopted "Final Rules." 5 U.S.C. § 706 (emphasis added). An ATF "classification" was concrete and final enough for the Government to explicitly cite it while threatening criminal prosecution and bringing a civil enforcement action. The Government's feigned ignorance now is, at best, disingenuous and, at worst, dishonest. The Government classified FRTs as machineguns, acted upon that classification, and demanded that American citizens act on that classification on pain of civil and criminal liability. *That* is what the district court vacated.

---

demanded that individuals "voluntarily" surrender FRTs under the explicit threat of prosecution if they declined to do so.

**b. Vacatur Includes Families and Downstream Customers of Members of the Associational Plaintiffs, And Even If It Did Not, Their Protection Is Necessarily Incidental to the Protection of Members**

The Government takes issue with protections for families of members of the associational plaintiffs and downstream customers of the associational plaintiffs. *See* Opening Br. at 27. These concerns are misplaced.

First, as described above, family members and downstream customers are also protected by vacatur.

Second, such protections are necessary to provide full relief to the associational plaintiffs. As this Court previously observed, "a narrower preliminary injunction that protects just possession—not manufacture, distribution, or transfer—ignores that Plaintiffs must be able to acquire FRTs in order to use them." ROA.2144. To acquire them, they must be able to purchase them. To distribute or sell them, the recipient or purchaser must be confident that he or she will not be prosecuted. It is little comfort to say a NAGR member can legally *sell* an FRT if the Government maintains its position that others cannot legally *purchase* one.

Likewise, the commercial associational members will not receive complete relief if the Government remains free to threaten their prospective customers with criminal prosecution. This would have an undeniable chilling effect on the market for a product declared to be legal and harm the manufacturers/sellers.

Thus, this relief does not protect non-parties *qua* non-parties. It effectuates

relief for members of the associational plaintiffs by ensuring that they can carry out the protected activities. The district court's factual determination that this quantum of relief was necessary was not clearly erroneous and should be upheld.

### c. The District Court Appropriately Enjoined Prospective Criminal Enforcement

The Government claims the district court exceeded its authority by enjoining future criminal prosecutions based on its *ultra vires* classification of FRTs as machineguns. *See* Opening Br. at 35. The Government raised these same arguments at the preliminary injunction stage of this litigation. *See, e.g.*, ROA.1309 ("Defendants once again call into question the veracity of pre-enforcement judicial review of laws carrying criminal penalties."). This Court found them "unpersuasive, as the district court already explained." Doc. 51-2 at 7. They are no more so today.

The Supreme Court has emphasized that plaintiffs facing "a credible threat of prosecution … should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[It] is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law.").

Perhaps recognizing that their maximalist position is untenable, the Government pivots to claiming that pre-enforcement review may be available for *constitutional* claims and not others. *See* Opening Br. at 35–36. But this, too, is unavailing. There is no principled basis for this distinction.

In pressing its case, the Government relies on two cases: *Stolt-Nielsen, S.A. v. United States,* 442 F.3d 177, 183 (3d Cir. 2006) and *Deaver v. Seymour,* 822 F.2d 66, 68–71 (D.C. Cir. 1987). But each is distinguishable.

While *Stolt-Nielsen* has some broad language arguably consistent with the Government's thesis, its facts render it inapposite. In *Stolt-Nielsen*, the plaintiff sued to enforce a conditional leniency agreement with the government that the government purported to revoke as a consequence of the plaintiff's behavior. As the district court observed, *Stolt-Nelson* was concerned with "a fundamentally individualized determination rather than a review of a generally applicable administrative action. And this distinction is key." ROA.3687.

Similarly, *Deaver* is concerned with a collateral challenge to the existence of an independent counsel on the eve of a pending indictment. It does not concern the application of a broadly applicable administrative action.[11]

---

[11] Moreover, *Deaver's* core holding is called into question by *Axon Enter., Inc. v. Federal Trade Commission*, 598 U.S. 175 (2023), which held that the subject of an enforcement proceeding could bring a collateral challenge to the constitutional structure of the enforcing body.

