No. 24-10707

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

National Association for Gun Rights, Incorporated; Texas Gun Rights, Incorporated;
Patrick Carey; James Wheeler; Travis Speegle,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven
Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco,
Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas
District Court Case No. 4:23-cv-830 (Hon. Reed O'Connor)

## REPLY BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
  *United States Attorney*

MARK B. STERN
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................1

ARGUMENT .........................................................................................................3

I.  The FRT-15 and WOT Are Machineguns ................................................3

II.  The Relief the District Court Ordered Was Inappropriate ................................ 10

    A.  The District Court Erred in Extending Relief to Unidentified
        Individuals and Entities ........................................................11

    B.  The Relief the District Court Ordered Cannot Be Squared With
        Standing Principles ..........................................................16

    C.  The Injunction Is Overbroad Insofar as it Enjoins Criminal
        Prosecutions......................................................................20

CONCLUSION .................................................................................................. 23

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                      **Page(s)**

*American Pipe & Constr. Co. v. Utah,*
   414 U.S. 538 (1974) ................................................................. 19

*Babbitt v. United Farm Workers Nat'l Union,*
   442 U.S. 289 (1979) ................................................................. 20

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................. 15

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023) ................................................... 8

*Deaver v. Seymour,*
   822 F.2d 66 (D.C. Cir. 1987) ................................................. 21

*Douglas v. City of Jeannette (Pa.),*
   319 U.S. 157 (1943) ................................................................. 20

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
   129 F.3d 826 (5th Cir. 1997) ................................................. 16

*Garland v. Cargill,*
   602 U.S. 406 (2024) ....................................... 1, 4, 4-5, 5, 6, 7, 8, 9

*Gettman v. DEA,*
   290 F.3d 430 (D.C. Cir. 2002) ............................................... 17

*Gill v. Whitford,*
   585 U.S. 48 (2018) ................................................................... 18

*Heinsohn v. Carabin & Shaw, P.C.,*
   832 F.3d 224 (5th Cir. 2016) ................................................. 17

*Hunt v. Washington State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ................................................................. 19

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................................. 19

*Peoples Nat'l Bank v. Office of Comptroller of the Currency,*
   362 F.3d 333 (5th Cir. 2004) ................................................. 15

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ........................................................................... 18

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ......................................................................... 12

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ......................................................................... 20

*Stolt-Nielsen, S.A. v. United States*,
  442 F.3d 177 (3d Cir.), as amended (May 16, 2006) ........................ 21

*Students for Fair Admissions, Inc. v. University of Tex. at Austin*,
  37 F.4th 1078 (5th Cir. 2022) .......................................................... 17

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ......................................................................... 18

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ......................................................................... 20

*United States v. Carter*,
  465 F.3d 658 (6th Cir. 2006) .......................................................... 2, 9

*United States v. Cox*,
  342 F.2d 167 (5th Cir. 1965) ........................................................ 20, 21

*United States v. Rare Breed Triggers LLC*,
  690 F. Supp. 3d 51 (E.D.N.Y. 2023) ......................................... 3, 14, 15, 16

*Wilson v. Thompson*,
  593 F.2d 1375 (5th Cir. 1979) ......................................................... 20

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 702 ................................................................................. 21
  5 U.S.C. § 706 ................................................................................. 15

18 U.S.C. § 922(o) ........................................................................ 11, 14

18 U.S.C. § 922(g) ........................................................................ 13, 22

18 U.S.C. § 924(a)(2) ........................................................................ 14

26 U.S.C. § 5845(b) ................................................................................................. 4

**Rules:**

Fed. R. Civ. P. 23(c) ........................................................................................... 19

Fed. R. Civ. P. 65 ............................................................................................... 10

Fed. R. Civ. P. 65(d)(1)(C) ............................................................................. 2, 12

**Other Authority:**

Superseding Indictment, *United States v. Berrios-Aquino*,
   No. 22-cr-00473 (D.P.R. Apr. 20, 2023) ....................................................... 14

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court's decision in *Garland v. Cargill*, 602 U.S. 406 (2024), explained the fundamental distinction between a semiautomatic rifle and a machinegun. A semiautomatic rifle with a standard trigger is not a machinegun because the shooter must "engage the trigger and then release the trigger to allow it to reset," *id.* at 421. With a machinegun equipped with an auto sear, by contrast, a shooter may "fire multiple shots while engaging the trigger only once," *id.* at 420 n.4, by applying continuous pressure to the trigger.

