No. 24-10707

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS,
INC.; PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES
DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL
CAPACITY AS DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES; BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-cv-830

## TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | Declaration of Eric Barlow |
| 2 | Declaration of Melissa Rodriguez, submitted in *U.S. v. Rare Breed Triggers*, No. 23-cv-369 (E.D.N.Y.) |
| 3 | Declaration of Cheryl Harrell, submitted in *U.S. v. Rare Breed Triggers*, No. 23-cv-369 (E.D.N.Y.) |
| 4 | Declaration of Dr. Dennis Quinlan Jr. |
| 5 | Declaration of B. Stephan Finkel |
| 6 | Declaration of Todd W. Daloz |

Respectfully submitted,

**MATTHEW J. PLATKIN**
*Attorney General of New Jersey*

By:   /s/ Jeremy M. Feigenbaum
JEREMY M. FEIGENBAUM
Solicitor General
SHANKAR DURAISWAMY
*Deputy Solicitor General*
MARIE V. CEPEDA MEKOSH
MAX G. LESSER
*Deputy Attorneys General*
New Jersey Attorney General's Office
25 Market Street
Trenton, NJ 08625
(609) 376-2690
jeremy.feigenbaum@njoag.gov

# EXHIBIT 1

# Declaration of Eric Barlow

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**NO. 24-10707**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.;
PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,
V.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT
OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

_____

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-Cv-830

_____

**DECLARATION OF ERIC BARLOW**

I, Eric Barlow, hereby declare:

1.  I am a Senior Investigator with the Statewide Affirmative Firearms Enforcement ("SAFE")

    Office of the New Jersey Office of the Attorney General, a position I have held since May

    2023. SAFE is a first-in-the-nation office with the specific mandate of bringing civil

    enforcement actions against firearm companies to hold them accountable for violations of the

    law that harm the health and safety of New Jersey residents. As a SAFE investigator I am

    responsible for conducting civil investigations into violations against gun industry members

    that may result in civil enforcement actions. This includes assisting State attorneys with the

gathering of information, synthesizing and analyzing relevant data, records, files, financial statements and correspondence to determine compliance with rules and regulations governing firearms and industry members within New Jersey. Furthermore, I assist with the facilitation and effective administration of laws pertaining to gun violence as directed by the New Jersey Attorney General.

2. Prior to holding this position, I was an enlisted sworn member of the New Jersey State Police ("NJSP") for twenty-five years. I began my career with NJSP in April 1995 as a member of the 115th State Police Class. I spent the majority of my tenure with NJSP in the Intelligence and Criminal Enterprise Section where I focused on long term criminal investigations that included gun and drug trafficking and official corruption. These investigations included witness interviews, surveillance work, drafting search warrants and communication data warrants, and reviewing information obtained from subpoenas and other court orders. I am also familiar, based on my training and experience, with firearms and after-market machine gun conversion devices. From 2006 – 2012, I worked as an NJSP Task Force Officer assigned to the Trenton Field Office of the New Jersey division of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), where I led multi-state gun trafficking investigations. From 2016 – 2020, I worked for the NJSP Office of Professional Standards Internal Affairs Investigations Bureau, where I led criminal and administrative investigations into members of the state police.

3. After finishing my NJSP tenure with the rank of Captain, I became a Sworn State Investigator ("SSI") with the Gloucester County Prosecutor's Office, where I conducted internal affairs investigations.

4. I earned my Bachelor of Arts degree from Richard Stockton University in the field of criminal justice and I earned my Master of Education from Seton Hall University.

5. I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information gathered by members of my staff, and upon conclusions and determinations reached and made in accordance therewith.

<u>Unique Dangers of Forced Reset Triggers and Similar Machinegun Conversion Devices</u>

6. Gun violence is a significant threat to the safety and well-being of New Jersey's residents. In 2022, there were 468 gun deaths in New Jersey, including 235 homicides, 229 suicides, and 15 gun deaths involving children and teens. *State Data: New Jersey*, Johns Hopkins Bloomberg School of Public Health – Center for Gun Violence Solutions (2022) (citing 2022 data from the Center for Disease Control [CDC]). In 2022, there were 1,116 total shooting victims in New Jersey, and in 2023 there were 895. *See NJGUNStat Report – Weapon and Victim Breakdowns,* https://www.nj.gov/oag/njsp/njgunstat/index.shtml (compiling total shooting victims from January 2022-December 2022 and January 2023-December 2023).

7. Machinegun conversion devices (MCDs) enable semi-automatic firearms to fire automatically, so that they can match or exceed the rate of fire of many military machineguns. Federal and state law prohibit certain MCDs. Federal law criminalizes both the possession of a machinegun and certain MCDs. 18 U.S. Code § 921(a)(24) and 922(a)(4) and 922(o)(1); 26 U.S. Code § 5845(b) (defining the term "machine gun" to include "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun.").  New Jersey regulates certain MCDs, either as independent parts or when attached to a firearm under its machinegun and assault weapon bans pursuant to N.J. Stat. Ann. §§ 2C:39-1(i), (w); 2C:39-3(i); 2C:39-5(a), (f). In

New Jersey, ATF's Firearms Trace Data reveals that 22 MCDs were recovered in 2023. *See* ATF, *Firearms Trace Data: New Jersey - 2023*, https://www.atf.gov/resource-center/firearms-trace-data-new-jersey-2023#total) (last updated Dec. 9, 2024).

8.  MCDs make firearms significantly more dangerous and destructive because of their increased rate of fire. For instance, semi-automatic weapons equipped with an MCD can fire up to 20 bullets in only one second with a single function of the trigger. *See FACT SHEET: President Biden and Vice President Harris Announce Additional Actions to Reduce Gun Violence and Save Lives*, The White House (September 26, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/09/26/fact-sheet-president-biden-and-vice-president-harris-announce-additional-actions-to-reduce-gun-violence-and-save-lives/. This high rate of fire decreases firing accuracy and increases risks to bystanders. *See* Marty Roney, *Police demonstrate dangers of handgun-to-machine gun 'Glock switches'*, Yahoo News – The Montgomery Advertiser (Dec. 2, 2024), https://www.yahoo.com/news/police-show-dangers-handgun-machine-095552253.html; STATE OF NEW JERSEY COMMISSION ON INVESTIGATION, ILLEGAL FIREARMS – USE & TRENDS IN NEW JERSEY 4 (SEPT. 2024) (MCD Glock 'switches' cannot control where the bullets go, leading to a greater likelihood of unintended targets.). For instance, Glock firearms equipped with an MCD "switch" "fire so fast, and with a recoil so difficult to control, that the result is typically an uncontrolled 'spray' of bullets over a wide area." Complaint at 2, *Platkin v. Glock, Inc.*, N.J. Super Ct Ch. Div. ESX-C-000286-24 (Dec. 12, 2024) (hereinafter "*Platkin v. Glock, Inc.*"). Consequently, law enforcement officials have noted that the rapid firing rate generated by MCDs is uniquely dangerous for public safety because it (1) "increases the likelihood that we're going to encounter *multiple victims* when these [modified weapons] are

used" and (2) "increases the likelihood that those incidents will be *fatal*." Norah O'Donnell, *Proliferation of modified weapons cause for alarm, officials say*, CBS News (Apr. 27, 2023), https://www.cbsnews.com/news/modified-weapons-switches-gun-violence-atf-washington-dc/ (quoting Washington, D.C. Metropolitan Police Department Commander LaShay Makal) (emphasis added).

9. There are unfortunately numerous examples of this tragic dynamic in action. In Alabama, a firearm equipped with an MCD killed three teenagers and one adult and wounded thirty-two others at a sixteenth birthday party—leaving 89 shell casings at the scene. *Platkin v. Glock, Inc.* at 6-7. In New Jersey, a shooter fired 28 rounds from a firearm with an MCD in just over one second, seriously injuring three people. *Id.* at 1. New Jersey has identified at least twenty-six other criminal cases where numerous MCDs for Glock firearms have been recovered. *Id.* at 4-6, 51-54.