Next, the Government challenges the district court's citation to the Administrative Procedure Act, claiming that the APA's general provisions permitting challenges to criminal proceedings are superseded by section 702. *See* Opening Br. at 37. But the Government's bold statement would create an exception that swallows the rule and runs counter to the text and purpose of the APA itself.

"[T]he Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)). The APA itself refers to "mandatory or injunctive decree[s]" issued thereunder. 5 U.S.C. § 702. The import of this text is that injunctive relief is available under the APA. Moreover, the entire purpose of § 702 is to ensure that "[a] person suffering a legal wrong because of agency action" is able to obtain an appropriate remedy. *Id.* . This purpose would be eviscerated if it turned out that § 702 conferred no right to obtain meaningful relief through the courts when wronged by agency action.

The deficiency of the Government's argument is highlighted by the consequences of its position. The Government does not and could not challenge the court's authority to enter a declaratory judgment ruling finding that FRTs are not machineguns and may not be prohibited by administrative fiat. Instead, the Government argues that, even if that is true, the Government should still be allowed to arrest and prosecute people for possessing them. This is a recipe for blatant Due

Process violations. The executive branch cannot arrest and prosecute people for things that are not crimes, and it does not violate the separation of powers for the courts to say as much. *See generally Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 378 (5th Cir. 2022) ("[A]n agency 'literally has no power to act … unless and until Congress authorizes it to do so by statute.'" (quoting *FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022))).

In prior cases where injunctive relief was denied in favor of vacatur only, the courts noted that "Defendants have represented that they will abide by the Court's order." *See O.A. v. Trump*, 404 F.Supp.3d 109, 153–54 (D.D.C. 2019). Here, the Government is saying *exactly the opposite*. The best evidence of the need for injunctive relief is the Government's own brief. *See* Opening Br. at 33 (disregarding the consequences of vacatur and alluding to engaging in a strategy of inter-circuit nonacquiescence). The Government itself provides the strongest possible evidence as to why vacatur is inadequate and why an injunction is both necessary and appropriate. Absent an injunction, the Government will flout this Court's determination.

And after the court's vacatur and declaration, any such prosecution would inherently be in bad faith and, thus, properly subject to injunction. *See Wilson v. Thompson*, 593 F.2d 1375, 1381 (5th Cir. 1979) ("Our cases as well have recognized that the bad faith exception is not limited to situations where there is a threat of

33

multiple or repeated prosecutions.").

### d. The District Court's Order to Send Remedial Notices is Not Overbroad

The Government is entirely responsible for the purported "confusion" alleged to have been caused by remedial notices. The Government sent out thousands of threatening notices claiming FRTs were machineguns. This district court (correctly) concluded they are not. Thus, the Government's action was unlawful. The least the Government can (and must) do is correct its own misrepresentations.

In response, the Government argues that another court may disagree.[12] This ignores the import of the district court's vacatur. As the district court itself said (and as discussed above), "[v]acatur of the ATF's unlawful action—classification of FRTs as machineguns—achieves the same effect here as a nationwide injunction" because "[a]t its core, vacatur is inherently universal in character." ROA.3715.

The Government's reference to litigation in the Eastern District of New York does not compel a different result. First, procedurally, the Eastern District of New York is at the preliminary injunction stage. There is no final judgment. Second, as the Government notes, Plaintiffs have asked the Second Circuit to dismiss the EDNY case based largely on the effect of the district court's vacatur. That dismissal would

---

[12] The Government claims this relief "applies *solely* to nonparties." Opening Br. at 13 (emphasis added). This is plainly false. Associational plaintiff members—including plaintiff Carrey—received "warning" notices from the Government. ROA.1454–55.

resolve the purported tension on which the Government focuses.