There is no dispute that the devices at issue here—the FRT-15 and Wide Open Trigger (WOT)—replace a standard semiautomatic rifle trigger and make it unnecessary to "release and reengage" the trigger or "take[] pressure off" the trigger for each shot. *Cargill*, 602 U.S. at 411, 420. Instead, once the trigger is engaged, the mechanics of the devices ensure that the weapon automatically fires repeatedly as long as pressure is applied to the trigger—just as a machinegun with an auto sear fires repeatedly as long as pressure is applied to the trigger.

In describing these distinctions, the Supreme Court repeatedly emphasized that the "engage[ment]" and then "release" of a standard semi-automatic trigger forms part of the "complete process" that makes up a "single function of the trigger" under the statutory definition. *Cargill*, 602 U.S. at 421 (quotation omitted). Plaintiffs make no attempt to come to grips with the Court's analysis and instead urge that the sole dispositive consideration is whether the trigger moves for each shot fired. That is not

the holding of *Cargill.* The Supreme Court did not suggest that a device ceases to be a machinegun simply because the trigger moves repeatedly. Nor do plaintiffs dispute that continuous movement of the trigger is a feature of other devices that they concede are machineguns, such as the device in *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006) (per curiam).

Because the devices at issue here fall within in the statutory definition of "machinegun" as explicated in *Cargill*, the judgment of the district court should be reversed. But even assuming that plaintiffs were entitled to some relief, they provide no justification for the scope of the district court's injunction. They do not dispute that the government has no means of determining who is covered by the district court's injunction now or in the future, and do not explain how an order of that type comports with the baseline requirement that injunctive relief be stated with specificity. *See* Fed. R. Civ. P. 65(d)(1)(C). These problems are compounded by plaintiffs' understanding of the district court's "vacatur," which, in their view, prohibits the government from bringing enforcement actions against anyone, whether or not they are covered by the injunction. That understanding would render the injunction superfluous and would improperly purport to bar U.S. Attorneys across the nation from determining whether to bring suit against entities or individuals with no connection to this litigation. That understanding of the "vacatur" is particularly anomalous because enforcement actions are not based on ATF's classification letters

but on the statute itself, which is subject to de novo review by the court in any enforcement proceeding. *See, e.g., United States v. Rare Breed Triggers LLC*, 690 F. Supp. 3d 51, 75, 88 (E.D.N.Y. 2023) (holding on de novo review that the devices at issue here are machineguns).

The district court's relief also disregards basic principles of standing and equity. It granted associational standing to two organizations despite the absence of any showing that their members in any way direct or control the organizations and extended relief to every member regardless of whether they have standing. It ordered that remedial notices be sent to non-parties who may be subject to criminal or civil enforcement in other jurisdictions that may conclude these devices are machineguns. At a minimum, the district court's relief should be significantly curtailed to comport with basic rules of standing and equity.

## ARGUMENT

## I.     The FRT-15 and WOT Are Machineguns

**A.** As the district court recognized—and plaintiffs' brief confirms—there is no dispute about how the FRT-15 and WOT mechanically operate. Using these devices, a shooter engages the trigger once, maintains pressure on the trigger, and the weapon fires repeatedly. That is the same process as an M16 or similar machinegun equipped with an auto sear, which likewise fires repeatedly from continuous pressure on the trigger. In using either weapon, the shooter maintains continuous pressure on the

3

trigger. However, the mechanics of the FRT-15 and WOT cause the trigger to move slightly for each shot because of the force of the travel of the bolt carrier and the design of the devices, though the shooter does not release and reengage the trigger to fire successive shots. From the fact that "the *trigger* still moves forward and backward for each and every shot," Br. 11, plaintiffs conclude that these devices do not allow the firing of "more than one shot . . . by a single function of the trigger," 26 U.S.C. § 5845(b).