10. MCDs' unique dangerousness also poses "perilous" risks for law enforcement on the front lines responding to the carnage inflicted by these modified weapons. Memorandum from the Deputy Attorney General, *Combating Illegal Machine Gun Conversion Devices through Enhanced Enforcement, Training, and Intelligence Sharing*, U.S. Department of Justice (Sept. 6, 2024), https://www.justice.gov/dag/media/1366606/dl. In addition to their increased rate of fire, it is not always visually apparent or obvious that a firearm has been equipped with an MCD, which presents risks to members of law enforcement who encounter suspects armed with MCD-modified guns when responding to emergency calls. According to the ATF, MCDs have been utilized in many of the most dangerous crimes of violence that law enforcement responds to, including "homicides, aggravated assaults, robberies, [and]

carjackings." ROA.2011.  Tragically, an MCD was also used in the murder of a police officer. *Id.*

11. In recent years a new form of MCD has emerged that is principally intended for use with AR-15 style rifles called Forced Reset Triggers (FRTs). FRTs replace the standard trigger assembly on a firearm to allow a shooter to fire at a significantly increased rate. *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51, 59 (E.D.N.Y. 2023). Like other MCDs, FRTs pose unique dangers to law enforcement and the public based on their high rate of fire.

### New Jersey Law Banning FRT-Equipped Firearms

12. New Jersey law defines a machinegun as "any firearm, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the firearm, mechanism or instrument and fired therefrom." N.J. Stat. Ann. § 2C:39-1(i). The New Jersey Attorney General's Office interprets this provision as covering firearms equipped with an FRT.

### Prevalence of Forced Reset Triggers in New Jersey

13. SAFE has recently obtained records showing that in 2021 and 2022, Rare Breed Triggers LLC made 364 deliveries through a commercial shipping service to addresses in New Jersey.

14. SAFE has acquired information indicating that Wide Open Enterprises shipped 25 packages containing one or more suspected Wide Open Triggers (WOTs) to addresses in New Jersey in 2021. WOTs are a version of an FRT and operate based on the same mechanical principles as Rare Breed Triggers' FRT-15, *see National Association of Gun Rights, Inc. v. Garland*, No. 4:23-cv-00830, 2024 WL 3517504 at *3 (N.D. Tex. Jul. 23, 2023), making FRT-15's and WOTs effectively "identical." *United States v. Rare Breed Triggers, LLC*, 690 F.Supp.3d 51, 123 n.1 (E.D.N.Y. 2023) ("Defendants [Rare Breed Triggers LLC] also sell a trigger

called the "WOT" which all parties agree, for purposes of this litigation, is identical to the FRT-15.").

15. SAFE has acquired information indicating that at least 23 FRTs shipped to individuals in New Jersey have been recovered by law enforcement authorities.

16. If the federal government ceases enforcement against FRTs as machineguns as a result of this litigation, it is likely that the number of FRTs in the State will increase. Firearms or firearm-related devices that are prohibited in New Jersey are nonetheless recovered regularly in the State, especially when such devices are lawful in other states, in part due to the activities and presence of significant interstate firearms trafficking networks. For example, despite New Jersey's prohibitions on ghost gun parts and kits (N.J.S.A. 2C:39-9(k), -3(n), and -9(n)), these illegal items have nonetheless made their way into the State's borders with alarming ease. *See* Complaint at 41-46, *Platkin v. Patriot Enterprises Worldwide LLC d.b.a. JSD/Eagle Shows*, N.J. Super Ct. Ch. Div. MER-C-000093-23 (Dec. 12, 2023).

17. If ATF's classification of FRTs as machineguns is vacated nationwide as a result of this litigation, the legality of FRTs will similarly vary from state to state. Given the trends with other firearms and firearm-related devices outlined in the previous paragraph, even if FRTs are banned under New Jersey law, a greater number of FRTs will come into New Jersey from other states where FRTs are not banned.

18. FRT-15s and WOTs are both FRTs that are specifically designed for AR-15s, a gun model whose possession is banned in New Jersey under N.J. Stat. Ann. §§ 2C:39-1(w)(1), -5(f). However, FRTs are compatible with other types of firearms that are not illegal to possess under New Jersey law. For example, Rare Breed Triggers states that the FRT-15 it manufactures is compatible with some AR-9mm firearms. *Frequently Asked Questions*, Rare

Breed Triggers, https://rarebreedtriggers.com/frequently-asked-questions/ (last visited Dec. 30, 2024). Possession of the AR-9mm is not outlawed in New Jersey. *See* N.J. Stat. Ann. § 2C:39-1(w)(1). Additionally, other firearms may be modified in ways that allow them to be equipped with an FRT, *see, e.g.*, Gat Cat Till, *Rare Breed FRT-15 in a 22lr!*, YouTube (May 28, 2021), https://www.youtube.com/watch?v=94l6J8xeJHo, including base firearms that are otherwise legal under New Jersey law.

Cost of Responding to Incidents Involving Forced Reset Triggers

19. The State incurs greater costs when responding to crime scenes involving devices that increase a firearm's rate of fire, such as FRTs. As outlined above, crimes committed using weapons with an accelerated rate of fire are likely to cause increased casualties. As a result, the State must send more law enforcement officers to the scene, as such crimes typically involve a higher number of victims and witnesses that law enforcement officers will have to interview while investigating the crime. The crime scene itself would require additional personnel and time to process because increased numbers of shell casings and the damage from increased gun fire would require that more officers spend more hours locating and collecting evidence. Forensic ballistics examiners would likewise face an influx of evidence submitted for their expert and time-consuming analyses. The State would also require a greater response by emergency medical technicians (EMTs) to provide emergency medical care to more individuals injured during the shooting. In addition, medical examiners would have to devote more time and resources to forensically investigate the greater number of fatalities that are associated with such incidents. Accordingly, the State will likely need to divert more resources to respond to crime scenes as FRTs become more prevalent.

20. In addition, as new firearm technologies are introduced into the market, the State's law enforcement officers require additional training to be able to recognize, track, and safely handle such technologies. The lack of a nationwide prohibition on FRTs will lead to the greater proliferation of FRTs in New Jersey and a greater need for state-level enforcement. Consequently, law enforcement officers will require more extensive training on FRTs in the absence of federal regulation of these devices. For example, law enforcement officers must be able to recognize FRTs to know to recover them during firearm seizures, as must State ballistics lab technicians who need to be able to identify FRTs when analyzing firearms that come into the lab. Additionally, law enforcement must receive training on how to safely handle firearms equipped with FRTs. As a result, the State will likely be required to divert and expend additional State resources to be able to develop such training materials and provide such trainings to the State's law enforcement officers.

Costs of Enforcing Laws Against Forced Reset Triggers

21. If there is a continuing freeze in federal enforcement against FRTs, States will have to address the ongoing federal enforcement gap against FRTs by diverting greater law enforcement resources to enforce New Jersey's own machinegun ban against FRT-equipped firearms.

22. The need for enforcement will be exacerbated by the lack of a uniform federal rule because weapons outfitted with FRTs that are lawful in other states will end up in New Jersey. This mirrors the historical trend through which other firearms or firearm-related devices that are banned in New Jersey, but lawful elsewhere, make their way into the State.

23. In all, we expect law enforcement costs borne by our state to increase if the vacatur of ATF's classification of FRTs as machineguns remains in effect.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15 day of January, 2025, in Trenton, NJ .