The Government engaged in a widespread campaign of misinformation to discourage American citizens from exercising their constitutional right to bear arms in a manner Defendants do not like. No statute or congressional directive required the ATF to undertake its direct notification campaign. It was undertaken to chill legal behavior by discouraging the possession, sale, or manufacture of FRTs under the false pretense that they were illegal machineguns. The information distributed was false and unlawful. Thus, requiring corrective notification *to the same recipients* of the ATF's targeted mailing campaign in the same manner—whether or not all recipients are organizational members—is appropriate and is neither overly broad nor does it create an undue risk of confusion. This is necessary for the commercial associational plaintiffs to receive full relief. It is the only way they can manufacture and sell without a false cloud of doubt, disseminated by the ATF, hanging over their heads.

### e.  Injunctive Relief Properly Extends Beyond Persons Who Were Members of the Associational Plaintiffs at the Time the Complaint was Filed

The Government repeatedly asserts—without analysis—that relief is limited to members of the association plaintiffs "at the time this suit was brought." *See* Opening Br. at 27–28, 38, 39. It is wrong.

In *Franciscan Alliance*, the district court enjoined the federal government "from interpreting or enforcing Section 1557 of the Affordable Care Act, 42 U.S.C.

§ 18116(a), or any implementing regulations thereto against Plaintiffs, their current and future members." 553 F. Supp. 3d 361, 378 (N.D. Tex. 2021), *amended*, No. 7:16-CV-00108-O, 2021 WL 6774686 (N.D. Tex. Oct. 1, 2021), and *aff'd in part, dismissed in part*, 47 F.4th 368 (5th Cir. 2022). This judgment was affirmed by this Court. *Franciscan All.*, 47 F.4th at 379–80. If Article III allows an injunction that benefits unknown future members of a plaintiff association, then it plainly supports an injunction that benefits individuals who were members at the time an injunction was issued. *See also Christian Emps. All. v. Azar*, No. 3:16-CV-309, 2019 WL 2130142, at *4 (D.N.D. May 15, 2019) (ruling that the preliminary injunction would apply to future members because limiting it to current members at the time of the injunction would "result in an endless cycle of litigation as new members and the Alliance seek to protect their rights."); *Reaching Souls Int'l Inc. v. Azar*, No. CIV-13-1092-D, 2018 WL 1352186, at *2 (W.D. Okla. March 15, 2018) (extending injunction to "all current and future participating employers in the Guidestone plan").

To the extent the Government offers any support for its position, it is a cryptic citation to a footnote in *Lujan v. Defs. of Wildlife*, offered without a parenthetical explanation, let alone analysis. Opening Br. at 28 (citing 504 U.S. 555, 570 n.5). This citation is a *non sequitur*. Footnote 5 repeats the unremarkable proposition that *standing* is determined at the time the complaint is filed. 504 U.S. 555, 570 n.5

(1992) ("*standing* is to be determined as of the commencement of suit" (emphasis added)). It says nothing about the scope of relief available to associational plaintiffs.

The Government *wants* relief to be limited to persons who were members at the time the complaint was filed. But neither *wanting* it nor complaining about it makes it so. Relief properly extends to current and future members of the associational plaintiffs, as it did in *Franciscan Alliance*.

## CONCLUSION

James Madison warned that "[t]he accumulation of all powers, legislative, executive and judiciary, in the same hands … may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961). Here, the Government seeks to unite the executive and legislative power, arrogating unto itself the authority to write and enforce the law it wishes it had rather than the one that Congress provided. This is not and cannot be correct.

The judgment of the district court should be affirmed.

Date: October 29, 2024          Respectfully submitted,

*/s/Gary M. Lawkowski*
GARY M. LAWKOWSKI
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

WHITNEY DAVIS
Eggleston King Davis, L.L.P.
102 Houston Avenue
Suite 300
Weatherford, TX 76086

GLENN D. BELLAMY
Wood Herron & Evans, L.L.P.
600 Vine Street
Suite 2800
Cincinnati, OH 45202

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/Gary M. Lawkowski*
Gary M. Lawkowski

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 8,963 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in Times New Roman font 14-point type face.

*/s/Gary M. Lawkowski*
Gary M. Lawkowski