That reasoning is flatly at odds with the Supreme Court's analysis in *Garland v. Cargill*, where the Court explained that to determine what constitutes a single "function of the trigger" a court must consider the entire "trigger assembly" and its relationship to the "mechanics of the firing cycle." 602 U.S. 406, 416 (2024) (quotation omitted). In applying that analysis to non-mechanical bump stocks, the Supreme Court repeatedly emphasized that those weapons are not machineguns because "[a]s with any semiautomatic firearm, the trigger still must be released and reengaged to fire each additional shot," *id.* at 412, which requires "the shooter" to "take[] pressure off the trigger" in some fashion, *id.* at 420; *accord id.* at 415 ("must release and reset the trigger between every shot"); *id.* at 421 ("For each shot, the shooter must engage the trigger and then release the trigger to allow it to reset."); *id.* at

4

424 ("Too much forward pressure and the rifle will not slide back far enough to release and reset the trigger, preventing the rifle from firing another shot.").

The Court explained that the "complete process" of engaging and releasing the trigger "constitutes a 'single function of the trigger'" on a semiautomatic rifle with a standard trigger: "A shooter may fire the weapon again after the trigger has reset, but only by engaging the trigger a second time and thereby initiating a new firing cycle. For each shot, the shooter must engage the trigger and then release the trigger to allow it to reset. Any additional shot fired after one cycle is the result of a separate and distinct 'function of the trigger.'" *Cargill*, 602 U.S. at 421. "Nothing changes" in this process with a non-mechanical bump stock: "Between every shot, the shooter must release pressure from the trigger and allow it to reset before reengaging the trigger for another shot." *Id.* The non-mechanical bump stock "merely reduces the amount of time that elapses between separate 'functions' of the trigger" by making it "easier for the shooter to move the firearm back toward his shoulder and thereby release pressure from the trigger and reset it" and "press the trigger against his finger very quickly thereafter." *Id.*

The Supreme Court contrasted non-mechanical bump stocks with machineguns with auto sears: machineguns with auto sears will fire repeatedly "if the trigger is being held back," and thus "permit[] a shooter to fire multiple shots while engaging the trigger only once." *Cargill*, 602 U.S. at 420 n.4. With those devices, the

shooter's continuous pressure on the trigger enables the weapon to fire repeatedly by repeatedly releasing the hammer; the auto sear "catches the hammer as it swings backwards, but will release [the hammer] again once a new cartridge is loaded if the trigger is being held back." *Id.*

Like an M16 equipped with an auto sear, the FRT-15 and WOT devices fire automatically as long as pressure is applied to the trigger. *See, e.g.*, ROA.954, ROA.3064-65, ROA.4099-4100. The action of the bolt carrier automatically pushes the trigger slightly forward to be restrained by the "locking bar" for a fraction of a second until the weapon is reloaded and prepared to fire again, at which point the "trip surface" of the rifle's bolt carrier contacts the locking bar, causing another shot. *See, e.g.*, ROA.1105-08. The "locking bar" thus performs the same tasks as the auto sear—restraining the release of the hammer until the weapon is ready to fire again and enabling release of the hammer through interaction with the "trip surface" of the rifle's bolt carrier. ROA.1099. The only difference is that the locking bar achieves indirectly what the auto sear does directly. An auto sear retains the hammer directly between shots, *see* ROA.1140, while with these devices the hammer is retained by the trigger, which is in turn retained by the locking bar, which restrains the trigger from moving between shots. A single engagement of the trigger thus produces multiple

6

shots, with no need for the shooter to "release the trigger to allow it to reset." *Cargill*, 602 U.S. at 421.

**B.** Plaintiffs fail to come to grips with the Supreme Court's emphasis on the entire cycle of operations, including the necessity of a "release" of the trigger in completing the "single function of the trigger" on a standard semiautomatic firearm. In their view, the Court's discussion was superfluous to its analysis. On plaintiffs' understanding, the Court need have gone no farther than to note that the trigger moved for every shot. That fact would have been dispositive, regardless of whether the trigger is "released."