*Eric Barlow*

Eric Barlow

New Jersey Office of the Attorney General

# EXHIBIT 2

**Declaration of Melissa Rodriguez, submitted in U.S. v. Rare Breed Triggers, No. 23-cv-369 (E.D.N.Y.)**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

              Plaintiff,

  - v. -

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; KEVIN MAXWELL,

              Defendants.

1:23-CV-00369
(NRM) (RML)

## DECLARATION OF MELISSA RODRIGUEZ

I, Melissa Rodriguez, have personal knowledge of the following facts set forth below, and if called as a witness I would testify as follows:

1.      I serve as a Senior Forensic Auditor, with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I am currently assigned to the Financial Investigative Services Division and to the Tampa Field Division.

2.      The Financial Investigative Services Division (FISD) provides comprehensive financial investigative services in support of ATF investigations.

3.      The facts set forth in this declaration are based on my personal knowledge and experience; knowledge obtained during my participation in this investigation; information from other individuals, including other law enforcement officers conducting investigations into defendants; and my review of documents, public records, ATF records, and other sources of information.

4.      This investigation involves the Rare Breed Triggers model FRT-15, manufactured, marketed and sold by defendants Rare Breed Triggers, LLC (RBT), Rare Breed Firearms, LLC

(RBF), Kevin Maxwell (Maxwell), and Lawrence DeMonico (DeMonico). The investigation also involves these Defendants' sale of the Wide Open Trigger (WOT).

5.    In part, my role in ATF's investigation into RBT includes reviewing financial records produced by JPMorgan Chase, N.A. and Fifth Third Bank. The JP Morgan Chase, N.A documents were produced in response to a subpoena served by the United States on February 16, 2023 (JPMorgan Chase Records). The Fifth Third Bank records were produced in response to a subpoena served by the United States on May 16, 2023. This Declaration includes a summary of these financial records, a chart annexed as Exhibit A, bearing Bates Nos. USA_20530-38, which consists of a PowerPoint presentation summarizing the calculations set forth below, and a calculation of estimated profits resulting from the sale of the FRT-15s and Wide Open Triggers.

## FRT-15 Sales By Rare Breed Triggers

According to the Rare Breed Triggers LLC website, the triggers retailed for $380.00. Based on my review of the financial records described below, and using this retail sale price for an estimate, RBT sold over 103,000 triggers. This was estimated by taking the total deposit amount of $39,388,838, as reflected by financial records I summarized, and dividing it by the retail sales price of $380.00 ($39,388,838/$380 = 103,654.8). This figure does not take into account any discounts given or any wholesale sales made at a lower sales price or a higher sales price.

## RBT and Related Companies

10.    Rare Breed Triggers LLC was first registered to do business in the State of Florida in May 2020. At that time there were four owners listed on the registration. They were Lawrence Demonico, Michael Register, Cole Leleux, and Kevin Maxwell. In December 2020, the registration was changed. All the previous individuals were removed except for Kevin Maxwell.

*See* USA_16527-16533.  On or about the same time, seven additional companies were created.  In November 2021, the registration of RBT was moved to North Dakota.

11.     Business 1 – XYZ Distribution LLC DBA RB Trig LLC.  This business was registered in the state of Wyoming on November 24, 2020.  The DBA RB Trig LLC was filed on December 7, 2020.  *See* USA_18999-19002.

12.     Business 2 – ABC IP LLC.  This business was registered in the state of Delaware on November 25, 2020.  This business is owned by four other businesses.  *See* USA_17554-17555.  The businesses are Leleux LLC, Spider Hole LLC, AN 1861 LLC, and LAD LLC.  *See* USA_17235-17236.

13.     Business 3 – DEF Consulting LLC.  This business was registered in the state of Delaware.  This business is owned by four other businesses.  The businesses are Leleux LLC, Spider Hole LLC, AN 1861 LLC, and LAD LLC.

14.     Business 4 – Leleux LLC.  This business was registered in the state of Florida on 11/24/2020.  This business is owned solely by Cole Leleux.  *See* USA_18644.

15.     Business 5 – Spider Hole LLC.  This business was registered in the state of Florida.  This business is owned solely by Michael Register.

16.     Business 6 – AN 1861 LLC.  This business was registered in the state of Florida.  This business is owned solely by Kevin Maxwell.  *See* USA_17847.

17.     Business 7 – LAD LLC.  This business was registered in the state of Florida.  This business is owned solely by Lawrence Demonico.  *See* USA_18368-18379.

### RBT and Related Company Flow of Funds from Fifth Third Bank and JP Morgan Records

18.     The sales of FRT – 15 Triggers were deposited into Rare Breed Trigger's JP Morgan Account -1008.  The authorized signors on the account were Kevin Maxwell (Manager)

and Cole Leleux (Signor). *See* USA_15992. Lawrence Demonico was added as a Signor on 01/22/2021. *See* USA_15993. From 01/01/2021 to 12/01/2022, there was $39,388,838 deposited. *See* USA_15997-16525.

19.     During this same time frame, payments totaling $35,628,260 were paid from the JP Morgan account -1008 to XYZ Distribution LLC DBA RB Trig LLC. The following payments were also made from the Rare Breed Triggers LLC account:

    a.  Payments totaling $216,00 were paid to Kelly Leleux.

    b.  Payments totaling $216,00 were paid to Lawrence Demonico.

    c.  Payments totaling $192,372 were paid to Black Rifle Co.

    d.  Payments totaling $130,760 were paid to Kevin Maxwell.

    e.  Payments totaling $107,400 were paid to Jennifer Pierson.

    f.  Payments totaling $21,359 were paid to Brian Luettke – FTINC LLC.

    g.  Payments totaling $9,428 were paid to Dan O'Kelly – International Firearm Specialist Academy.

    h.  Payments totaling $6,000 were paid to Rick Vasquez – Rick Vasquez Firearms LLC.

    i.  On December 9, 2022, a transfer of $329,490 was made to Cadence Bank. The account balance after the transfer was $0.00 and the account was closed.

20.     XYZ Distribution LLC DBA RB Trig LLC's Fifth Third Bank Account -4747 was opened December 2020. The authorized signors on Fifth Third Bank Account -4747 were Cole Leleux (Managing Member/Signor), Michael Register (Managing Member/Signor), Lawrence Demonico (Managing Member/Signor), and Kevin Maxwell (Managing Member/Manager). *See* USA_19794 and 19803. This account was open a month until the JP Morgan Account -6295 was

opened.  The remaining funds in Fifth Third Bank Account -7474 were transferred to JP Morgan Account -6295 and the Fifth Third Bank account was subsequently closed.  The authorized signors on JP Morgan Account -6295 are Cole Leleux (Signor), Michael Register (Signor), Lawrence Demonico (Signor), and Kevin Maxwell (Manager).  *See* USA_17231.  From December 22, 2020 to April 28, 2023, there was $39,388,838 deposited into these accounts from Rare Breed Triggers LLC: $705,000 was deposited into Fifth Third Bank Account -4747 (*see* USA_19785-19805); and $35,628,260 was deposited into JP Morgan Account -6295.  *See* USA_18736-18998.  The account balance as of April 28, 2023 was $47,758.52.  *See* USA_18993.

21.     During the same time period, payments totaling $28,150,030 were paid from JP Morgan account ended -6295 (held by XYZ Distrubution) to ABC IP LLC.  The following payments were also made from JP Morgan account ended 6295 (held by XYZ Distrubution):

   a.   Payments totaling $7,224,809 were paid to Third Gen Manufacturing.

   b.   Payments totaling $524,596 were paid to DEF Consulting LLC.

   c.   Payments totaling $144,946 were paid to Black Spider Optics LLC.

   d.   Payments totaling $125,000 were paid to Janeway Machine INC.

   e.   Payments totaling $90,000 were paid to Work Holding Tools LLC.

   f.   Payments totaling $7,161 were paid to Brian Eicher.