But that fact was not dispositive, and the Court's detailed discussion makes plain that it is not sufficient to observe that the trigger moves. A court must instead analyze the "complete process" of engaging and releasing the trigger. And, for all relevant purposes, that process in an FRT-15 or WOT is no different than that in the M16.

Plaintiffs attempt to distinguish the function of an auto sear in the M16 on the ground that with an auto sear "the trigger moves only for the first shot." Br. 15. In the case of a FRT-15 or WOT, "[t]he locking bar does not bypass the trigger" and the trigger must "mechanically function[] for each and every shot." *Id.* But as ATF explained, and as plaintiffs do not dispute, the auto sear and the locking bar perform the same critical task of timing when the hammer is released for subsequent shots,

and they do so by interacting with the "trip surface" of the bolt carrier in the same fashion. *See supra* pp. __. As discussed, that the locking bar "does not bypass the trigger" (Br. 16) does not resolve the single-function inquiry.

Plaintiffs' contention that these devices do not operate "automatically" (Br. 16-17) restates their contention that the devices do not operate by a single function of the trigger. The district court did not separately analyze that statutory term or hold that these devices do not operate automatically. In any event, here, unlike in *Cargill*, it is undisputed that these devices do not require anything other than engagement of the trigger to fire repeatedly. *See Cargill*, 602 U.S. at 424. The only question is whether the movements of the trigger in that process are distinct "functions." Plaintiffs nevertheless cite language from the district court that they assert resolves the issue of automatic firing. Insofar as it bears on the inquiry, the cited discussion is irreconcilable with plaintiffs' position. In the quoted passage, the district court stated that an Akins Accelerator—a mechanical bump stock on which the trigger moved to release the hammer for every shot fired—is a machinegun notwithstanding that the trigger is "actuat[ed]" for each shot fired. ROA.3708; *see Cargill*, 602 U.S. at 411 n.1 (noting that *Cargill* does not consider mechanical bump stocks); *Cargill v. Garland*, 57 F.4th 447, 462 n.8 (5th Cir. 2023) (en banc) (plurality opinion) (explaining that the plurality's decision is consistent with treating an Akins Accelerator as a machinegun).

The quoted language also underscores plaintiffs' error in extracting phrases in *Cargill* from their context. They note the Court's observation that a shooter "engages the trigger by moving it backward," *Cargill*, 602 U.S. at 418, and from that phrase argue that "to 'engage' the trigger is to actuate it," Br. 11. But that language comes from the beginning of the Court's extended description of how a standard semiautomatic rifle trigger operates, *Cargill*, 602 U.S. at 416-21, which concludes with the language quoted above that these standard trigger mechanisms require "the shooter" to "engage the trigger and then release the trigger to allow it to reset" for each shot fired, *id.* at 421. Plaintiffs commit the same error when they quote (Br. 9) *Cargill*'s statement that "the phrase 'function of the trigger' means the physical trigger movement required to shoot the firearm," 602 U.S. at 416, without acknowledging the Supreme Court's prefatory statement limiting that description to semiautomatic firearms with "standard trigger mechanisms," *id.*

Plaintiffs' discussion of the firearm in *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006) (per curiam), further illustrates the difficulties with their analysis. That firearm was a rifle that had been modified so that if the shooter pulled back and released the bolt, the bolt would automatically move back and forth repeatedly to fire multiple shots. *Id.* at 665. The bolt was the "trigger" on that weapon, and it was required to complete the same physical cycle for every shot fired. Plaintiffs do not dispute that the weapon in *Carter* was a machinegun notwithstanding that the trigger

moved back and forth automatically.  They assert instead that FRT-15s and WOTs are different because the trigger "*does not* move back and forth 'automatically'" and "a weapon equipped with an FRT will not continue to fire without an external force."  Br. 13.  In other words, plaintiffs rely on the shooter's application of pressure to the trigger to distinguish these devices.  But the premise of plaintiffs' argument is that the only determining factor is whether "the *trigger* still moves forward and backward for each and every shot, resetting in between."  Br. 11; *accord* Br. 10 ("It is the physical movement of the trigger that matters, not the movement of the trigger finger or the pull of the trigger.").  Plaintiffs make no attempt to reconcile their position with the Sixth Circuit's reasoning and holding in *Carter*.