22.     ABC IP LLC's Fifth Third Bank Account -5900 was opened December 2020.  The authorized signors on Fifth Third Bank Account -5900 were Cole Leleux (Managing Member/Signor), Michael Register (Managing Member/Signor), Lawrence Demonico (Managing Member/Signor), and Kevin Maxwell (Managing Member/Signor).  *See* USA_19825-19826 and 19835.  This account was only open a month until JP Morgan Account -6833 was opened.  The remaining funds in Fifth Third Bank Account -5900 were transferred to JP Morgan Account -6833

and the Fifth Third Bank account was subsequently closed.  The authorized signors on JP Morgan Account -6833 are Cole Leleux (Signor), Michael Register (Signor), Lawrence Demonico (Signor), and Kevin Maxwell (Signor).  *See* USA_17226.  From December 22, 2020 to April 28, 2023, there was $28,150,030 deposited into these accounts.  Fifth Third Bank account ended -5900 received $307,164 (*see* USA_19815-19837) and JP Morgan Account ending in -6833 received $27,842,866 (*see* USA_17252-17553) from XYZ Distribution LLC DBA RB Trig LLC.  The account balance as of April 28, 2023 was $46,104.64.  *See* USA_17544.

23.    During the same time period, the following payments were made from the ABC IP LLC's account:

    a.  Payments totaling $6,836,782 were paid to LAD LLC.

    b.  Payments totaling $6,711,311 were paid to Leleux LLC.

    c.  Payments totaling $6,708,523 were paid to Spider Hole LLC.

    d.  Payments totaling $4,269,060 were paid to AN 1861 LLC.

    e.  Payments totaling $1,641,900 were paid to Wizard Labs.

    f.  Payments totaling $776,775 were paid to CRDB INC.

    g.  Payments totaling $12,056 were paid to Nicholas Gough.

    h.  Payments totaling $10,000 were paid to Brian Blakely.

    i.  Payments totaling $10,000 were paid to Wolf Tactical.

24.    Leleux LLC's Fifth Third Bank Account -7724 was opened December 2020.  The authorized signor on Fifth Third Bank Account -7724 was Cole Leleux (Manager).  *See* USA_20214.  This account was only open a month until JP Morgan Accounts -0018 and -5756 were opened.  The remaining funds in Fifth Third Bank Account -7724 were transferred to JP Morgan Account -0018 and the Fifth Third Bank account was subsequently closed.  The authorized

signor on JP Morgan Account -5756 is Cole Leleux (Manager). *See* USA_17230. From December 22, 2020 to April 28, 2023, there was $6,854,518 deposited. $69,023 was deposited into Fifth Third Bank Account ended -7724 (*see* USA_20207-20222) and $6,785,495.34 was deposited into JP Morgan Account ended -5756. *See* USA_18425-18643. Based on my review of the financial records, $6,711,311 came from ABC IP LLC and $143,207 from DEF Consulting LLC. The account balance of JP Morgan Account ended 5756 as of 04/28/2023 was $66,318.38. *See* USA_18638. The account balance of JP Morgan Account ended -0018 as of 04/28/2023 was $202.58. *See* USA_18727. During this same time period, the following payments were made from the Leleux LLC's account ending -5756:

    a.   Payments totaling $5,108,756 were paid to Cole Leleux.

    b.   Payments totaling $418,358 were paid to Investments.

    c.   Payments totaling $332,718 were paid to Kelly Leleux.

25.    Spider Hole LLC's Fifth Third Bank Account -5314 was opened December 2020. The authorized signor on Fifth Third Bank Account -5314 is Cole Leleux (Managing Member/Signor). *See* USA_19992-19993 and 19994. On January 1, 2021 Amy Register was added as a Managing Member/Signor to the account. *See* USA_19994. From December 22, 202010 to April 8, 2023t, there was $6,851,730 deposited. *See* USA_19879-20205. Based on my review of the financial records, $6,708,523 came from ABC IP LLC and $143,207 from DEF Consulting LLC. The account balance as of March 31, 2023 was $4,327.84. *See* USA_19940. During the same time period, the following payments were made from the Spider Hole LLC's account:

    a.   Payments totaling $3,610,325 were paid to Michael Register.

    b.   Payments totaling $2,005,325 were paid to Amy Register.

    c. Payments totaling $528,955 were paid to Investments.

26.    AN 1861 LLC's Fifth Third Bank Account -0901 was opened December 2020. The authorized signor on Fifth Third Bank Account -0901 was Kevin Maxwell (Manager). *See* USA_19863 and 19872. This account was only open a month until JP Morgan Account -6782 was opened. The remaining funds in Fifth Third Bank Account -0901 were transferred to JP Morgan Account -6782 and the Fifth Third Bank account was subsequently closed. The authorized signor on JP Morgan Account -6782 is Kevin Maxwell (Manager). *See* USA_17227. From December 22, 2020 to April 28, 2023, there was $4,359,099 deposited. $43,923 was deposited into Fifth Third bank account ended -0901 (*see* USA_19858-19877) and $4,315,176 was deposited into JP Morgan account ended -6782. *See* USA_17598-17846. Based on my review of the financial records, $4,269,060 came from ABC IP LLC and $90,0039 from DEF Consulting LLC. The account balance as of 04/28/2023 was $18,543.68. *See* USA_17838. During the same time period, the following payments were made from the AN 1861 LLC's account:

    a. Payments totaling $1,510,762 were paid to Kevin Maxwell.

    b. Payments totaling $1,298,124 were paid to Investments.

    c. Payments totaling $14,000 were paid to Michael Register.

27.    LAD LLC's Fifth Third Bank Account -6338 was opened December 2020. The authorized signor on Fifth Third Bank Account -6338 was Lawrence Demonico (Managing Mcmbcr). *See* USA_19847 and 19856. This account was only opcn a month until JP Morgan Account -0757 was opened. The remaining funds in Fifth Third Bank Account -6338 were transferred to JP Morgan Account -0757 and the Fifth Third Bank account was subsequently closed. The authorized signor on JP Morgan Account -0757 is Lawrence Demonico (Manager). *See* USA_17229. From December 22, 2020 to April 28, 2023, there was $6,978,268 deposited.

$69,023 (was deposited) into Fifth Third Bank Account ended 6338 (*see* USA_19839-19856), $6,849,585 into JP Morgan Account ended 0757 (*see* USA_18084-18367), and $59,660 into an unknown account.  Based on my review of the financial records, $6,836,782 came from ABC IP LLC, $525,000 from a Frost Bank Account, and $140,961 from DEF Consulting LLC.   The account balance as of April 28, 2023 was $351,832.98.  *See* USA_18361.  During the same time period, the following payments were made from the LAD LLC's account:

    a.  Payments totaling $2,468,791 were paid to Lawrence Demonico.

    b.  Payments totaling $1,370,912 were paid to Investments.

    c.  Payments totaling $1,341,982 were paid to an Unknown Bank.

    d.  Payments totaling $286,825 were paid to Pipe Hitters Union.

    e.  Payments totaling $158,106 were paid to Karli Demonico.

    f.  Payments totaling $57,054 were paid to Amplify Credit Union.

**RBT and Related Company Owner's Money Received**

28.    Lawrence Demonico received payments totaling $2,684,791.  These were payments from LAD LLC and Rare Breed Trigger LLC.  Kari Demonico also received payments totaling $158,106 from LAD LLC.

29.    Cole Leleux received payments totaling $5,168,756.  These were payments from Leleux LLC and Black Spider Optics (paid by Rare Breed Trigger LLC).  Kelly Leleux also received payments totaling $548,718 from Leleux LLC and Rare Breed Trigger LLC.

30.    Kevin Maxwell received payments totaling $1,510,762.  These were payments from AN 1861 LLC and Rare Breed Trigger LLC.