## II.    The Relief the District Court Ordered Was Inappropriate

Plaintiffs do not dispute that neither the government nor the district court is aware of the full range of individuals and entities to whom the injunction and other aspects of the judgment apply.  Nor do they dispute that the government has no means of ascertaining the identities of those individuals and entities on its own.  And they do not attempt to explain how the injunction comports with the requirements of Federal Rule of Civil Procedure 65 and the principles of fair notice that rule codifies.

Plaintiffs apparently believe that such concerns are immaterial because the district court's "vacatur" establishes the meaning of the statute nationwide and precludes the government from bringing an action against persons who are not parties

to this suit and asking another court to interpret and apply the statutory text. Yet plaintiffs struggle to explain why, if the district court's "vacatur" has the effect they ascribe it, it was necessary for the district court to enter declaratory and injunctive relief that runs to the plaintiffs at all. On top of all that, plaintiffs do not acknowledge other traditional limitations on equitable relief, including the background principles that relief should be limited to parties with standing and that injunctions generally may not issue against criminal prosecutions.

These problems have a straightforward solution. To the extent plaintiffs have an entitlement to relief at all, it is to a declaratory judgment that FRT-15s and WOTs are not machineguns. That declaration would preclude future enforcement actions against plaintiffs under the federal ban on machineguns, 18 U.S.C. § 922(o), or in other circumstances in which the status of those devices would be at issue. But the district court's injunction cannot be sustained, and the district court's "vacatur" does not solve these fundamental problems.

### A.    The District Court Erred in Extending Relief to Unidentified Individuals and Entities

**1.** Plaintiffs nowhere dispute that the government is not aware—and has no way to learn—the identities of all members of the plaintiff organizations to whom the district court's injunction applies. Nor do they dispute that the government has no way to identify the family members of the individual plaintiffs or the "downstream customers" of any "commercial member" of these organizations. Indeed, plaintiffs'

11

apparent position is that the universe of individuals covered by the injunction will grow indefinitely: not only will additional "downstream customers" be added, but any "future members" of the associational plaintiffs would likewise be covered.  Br. 29, 37.

Plaintiffs make no effort to reconcile this feature of the injunction with the basic principle that injunctive relief must be specifically described "to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam); *see* Fed. R. Civ. P. 65(d)(1)(C) (requiring that every injunction "describe in reasonable detail . . . the act or acts restrained or required").  That requirement reflects the principle that because "an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt*, 414 U.S. at 476.

Plaintiffs do not resolve these issues by asserting that the government "knows to whom it previously mailed threatening notices" or "previously seized FRTs."  Br. 23.  The central point is that because the government does not know who is covered by the judgment here, it cannot identify to whom the district court's relief applies, both in terms of returning devices already in its possession and for considering any future actions against non-parties.

12

Plaintiffs urge that such difficulties are illusory because "the Government could comply with the district court's order by not initiating enforcement actions against anyone," including non-parties. Br. 23-24. That plaintiffs urge this course tacitly acknowledges that the injunction itself lacks sufficient specificity, and plaintiffs nowhere argue otherwise. They declare, however, that "[w]hile the *injunction* is limited to the plaintiffs because they are the parties before the court, there is nothing that requires the Government to pursue enforcement actions against any other individuals. On the contrary, *vacatur* of the Government's classification of FRTs as machineguns functionally prohibits it from doing so." Br. 24. Thus, in plaintiffs' view, the defects in the injunction are irrelevant because the vacatur "functionally prohibits" the government from enforcing its understanding of the statute against everyone.

The district court did not purport to dictate the meaning of the statute for all courts in actions brought against entities who are not parties to this suit, and it expressly declined to enter a nationwide injunction applying to non-parties. ROA.3718. And it excluded from its injunctive relief any ongoing suits that might implicate persons covered by the injunction—including the ongoing *Rare Breed Triggers* litigation in the Eastern District of New York—as well as members of the organizations barred from possessing firearms under 18 U.S.C. § 922(g). ROA.3722.