31.    Michael Register received payments totaling $3,830,922.  These were payments from Spider Hole LLC, LAD LLC, Black Spider Optics (paid by Rare Breed Trigger LLC), and AN 1861 LLC.  Amy Register also received payments totaling $2,005,325 from Spider Hole LLC.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 25, 2023.

By: _____
MELISSA RODRIGUEZ
Digitally signed by MELISSA RODRIGUEZ
Date: 2023.07.25 15:22:12 -04'00'

Melissa Rodriguez
Senior Forensic Auditor
Executed July 25, 2023

# EXHIBIT 3

# Declaration of Cheryl Harrell, submitted in U.S. v. Rare Breed Triggers, No. 23-cv-369 (E.D.N.Y.)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>      - v. -<br><br>RARE BREED TRIGGERS, LLC; RARE BREED FIREARMS, LLC; LAWRENCE DEMONICO; KEVIN MAXWELL,<br><br>                    Defendants. | 1:23-CV-00369<br>(NRM) (RML) |

## DECLARATION OF SPECIAL AGENT CHERYL HARRELL

I, Cheryl Harrell, have personal knowledge of the following facts set forth below, and if called as a witness I would testify as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and am currently the Assistant Special Agent in Charge of the ATF Tampa Field Division.  As part of my responsibilities, I routinely work with the Tampa Field Division's Crime Gun Intelligence Center for case support and intelligence products.  As an ATF Special Agent, I have investigated violations of federal firearms law relating to firearm trafficking, violent crime, and the illegal use, possession, shipment, and transportation of firearms during my career.

2.      The facts set forth in this declaration are based on my personal knowledge; knowledge obtained as a result of my supervisory role in the ATF Tampa Field Division; information from other individuals, including ATF Special Agents and intelligence personnel involved in the investigation into Defendants; ATF records; and other sources.  The information contained in this declaration is a summary and does not incorporate all facts known to me regarding this investigation.

3.    This investigation involves the Rare Breed Triggers model FRT-15, manufactured, marketed and sold by defendants Rare Breed Triggers, LLC (RBF) and Rare Breed Firearms, LLC (RBF), Kevin Maxwell (Maxwell), and Lawrence DeMonico (DeMonico) (collectively, Defendants).  The investigation also involves the sale of the Wide Open Trigger (WOT) by Defendants.

4.    This Declaration serves as a supplement to the Declaration of Special Agent Daniel Koneschusky filed with the complaint in this action on January 19, 2023 (Koneschusky Decl.). (Dkt. 7), the Declaration of Special Agent Dean Conigliaro, dated February 23, 2023 (Dkt. 25), the Declaration of Special Agent Dean Conigliaro, dated March 29, 2023 (Dkt. 40-1), and the Declaration of Special Agent Dean Conigliaro, dated April 1, 2023 (Dkt. 43-1).

## DEFENDANTS HAVE SOLD PRODUCTS REQUIRING RETRIEVAL BY ATF SPECIAL AGENTS

5.    Both the FRT-15 and the WOT have been classified as machineguns by ATF as they are machinegun conversion devices (MCDs).  They are generally prohibited to possess or distribute, except under very limited circumstances.  *See e.g.,* 18 U.S.C. § 922(o).

6.    Between approximately November 28, 2022, and January 16, 2023, Defendants shipped 3,461 packages containing a suspected total of 7,700 WOT MCDs.  The shipments were sent to forty-seven states and U.S. territories.  These represent only a fraction of the MCDs suspected to have been sold or distributed by Defendants.

7.    Between March 17, 2021, and August 22, 2021, Defendants sold approximately 560 FRT-15s to a firearms dealer in Massachusetts ("MA Dealer") who subsequently resold the FRT-15s over the Internet to purchasers across the United States, including within the Eastern District of New York.

8.     When highly restricted devices or firearms are improperly distributed to the public, either because the devices or firearms were not registered under the provisions of the National Firearms Act, 26 U.S.C. § 5801 *et. seq*., or because they are generally prohibited from distribution because of 18 U.S.C. § 922(o), or for other comparable reasons, ATF must take steps to actively retrieve the items, or encourage and solicit their voluntary destruction or abandonment.  This is done to abate the illicit possession and distribution within the marketplace; to protect the public at large; and to mitigate the risk of unlawful possession by an unaware or misinformed recipient.

9.     The FRT-15 and WOT are post-86 machineguns, meaning they are machineguns that were manufactured after May 19, 1986, the effective date of the federal machinegun ban, 18 U.S.C. § 922(o).  It is generally unlawful for a member of the public to possess a post-86 machinegun.

10.     The MCDs sold by Defendants and the MA Dealer are the subject of an active retrieval effort by ATF, which is being coordinated by the ATF Tampa Field Division.

## RETRIEVAL RISK ASSESSMENT AND RESOURCE OBLIGATIONS

11.     As part of the retrieval effort, ATF first conducts an assessment of each individual recipient for the purpose of prioritizing retrievals based on risk to the community and public safety. These assessments are also necessary for the safety of ATF Special Agents that are tasked with conducting the physical retrievals and our local law enforcement partners who may provide assistance.

12.     Retrievals are prioritized based on multiple factors, including, but not limited to, whether the recipient's criminal history requires heightened review, such as possession by suspected convicted felons, or whether the recipient has received multiple devices indicative of further re-selling or trafficking.

13.     These assessments are often not definitive, and require further review and investigation to confirm.  This further review and investigation is conducted by the ATF Field Division receiving the directive to conduct the specific retrieval based upon the geographic area in which the recipient received the MCD.

14.     With respect to the retrievals associated with Defendants and the MA Dealer, there are approximately 164 recipients (as of the date this declaration was signed) requiring an enhanced review and prioritized retrieval.  Included within these 164 recipients are, among others, individuals suspected of having previously been convicted of one or more felonies, as well as individuals suspected to be engaged in re-selling or trafficking.

15.     Retrievals are resource intensive, requiring both a commitment in analytical resources to conduct records checks and retrieval assessments, as well as a commitment in Special Agent resources to locate and interview recipients, and retrieve the MCDs.  For instance, the ATF Tampa CGIC analysts have expended approximately 2,910 working hours to conduct the required retrieval assessments.  The ATF Tampa Special Agents have spent approximately 1,638 hours on the retrieval process. This does not include the hours spent by other ATF components assisting in the analytical work, related analytical work conducted by the ATF Tampa CGIC, or other associated resource demands placed on ATF in order to recover these MCDs from the general public.

16.     These analytical and retrieval efforts are only the starting point.  For instance, it is common for recipients to no longer be at the shipping address, and efforts have to be made to locate them.  Additionally, with respect to suspected re-sellers and traffickers, ATF must attempt to identify the subsequent purchasers, and a compounding analytical and retrieval effort must then be undertaken.

17.     There are 25 ATF Field Divisions in the United States.  Every ATF Field Division received multiple retrieval referrals associated with either the sales by Defendants, the MA Dealer, or both.

18.     Further, despite ATF's best efforts, it is not likely ATF will be able to recover every MCD sold by Defendants.  Accordingly, these prohibited devices will remain in public circulation thereby jeopardizing public safety and exposing the possessor to adverse legal consequences, including possible criminal liability.

## THREATS AGAINST ATF SPECIAL AGENTS

19.     Retrieval of the MCDs can place ATF Special Agents and local law enforcement at considerable risk.

20.     As a foundational matter, the MCDs are designed to be installed in AR-variant rifles in order to convert them to fully automatic fire.  These are very dangerous weapons.  Every time an ATF Special Agent knocks on a door in order to retrieve an FRT-15 or WOT, there is the possibility that an ill-intentioned individual in possession of an illegal machinegun is waiting on the other side.  Further, multiple recipients have been assessed to be high-risk due to suspected criminal histories or other factors.