Plaintiffs' reliance on "vacatur" is particularly anomalous because no one faces civil or criminal liability for violating a classification. An enforcement action instead

addresses a violation of the statute. *See, e.g.,* Superseding Indictment, *United States v. Berrios-Aquino*, No. 22-cr-00473 (D.P.R. Apr. 20, 2023) (charging defendant with violation of 18 U.S.C. §§ 922(o) and 924(a)(2) for possession of an FRT-15). Courts in such actions interpret the statute—not an ATF classification—and they do not accord deference to ATF's interpretation. That is why the *Rare Breed Triggers* court, considering a suit under the Fraud Injunction Act, conducted a de novo review and concluded that "the Government has demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun" based on "guidance from the Supreme Court, the plain meaning and purpose of the statute, and the interpretive methods applied by other federal appellate courts." *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51, 75, 88 (E.D.N.Y. 2023).

Plaintiffs do not appear to seriously dispute that other enforcement actions—such as criminal prosecutions and the *Rare Breed Triggers* action—proceed on the basis of the relevant statute itself rather than any "classification." And they do not defend the district court's mistaken view that the "classification" of the FRT-15 and WOT are products of the agency rule addressing bump-stock-type devices, *see* Opening Br. 24-25, instead simply dismissing ATF's consistent treatment of similar devices as "irrelevant," Br. 17. They instead highlight that in letters it sent as part of its effort to retrieve FRT-15s, ATF stated that these devices "have been classified as machineguns." ROA.1456; *see* Br. 27. But that statement of ATF's view reflects its

understanding of the statute, and it has no independent force.  In the event of a criminal prosecution a court would apply its own de novo understanding of the statute and reach a judgment on that basis.  ATF's communications thus explained that possession "could result in prosecution for criminal violations of Federal law," ROA.1456—in other words, under the relevant statutes, not under any "classification."[1]

Plaintiffs stress that the Administrative Procedure Act (APA) "allows a court to 'hold unlawful and set aside agency *action*,'" Br. 28 (quoting 5 U.S.C. § 706).  Whatever the meaning of that provision when a court addresses a regulation with independent force, it has no bearing on enforcement of the statute here.  A prosecutor's belief that particular conduct is covered by a statute is not "agency action" that a court can "vacate."  The only "legal consequences" flow from the statute itself, as interpreted and applied by the court hearing the case.  *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *Peoples Nat'l Bank v. Office of Comptroller of the Currency*, 362 F.3d 333, 336 (5th Cir. 2004) (holding that final agency action is a jurisdictional requirement).

---

[1] Plaintiffs' references to the *Rare Breed Triggers* litigation (Br. 28) are even farther afield.  As noted, the district court in that case addressed the status of these devices de novo and with no deference to ATF's views.  ATF's longstanding and consistent history with respect to the FRT-15 and similar devices—and defendants' awareness of that history—was instead relevant to defendants' knowledge that they were deceiving their customers.  *See Rare Breed Triggers*, 690 F. Supp. 3d at 91-99 (discussing classifications in this context).

**2.** Plaintiffs' defense of the aspect of the district court's order requiring remedial notices (Br. 34-35) rests on the same mistaken premises. The court had no authority to require "remedial" notices to be sent to nonparties, and doing so would engender confusion and legal risk for recipients if another court adopts a different view of the statute—as one district court already has. *See Rare Breed Triggers*, 690 F. Supp. 3d at 75, 88. Plaintiffs urge that no other court will ever be allowed to disagree because of "the import of the district court's vacatur." Br. 34. But as discussed, that is incorrect, and the district court clearly recognized that other pending actions in other districts would continue.