21.     These retrieval efforts also often garner significant negative attention by certain individuals.

22.     Indeed, ATF has observed an increase in threats made on social media platforms and other websites directly related to ATF's effort to recover the WOTs and FRT-15 sold or distributed by Defendants.

23.     In one post on a social media platform, the poster stated "Rare Breed gave up their customer data to ATF.  You can either bury the trigger when they come for it or use it."  Based

upon my training and experience, the individual is stating that recipients should either conceal the MCDs from ATF, or fire on ATF Special Agents with fully automatic firearms converted with the FRT-15 or WOT.

24.     In another post on a website, an individual stated the following: *Start digging holes around your whole house in your yard (sic) make about a foot deep and put 2 pounds of Tannerite in each hole (sic) cover it back up with the grass perfect and then wait for the Agents to surround your house and have one of each family member shoot a pile and start watching the fuckers go to (sic) sky high (sic) then take the frts (sic) put them on mounted turrets and start suppressing them back (sic) while that's happening have some go to the second floor and start throwing onion bombs on them and have them also start taking some marksman shots from up there (sic) keep holding them off and trust me (sic) men will come to help"* From my experience and training, the individual is encouraging the use of explosive materials as well as the use of the FRT-15s and WOTs to shoot, maim, and murder ATF Special Agents in connection with the retrieval of the MCDs sold by Defendants.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May 5, 2023.

By: _____
CHERYL HARRELL   Digitally signed by CHERYL HARRELL
Date: 2023.05.05 15:56:57 -04'00'

Cheryl Harrell
Special Agent

# EXHIBIT 4

# Declaration of Dr. Dennis Quinlan Jr.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.;
PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,

V.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT
OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

---

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-Cv-830

---

## DECLARATION OF DR. DENNIS QUINLAN JR.

---

I, Dr. Dennis Quinlan Jr, hereby declare:

1.  I am the Medical Director of the Bristol-Meyers Squibb Trauma Center ("Trauma Center") at

    Capital Health Regional Medical Center ("Capital Health"), a position I have held since

    2024. As Medical Director for the Trauma Center, I am responsible for the Center's

    operations as well as adherence to state and certifying bodies rules and regulations. Prior to

    holding this position, I served as associate medical director from 2017 to 2024. I received my

    medical degree from the University of Medicine and Dentistry of New Jersey (UMDNJ)—

    New Jersey Medical School in Newark, NJ. I completed my general surgery residency and

received fellowship training in cardiothoracic surgery at UMDNJ—New Jersey Medical School. I also completed a surgical critical care fellowship at Christiana Care in Newark, DE.

2. Prior to joining Capital Health in 2008, I held appointments at St. James Hospital (Newark, NJ), UMDNJ-University Hospital (Newark, NJ), Union Hospital (Union, NJ), Robert Wood Johnson University Hospital (Rahway, NJ), and Trinitas Hospital (Elizabeth, NJ).

3. I am board certified in general surgery, critical care and thoracic surgery. My triple board certification is unique among trauma surgeons in the state of New Jersey. I am a member of the New Jersey Medical Society and the American Medical Association. I am also an instructor in ATLS (Advanced Trauma Life Support).

4. As Medical Director, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by members of my staff.

## Bristol Myers Squibb Trauma Center at Capital Health Regional Medical Center

5. The Bristol Myers Squibb Trauma Center at Capital Health Regional Medical Center is a Level II New Jersey state-designated Trauma Center. One of only 10 designated trauma centers in New Jersey, Capital Health is the regional referral center for injured patients in Mercer County and adjacent parts of Somerset, Hunterdon, Burlington, and Middlesex counties as well as nearby areas of Pennsylvania. Capital Health provides comprehensive care from the time of injury through rehabilitation.

## Health Impacts of Gun Violence

6. Gun violence has a profound impact on the health and well-being of the communities Capital Health serves. Capital Health estimates that our Trauma Center treated 1,200 total

patients in year 2024, with 57 suffering from firearm-related injuries in New Jersey. The injuries that result from gun violence are extremely serious, and can include anything from a mere wound to the soft tissues of any extremity to a significant traumatic brain injury. These injuries can require a wide range of treatments, including the cleansing and repairing of wounds to a craniotomy for treatment of a traumatic brain injury.

## Health Impacts of Accelerated Fire

7. Firearms with an accelerated rate of fire often cause more severe injuries and damage for victims because a single victim is more likely to be hit by multiple bullets. The ability to more rapidly fire projectiles into a body causes more significant injury, organ, and tissue damage.

8. Firearms with an accelerated rate of fire often cause there to be a higher number of total victims as a result of a shooting. The ability to more rapidly fire projectiles increases the likelihood that a shooter will hit multiple victims, which also increases risks to bystanders. Due to the higher volume of projectiles there is greater risk to those not involved in the incident as well as to those trying to render aid.

9. Furthermore, firearms that fire projectiles into a body at a higher velocity, such as rifles, also cause more significant injury, organ, and tissue damage. The kinetic energy from these projectiles carry more energy, which produces more tissue damage.

10. Combining a rapid rate of fire with a high velocity means that a victim is more likely to receive multiple gunshot wounds while also increasing the probable severity of those wounds. In addition, it increases the probability that a higher number of victims will experience these impacts. The more significant injuries caused by firearms with an

accelerated rate of fire and higher firing velocity leads to more medical complications for patients, which increases costs for hospitals and healthcare providers in treating patients.

11. When a shooting involves a greater number of victims, it places significant strain on the medical system. Typically, only one trauma surgeon is staffed to the emergency department after hours, and hospitals typically have reduced staff. Therefore, when multiple traumatic injuries occur after hours, the hospital must call in additional staff. Other issues that arise from this is that the hospital has to increase security to protect the patients and staff. If the number of patients overwhelms a single institution then that hospital typically has to divert patients to other hospitals, which delays their ability to get much-needed care. These additional complications increase costs to the hospitals and healthcare providers treating such patients.

12. For example, Capital Health was called to respond to a devastating shooting at the Art All Night festival in Trenton, NJ, in 2018. Eighteen victims arrived at the hospital with injuries. The injuries ranged from simple sprains from people fleeing the scene to significant torso and brain injuries. Because there is only one doctor in the emergency department on a typical night, we were required to call in all available staff to respond to the demands of treating the victims of the shooting. In such a situation if multiple patients need operative interventions then multiple backup surgeons will need to be called in. In addition, because of the large number of patients with severe injuries from the Art All Night shooting, the hospital had to divert patients with other, less urgent injuries to the emergency departments of other local hospitals.

## Impacts of Gun Violence on Victims and Families

13. Gun violence has severe, often lifelong effects on victims, their families, and their communities.

14. Research demonstrates that survivors of firearm-related injuries suffer significant, long-term mental health impacts, including increased diagnoses of psychiatric disorders, substance abuse disorders, and pain. *See, e.g.*, Zurui Song, José R. Zubizarreta, Mia Giuriato, Erica Paulos, & Katherine A. Koh, *Changes in Health Care Spending, Use, and Clinical Outcomes After Nonfatal Firearm Injuries Among Survivors and Family Members: A Cohort Study*, 175 Annals of Internal Med. 795 (2022); Zurui Song, José R. Zubizarreta, Mia Giuriato, Katherine A. Koh, & Chana A. Sacks, *Firearm Injuries in Children and Adolescents: Health and Economic Consequences Among Survivors and Family Members*, 42 Health Affs. 1541 (2023). At Capital Health, all traumatic injury patients are screened for nightmares. Survivors of gunshot injuries often experience an acute stress reaction, which can develop into post-traumatic stress disorder if left untreated.