### B.    The Relief the District Court Ordered Cannot Be Squared With Standing Principles

Plaintiffs fail to meaningfully address the standing concerns that underscore the improper scope of the injunction. As discussed in our opening brief, a "traditional membership organization" that claims to litigate on behalf of members and bind them to judgments must, at a minimum, be in some sense managed or controlled by the members whose claims it purports to press. That is why, when attempting to determine whether an organization is equivalent to a "traditional membership organization," this Court considers the degree of control the purported members have over the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.,* 129 F.3d 826, 829 (5th Cir. 1997). Plaintiffs make no serious effort to demonstrate any level of control here, relegating to a footnote their claim—already addressed in our opening brief, *see*

16

Opening Br. 31—that they have "a procedure for members to influence

organizational policy through referenda." Br. 23 n.9. From the evidence here, their

"members" appear to be no more than individuals who pay a fee in exchange for a

newsletter and a hat or tote bag. *See Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir.

2002) (rejecting assertion that magazine could sue on behalf of its subscribers).

Plaintiffs cannot avoid these difficulties by declaring that they are membership

organizations because they say they are "traditional membership organizations," with

"bylaws" that have never been produced in this litigation and unspecified

"membership criteria." Br. 22-23. Even the case on which plaintiffs seek to rely—

*Students for Fair Admissions, Inc. v. University of Texas at Austin*, 37 F.4th 1078 (5th Cir.

2022)—held that the organization at issue was a "traditional membership

organization" because of evidence that the organization's bylaws created "General

Members" who "pay membership dues and elect one of [the organization]'s five

directors." *Id.* at 1084-85.[2]

At a minimum, these considerations illustrate the inappropriateness of relief

extending to every member of the plaintiff organizations. Plaintiffs' own submissions

---

[2] Plaintiffs urge that the district court's ruling on standing reflects a "credibility determination" subject to clear error review. Br. 22 n.8. But at the summary judgment stage "a court may make no credibility determinations." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (quotation omitted). In any event, the point here is that even accepting plaintiffs' vague assertions about the organizations as true, those assertions are insufficient as a matter of law to establish standing.

illustrate that many—perhaps even a large majority—of their members lack standing in their own right, *see* Opening Br. 29 & n.3, but plaintiffs nevertheless insist that relief in this case should extend to members that lack standing. Article III instead requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). And plaintiffs do not aid themselves by noting (Br. 20-21) that some individual plaintiffs in this case have standing. No one disputes that the presence of one party with standing ensures that a court may decide the merits of a case, *see Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 51 n.2 (2006), and the corresponding premise that the presence of one member with standing is sufficient to establish a court's power to decide the merits in a suit brought by an organizational plaintiff on behalf of its members, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). But the power to decide the merits does not enable a court to exercise its Article III power to grant relief to individuals or parties that lack standing. And in this context, it is clear that relief should be limited only to those members at the time of suit who had standing and who have agreed to be bound by the judgment.

Finally, plaintiffs contend that injunctive relief should extend to new unidentified members indefinitely, such that any future member should automatically receive the benefits of the judgment. Br. 36. The district court has never suggested that its relief operates in that fashion, and more generally, plaintiffs cite no case from

this Court or any other appellate court endorsing that approach.  The premise of associational standing is that the organization is pressing the claims of its members. *See, e.g.*, *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977).  The Supreme Court has emphasized that standing is determined when a suit is filed, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992), and the organizations here plainly could not establish standing to assert the claims of members they did not yet have.

Plaintiffs presumably do not believe that every time an individual joins an organization that individual's claims are automatically controlled by any past adverse judgments in suits brought by the organization on the members' behalf before the individual joined.  Nor do plaintiffs presumably believe even that future members of NAGR and TGR would be bound by an adverse judgment in this suit if this Court reverses on the merits.  And it has long been acknowledged as improper for prospective parties to "await developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests." *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974).  Such practices are forbidden in the context of class actions, *see* Fed. R. Civ. P. 23(c), and no different rule should prevail because a party has chosen not to meet the requirements for a class action.  This case illustrates the point: the organizational plaintiffs waited until after the district court had granted a preliminary injunction to claim that the parties to the earlier-filed *Rare Breed Triggers* case in the Eastern District of New York

were members of NAGR, and have now sought to leverage the district court's

judgment in that litigation.  *See* Opening Br. 10 n.2, 32-33, 38.