15. Research also shows that survivors of firearm-related injuries require increased healthcare and have significantly increased healthcare expenses. For example, one study that I am aware of found that survivors have increased office visits, emergency department visits, and hospitalizations and incur an average increase in healthcare expenses of approximately $30,000 in the first year. *See* Zurui Song, José R. Zubizarreta, Mia Giuriato, Erica Paulos, & Katherine A. Koh, *Changes in Health Care Spending, Use, and Clinical Outcomes After Nonfatal Firearm Injuries Among Survivors and Family Members: A Cohort Study*, 175 Annals of Internal Med. 795 (2022); *see also* Zurui Song, José R. Zubizarreta, Mia Giuriato, Katherine A. Koh, & Chana A. Sacks, *Firearm Injuries in Children and Adolescents:*

*Health and Economic Consequences Among Survivors and Family Members*, 42 Health Affs. 1541 (2023).

16. Family members of those who die in firearm-related incidents and of survivors of firearm-related injuries similarly experience severe, often lifelong impacts, including an increase in diagnoses of psychiatric disorders. *See, e.g.,* Zurui Song, José R. Zubizarreta, Mia Giuriato, Erica Paulos, & Katherine A. Koh, *Changes in Health Care Spending, Use, and Clinical Outcomes After Nonfatal Firearm Injuries Among Survivors and Family Members: A Cohort Study*, 175 Annals of Internal Med. 795 (2022); Zurui Song, José R. Zubizarreta, Mia Giuriato, Katherine A. Koh, & Chana A. Sacks, *Firearm Injuries in Children and Adolescents: Health and Economic Consequences Among Survivors and Family Members*, 42 Health Affs. 1541 (2023).

17. The long-term effects of gun violence lead to worsened health outcomes for victims and increased healthcare costs for their families and health care providers. Shootings can also have a broader impact on the communities Capital Health serves. In fact, the Surgeon General has issued an advisory documenting the collective impacts of firearm violence exposure in the United States. *See* Off. of the U.S. Surgeon General, *Firearm Violence: A Public Health Crisis in America: The U.S. Surgeon General's Advisory 2024*, at 14-18 (2024), https://tinyurl.com/2w3n7vjw.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 15 day of January, 2025, in Trenton, New Jersey

Dr. Dennis Quinlan Jr., Medical Director

Bristol-Meyers Squibb Trauma Center at

Capital Health Regional Medical Center

# EXHIBIT 5

# Declaration of B. Stephan Finkel

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.;
PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,

V.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT
OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

---

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-Cv-830

---

### DECLARATION OF B. STEPHAN FINKEL

---

I, B. Stephan Finkel, hereby declare:

1. I am Director of Legislative Affairs for the Office of the Attorney General of the State of
New Jersey, a position I have held since 2004. As Director of Legislative Affairs, I supervise
the Legislative Affairs Unit and am responsible for ensuring that the Attorney General's
position on legislative matters is presented to the Governor's Office and to the Legislature in
a timely and effective manner, particularly with respect to legislation affecting the mission or
operations of the Department of Law and Public Safety.

2. Prior to starting my position as Director of Legislative Affairs, I worked in other roles in the
Legislative Affairs Unit, serving as Legislative Counsel from 1996 to 2000 and Chief

Legislative Counsel from 2000 to 2004. Prior to my work in the Legislative Affairs Unit, I worked as a Deputy Attorney General in the Division of Law of the New Jersey Department of Law and Public Safety, assigned to the JUA/MTF Complex Litigation Unit and to the Insurance Section. I graduated from Franklin and Marshall College and received my law degree from Villanova University School of Law.

3. As Director of Legislative Affairs, I have personal knowledge of the matters set forth below.

<u>The Legislative Affairs Unit</u>

4. The Legislative Affairs Unit of the New Jersey Office of the Attorney General is the unit responsible for developing and carrying out the Attorney General's legislative agenda and advocating the Attorney General's position on legislative matters. Generally, members of the Legislative Affairs Unit accomplish this mission by performing the following tasks in the legislative process: working with the various component divisions in the Department to develop and advocate for the introduction and passage of legislative initiatives which are legally and technically sound and which reflect the policy objectives and priorities established by the Attorney General; identifying and tracking pending legislation which may affect any of the Department's component divisions, and referring bills to the appropriate division or divisions for analysis and comment; reviewing divisional analyses and comments on pending legislation; evaluating the effects of each pending bill upon the Department's mission, organization, operation, or budget in recommending an appropriate departmental position; drafting amendments or developing alternative legislative or administrative proposals, as appropriate; coordinating with executive branch staff and officials from the Governor's Office and other State departments and agencies on matters related to legislation; developing and implementing strategies and obtaining Governor's Office approval to take

appropriate action to support or oppose pending legislation, or to secure adoption of recommended amendments or passage of departmental initiatives; interacting with legislators and partisan and non-partisan legislative staff members to provide pertinent information and to advocate for or against legislation; attending and monitoring legislative committee meetings and voting sessions as appropriate; preparing and submitting written positions; and testifying or arranging for testimony as needed.

### Process to Enact New Legislation

5. The following is a high-level overview of how a bill becomes law in New Jersey: A member or members of the Senate or General Assembly may sponsor a bill and propose it for introduction during a legislative session. Then, the bill is typically referred to a standing committee, where it may be selected for inclusion on a committee agenda. If authorized by legislative leadership, the committee chair may schedule the bill for consideration, and the committee would consider the bill during a public meeting. At that public meeting, members of the public may testify on the bill, and the committee members may discuss the bill and ask questions of the sponsor or witnesses. Committee members may approve proposed amendments to the bill, and bills may be released either in their original form as introduced, with amendments approved by the committee, or with a substitute bill approved by the committee. If the committee votes to release a bill from committee, the bill is placed on second reading and may be referred to another committee for further consideration or possible amendment, or scheduled for consideration by the full Senate or House. If the Senate President or Speaker of the Assembly opts to schedule a bill on second reading for a floor vote, the full Senate or Assembly may debate and vote on the legislation; while the public is permitted in the legislative chamber, public testimony is not permitted. The bill may

also be amended on the floor. If the majority of members of the Senate or Assembly vote in favor of the bill, then the bill is considered passed by that House and sent to the other chamber, where it may follow a similar process. When both chambers pass an identical version of the bill, it is presented to the Governor for consideration. The bill becomes law if the Governor signs it or takes no action on the bill before noon of the 45th day following presentation (or, if the house of origin is in adjournment, on the day the house reconvenes following that 45-day period), or if the Governor's veto is overridden by a 2/3 vote of the Legislature.

6. When so requested by the Governor's Office or if an issue arises that may affect the mission or operations of the Department of Law and Public Safety, the Legislative Affairs Unit may engage in the legislative process in a number of ways, including by producing draft legislation for consideration for sponsorship by members of the Legislature. This would be considered an initiative of either the Department or the Governor's Administration, and it would generally involve a staff member of the Legislative Affairs Unit—often working with departmental personnel—conducting research and identifying and accommodating policy and implementation considerations, drafting a proposed bill, and soliciting approval of the proposal from appropriate authorities, which may include the Attorney General, senior executive staff members, or division directors, and the Governor's Office. Upon approval, either the Governor's Office legislative liaisons or the Legislative Affairs Unit staff member would share the draft legislation with the potential legislative sponsors, by providing it to legislative leadership, Senate or Assembly members, and/or partisan staff members. This would typically be followed by meetings, discussion, or communications with the legislators and/or their aides, as well as with assigned committee aides, to provide further explanation of

and advocacy for the proposed bill, consider or respond to any potential opposition to the proposed bill, coordinate with stakeholders and others to garner additional support for the bill, and assist with drafting any required amendments. The staff member may present written testimony or testify in person at the committee hearing on the bill. If the bill moves through the legislative process and is presented to the Governor for consideration, the staff member also answers any questions that may arise from the Governor's Office on policy, technical, or substantive issues or on implementation, and advises the Governor's Office on the rationale for the bill and any implications it may have for the Department, the Administration, and the public.

7. In addition to the time and resources expended by the Legislative Affairs Unit, the process of enacting a bill involves significant time and resources from state legislators and the Governor, as the legislative process typically requires the completion of many technical and procedural steps to progress from the introduction stage through committee consideration, passage by both houses, and presentation to the Governor for signature, all of which require legislators, aides, and the Governor to engage in research, answer questions from stakeholders and constituents, and draft and incorporate amendments as needed.

8. Additionally, upon enactment of legislation supplementing or amending the criminal laws of the State, in carrying out the Attorney General's responsibilities as Chief Law Enforcement Officer of the State of New Jersey, the Division of Criminal Justice (DCJ) of the New Jersey Department of Law and Public Safety may provide notification to the State's police chiefs and prosecutors advising of any significant changes to the law. As may be needed, DCJ prosecutors or attorneys in the Division of Law may be called upon to analyze the impact of any such legislative changes on existing law and identify relevant enforcement

considerations, and so advise the law enforcement community. As such, when federal decisions impact the enforcement of state law, or newly enacted state law deviates from federal law in meaningful ways, DCJ would include in its communications an appropriate explanation or discussion to inform the State's law enforcement officers about the current state of New Jersey criminal law.

## Current New Jersey Law on Forced Reset Triggers

9. Under New Jersey law, "[a]ny person who knowingly has in his possession a machine gun or any instrument or device adaptable for use as a machine gun, without being licensed to do so … , is guilty of a crime of the second degree." N.J. Stat. Ann. § 2C:39-5(a). New Jersey law defines a machine gun as "any firearm, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the firearm, mechanism or instrument and fired therefrom." N.J. Stat. Ann. § 2C:39-1(i). My understanding is that a firearm equipped with an FRT qualifies as a machine gun under New Jersey law.

10. However, New Jersey does not currently have a law specifically banning FRTs as individual parts. *See* N.J. Stat. Ann. § 2C:39-1. Unlike federal law, New Jersey does not currently regulate parts or combinations of parts that convert a firearm into a machine gun. *See* N.J. Stat. Ann. § 2C:39-1(i) (defining machine gun, in relevant part, to mean "any firearm, mechanism or instrument").

## Enacting State Legislation to Ban FRTs

11. As Chief Law Enforcement Officer of the State of New Jersey, the Attorney General is responsible for overseeing enforcement of firearms laws in New Jersey. Consistent with the Attorney General's policy objectives, in response to the growing threat of machine gun

conversion devices ("MCDs") and the district court ruling in this case vacating ATF's

classification of FRTs as "machineguns" under federal law, the Legislative Affairs Unit has

devoted time and resources to preparing legislation that would ban FRTs as a standalone

device and enable more robust state enforcement against their possession and distribution.

And if the district court ruling in this case is upheld, the Legislative Affairs Unit expects to

continue committing time and resources to introduce and advocate for the passage of such

legislation. In addition, the legislative process to consider and potentially enact such

legislation will consume the time and resources of legislative officials and staff.

12. The Legislative Affairs Unit has been working with members of the New Jersey Legislature

on establishing statutory provisions that would, among other things, prohibit the possession

and distribution of standalone MCDs, including FRTs, in the State of the New Jersey. The

Legislative Affairs Unit has been engaged with the Legislature regarding the draft MCD bill

provisions for several months, and that work continues through today.

13. Specifically, the Legislative Affairs Unit has drafted language, proposed as a substitute for a

pending bill, which addresses standalone FRTs in multiple ways. First, it would modify the

state law definition of "machine gun" in N.J. Stat. Ann. § 2C:39-1(i) to "include the frame or

receiver of any such weapon, any part designed and intended solely and exclusively, or

combination of parts designed and intended, for use in converting a weapon into a machine

gun, and any combination of parts from which a machine gun can be assembled if such parts

are in the possession or under the control of a person." Second, it would add an express

prohibition on FRTs as individual parts to the prohibitions in N.J. Stat. Ann. § 2C:39-3(l), the

provision of New Jersey law that currently prohibits bump stocks and trigger cranks. The

draft language would make it a crime of the third degree to knowingly possess a forced reset

trigger, and would amend N.J. Stat. Ann. § 2:39-1 by adding a definition of the term "forced reset trigger."

14. The Legislative Affairs Unit's proposed language is expected either to be introduced as new legislation or to be included in amendments to or as a substitute for a bill that will be scheduled for a committee hearing in 2025.

15. If the district court's vacatur of the classification of FRTs as machineguns and the nationwide injunction limiting ATF enforcement is upheld, the Legislative Affairs Unit expects to continue committing time and resources to supporting passage of this bill, including engaging in the steps outlined above in paragraphs 4 and 6. For example, the Legislative Affairs Unit anticipates that, at a minimum, it will need to engage in additional discussions with the Assembly and subsequent Senate sponsors as well as their aides, partisan office staff, and committee members; assist with researching and/or drafting any requested amendments; engage with stakeholders and other persons interested in the bill; testify if needed at any scheduled committee hearings on the bill; research and respond to any questions or issues that may arise as the bill moves through the legislative process; and advise the Governor's Office on any technical, substantive, or policy issues related to the bill.

16. Additionally, given the divergence of state and federal law that would occur if the district court's ruling were to stand, my Unit would likely advise DCJ of the need to produce a bulletin to police chiefs and prosecutors to inform them about the changing legal landscape on FRTs and ensure that the State's law enforcement officers are aware of FRTs' legal status.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of January, 2025, in Trenton, New Jersey.

B. Stephan Finkel
Director of Legislative Affairs
New Jersey Office of the Attorney General

# EXHIBIT 6

# Declaration of Todd W. Daloz

NO. 24-10707

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————————————————

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.;
PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,
V.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT
OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

————————————————————

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-Cv-830

————————————————

## DECLARATION OF TODD W. DALOZ

————————————————

I, Todd W. Daloz, hereby declare:

1. I am the Director of Policy and Legislative Affairs in the Office of the Vermont Attorney

   General, a position I have held since September 2024. As Director of Policy and Legislative

   Affairs, I am responsible for developing the Attorney General's policy priorities, working

   with partners in the Legislature, the Governor's Office, and other advocates to realize those

   priorities, and representing the Attorney General's Office at public events, including on

   various boards and commissions. Prior to holding this position, I served as the Deputy

   Secretary of Human Services for the State of Vermont for two and half years, the General

   Counsel of the Vermont Agency of Human Services for one and a half years, and in the

General Counsel's office in the Vermont State Colleges.  I started my legal career as a Law Clerk for Vermont Supreme Court Justice Marilyn Skoglund and following that, spent five years as an Assistant Attorney General in the Office of the Vermont Attorney General.

2. As Director of Policy and Legislative Affairs, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by members of my staff.

3. Vermont law does not currently ban Forced Reset Triggers (FRTs), though Vermont has banned "bump stocks," which are similar devices used to simulate machineguns. In the absence of federal enforcement against FRTs as machineguns, the purposes of Vermont's law banning bump stocks would be undermined. To protect its citizens from the harm these weapons pose, Vermont would need to pass its own law banning FRTs as machinegun parts.

4. Moreover, Vermont would need to incur expenses to inform the public about the difference between machinegun devices and the differences in legality of those devices under federal and state law. For example, when bump stocks were held not to be machineguns by the U.S. Supreme Court last term, the Attorney General had to use staff time to explain to the public that such devices are still prohibited under state law. If federal enforcement of FRTs is frozen as a result of this litigation, the State would similarly have to incur expenses to communicate the legal status of FRTs to its residents and would need to expend similar resources on such public communications efforts.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of January 2025, in Montpelier, Vermont.

*/s/ Todd W. Dalos*
Todd W. Daloz
Director of Policy and Legislative Affairs
Office of the Vermont Attorney General