### C.    The Injunction Is Overbroad Insofar as it Enjoins Criminal Prosecutions

Plaintiffs likewise fail to justify the injunction's extension to criminal

prosecutions.  Plaintiffs do not even acknowledge the "familiar rule that courts of

equity do not ordinarily restrain criminal prosecutions," *Douglas v. City of Jeannette (Pa.)*,

319 U.S. 157, 163 (1943), or this Court's explanation that that rule is "an incident of

the constitutional separation of powers" that respects the "free exercise of the

discretionary powers of the attorneys of the United States in their control over

criminal prosecutions," *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) (en

banc).  And after two rounds of district-court briefing and two rounds of briefing

before this Court, plaintiffs have still failed to identify a single case enjoining a

criminal prosecution where the prosecution would purportedly be based on an

erroneous interpretation of the relevant statute.

Instead, plaintiffs simply parrot the district court's errors, citing (Br. 30, 33)

cases involving either declaratory judgments (rather than injunctions), *see Steffel v.

Thompson*, 415 U.S. 452, 459 (1974), or First Amendment claims, *Susan B. Anthony List

v. Driehaus*, 573 U.S. 149, 158 (2014); *Babbitt v. United Farm Workers Nat'l Union*, 442

U.S. 289, 298 (1979); *Wilson v. Thompson*, 593 F.2d 1375, 1381 (5th Cir. 1979).  But as

we explained (Opening Br. 35), while federal courts may sometimes enjoin criminal

prosecutions in the context of constitutional claims to avoid a chilling effect on

constitutional rights, courts have otherwise consistently rejected efforts to enjoin

prospective federal criminal prosecutions. *Stolt-Nielsen, S.A. v. United States*, 442 F.3d

177, 183 (3d Cir.), as amended (May 16, 2006); *Deaver v. Seymour*, 822 F.2d 66, 68-71

(D.C. Cir. 1987). Plaintiffs attempt to distinguish these cases as involving "a

fundamentally individualized determination" rather than "a broadly applicable

administrative action." Br. 31 (quoting ROA.3687). But that simply makes the

injunction here far *more* intrusive than the injunctions rejected in *Stolt-Nielsen* and

*Deaver*, and thus the intrusion on "the constitutional separation of powers"

correspondingly greater. *Cox*, 342 F.2d at 171.

Plaintiffs likewise offer nothing new beyond the district court's misreading of

the Administrative Procedure Act. The fact that the APA contemplates a "mandatory

or injunctive decree" as a possible remedy, 5 U.S.C. § 702, does not answer the

antecedent question of whether such a decree is available in a given case consistent

with the "duty of the court to . . . deny relief on any other appropriate . . . equitable

ground," *id.*

Plaintiffs are likewise wrong to suggest that the unavailability of injunctive relief

against a criminal prosecution here means that plaintiffs have no way "to obtain

meaningful relief." Br. 32. As plaintiffs acknowledge in the very next paragraph, a

court may in appropriate circumstances "enter a declaratory judgment." *Id.* There

would then be no point to pursuing criminal proceedings against individuals with the benefit of that judgment. The availability of that remedy makes the district court's injunctive relief—and its disregard of traditional equitable principles rooted in the separation of powers—all the more inappropriate.

* * * * *

In sum, if this Court affirms on the merits, the Court should nevertheless vacate the injunction in its entirety. If it determines not to do so, it should direct that the injunction be limited to the named plaintiffs or to organization members who identify themselves to ATF and should vacate the remedial notice requirement and the injunction as it applies to criminal prosecutions. At a minimum, the Court should clarify that even after the expiration of the district court's deadline, the return requirement cannot apply as to members of the plaintiff organizations that have not identified themselves to ATF and provided both adequate documentation of their membership at the time the suit was brought and adequate information to permit ATF to run a background check to determine if the individual is prohibited from possessing a firearm under 18 U.S.C. § 922(g).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

LEIGHA SIMONTON
  *United States Attorney*

MARK B. STERN

  *s/ Brad Hinshelwood*
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

November 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,543 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood