No. 24-10707

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————————

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.; PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,

v.

JAMES R. MCHENRY III, ACTING U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE; MARVIN G. RICHARDSON, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,
*Defendants-Appellants*

———————————————

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-cv-830

———————————————

**BRIEF OF THE STATES OF NEW JERSEY, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MARYLAND, MASSACHUSETTS, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, MINNESOTA, NEVADA, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON, AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS**

———————————————

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
JEREMY M. FEIGENBAUM
*Solicitor General*
SHANKAR DURAISWAMY
*Deputy Solicitor General*
MARIE V. CEPEDA MEKOSH
MAX G. LESSER

*Deputy Attorneys General*
New Jersey Attorney General's Office
33 Washington Street, 9th Floor
Newark, New Jersey 07102
*Attorneys for Amici States*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

<u>Amici States</u>

Matthew J. Platkin, Attorney General of New Jersey

Philip J. Weiser, Attorney General of Colorado

William Tong, Attorney General of Connecticut

Kathleen Jennings, Attorney General of Delaware

Anne E. Lopez, Attorney General of Hawai'i

Kwame Raoul, Attorney General of Illinois

Anthony G. Brown, Attorney General of Maryland

Andrea Joy Campbell, Attorney General of Massachusetts

Dana Nessel, Attorney General of Michigan

Keith Ellison, Attorney General of Minnesota

Aaron D. Ford, Attorney General of Nevada

Jeff Jackson, Attorney General of North Carolina

Dan A. Rayfield, Attorney General of Oregon

Peter F. Neronha, Attorney General of Rhode Island

Charity R. Clark, Attorney General of Vermont

Nicholas W. Brown, Attorney General of Washington

Counsel for New Jersey

Jeremy M. Feigenbaum

Shankar Duraiswamy

Marie V. Cepeda Mekosh

Max G. Lesser

Counsel for Colorado

Shannon Stevenson

Counsel for Connecticut

James M. Belforti

Counsel for Delaware

Ian R. Liston

Vanessa L. Kassab

Counsel for Hawai'i

Ewan C. Rayner

Counsel for Illinois

Alex Hemmer

Counsel for Maryland

Jessica M. Finberg

Counsel for Massachusetts

Anna Lumelsky

Counsel for Attorney General Dana Nessel on behalf of the People of Michigan

Adam R. de Bear

Counsel for Minnesota

Liz Kramer

Counsel for Nevada

Heidi Parry Stern

Counsel for North Carolina

Daniel P. Mosteller

Counsel for Oregon

Brian Simmonds Marshall

Counsel for Rhode Island

Sarah W. Rice

Counsel for Vermont

Jonathan T. Rose

Rosemary M. Kennedy

Counsel for Washington

William McGinty

Defendants-Appellants

James R. McHenry III, Acting U.S. Attorney General

United States Department of Justice

Marvin G. Richardson, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives

Bureau of Alcohol, Tobacco, Firearms and Explosives

<u>Counsel for Defendants-Appellants</u>

Brian B. Boynton

Leigha Simonton

Mark B. Stern

Bradley Hinshelwood

Laura Bakst

<u>Plaintiffs-Appellees</u>

National Association for Gun Rights, Inc.

Texas Gun Rights, Inc.

Patrick Carey

James Wheeler

Travis Speegle

<u>Counsel for Plaintiffs-Appellees</u>

Michael A. Columbo

Whitney A. Davis

Glenn D. Bellamy

*Amici Curiae*

Brady Center to Prevent Gun Violence

Giffords Law Center to Prevent Gun Violence

Everytown for Gun Safety Support Fund

March For Our Lives

Alan Wilson, Attorney General of South Carolina

Andrew Bailey, Attorney General of Missouri

Ashley Moody, Attorney General of Florida

Austin Knudsen, Attorney General of Montana

Ben Toma, Speaker of the Arizona House of Representatives

Brenna Bird, Attorney General of Iowa

Bridget Hill, Attorney General of Wyoming

Christopher M. Carr, Attorney General of Georgia

Dave Yost, Attorney General of Ohio

Drew H. Wrigley, Attorney General of North Dakota

Gentner F. Drummond, Attorney General of Oklahoma

Jason Miyares, Attorney General of Virginia

John M. Formella, Attorney General of New Hampshire

Jonathan Skrmetti, Attorney General and Reporter of Tennessee

Ken Paxton, Attorney General of Texas

Kris Kobach, Attorney General of Kansas

Liz Murrill, Attorney General of Louisiana

Lynn Fitch, Attorney General of Mississippi

Marty J. Jackley, Attorney General of South Dakota

Michael T. Hilgers, Attorney General of Nebraska

Patrick Morrisey, Attorney General of West Virginia

Raúl R. Labrador, Attorney General of Idaho

Russell Coleman, Attorney General of Kentucky

Sean D. Reyes, Attorney General of Utah

Steve Marshall, Attorney General of Alabama

Tim Griffin, Attorney General of Arkansas

Theodore E. Rokita, Attorney General of Indiana

Treg Taylor, Attorney General of Alaska

Warren Peterson, President of the Arizona Senate

Jeffrey Rounds

Evan Jones

Counsel for *Amici Curiae*

Ian Simmons

David K. Roberts

Danielle N. Siegel

Douglas N. Letter

Shira Lauren Feldman

Esther Sanchez-Gomez

David Pucino

Eric Tirschwell

Aaron Esty

Everytown Law

Ciara Wren Malone

Christian B. Corrigan

Peter M. Torstensen, Jr.

Michael R. Williams

Flores Law PLLC

Chad Flores

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
*Counsel for Amici States*

# <u>TABLE OF CONTENTS</u>

**Pages**

INTERESTS OF AMICI CURIAE AND INTRODUCTION ...................................1

ARGUMENT .........................................................................................................4

      I.    FRTS ARE MACHINEGUNS UNDER 26 U.S.C. § 5845(B) ......4

      II.   THE DISTRICT COURT DECISION THREATENS PUBLIC SAFETY AND DIRECTLY HARMS AMICI STATES ...............7

           A.  Proliferation and Public Safety Impact of MCDs and FRTs ...8

           B.  Impacts On Amici States.......................................................12

CONCLUSION ...................................................................................................16

CERTIFICATE OF COMPLIANCE...................................................................24

CERTIFICATE OF SERVICE ...........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*California v. ATF,*
    718 F. Supp. 3d 1060 (N.D. Cal. 2024)........................................................ 12, 15

*DeOtte v. Nevada,*
    20 F.4th 1055 (5th Cir. 2021).................................................................................14

*Garland v. Cargill,*
    602 U.S. 406 (2024) .................................................................... 2, 4, 5, 6, 7

*Gen. Land Office v. Biden,*
    71 F.4th 264 (5th Cir. 2023)........................................................ 12, 15

*Platkin v. Glock,*
    N.J. Super Ct. No. ESX-C-286-24 (Dec. 12, 2024) ...............................9

*United States v. Camp,*
    343 F.3d 743 (5th Cir. 2003)...............................................................6

*United States v. Rare Breed Triggers, LLC,*
    690 F. Supp. 3d 51 (E.D.N.Y. 2023)........................................ *passim*

**Statutes**

26 U.S.C. § 5845 ................................................................ 1, 2, 4, 7, 8

26 U.S.C. ch. 53 ....................................................................................1

720 Ill. Comp. Stat. Ann.  5/24-1(a)(14) ...................................................13

N.J. Stat. Ann. § 18A:64G-6.1a ...............................................................15

N.J. Stat. Ann. § 2C:39-1(i) ...................................................................13

N.J. Stat. Ann. § 2C:39-5(a) .....................................................................16

N.J. Stat. Ann. § 2C:39-1(i) .....................................................................16

**Other Authorities**

F.Y. 2024 CONGRESSIONAL BUDGET SUBMISSION, ATF, 14 (MAR. 2023), https://tinyurl.com/445shfcw.........................................................9

F.Y. 2025 PERFORMANCE BUDGET CONG. SUBMISSION, U.S. DEP'T OF JUSTICE – ATF, 11 (FEB. 2024), https://tinyurl.com/y283azsh........................................8

*Firearms Trace Data - 2023*, ATF, https://tinyurl.com/4z6c2ex6 ..........................9

H.R. Rep. 99-495 .....................................................................................1

H.R. Rep. No. 73-1780 ............................................................................1

NAT'L FIREARMS COMMERCE & TRAFFICKING ASSESSMENT: CRIME GUNS – VOLUME TWO, PART VII 4 (Jan. 11, 2023), https://tinyurl.com/yc2ujp6k ..........................8

Scott Glover & Curt Devine, *A Device that Can Turn a Semi-Automatic Weapon into a Machinegun in Moments Is Wreaking Havoc on American Streets*, CNN (Aug. 30, 2022), https://tinyurl.com/5n7t5v5m..............................................9

## **INTERESTS OF AMICI CURIAE AND INTRODUCTION**

Machineguns have been tightly regulated since 1934, when federal rules were put into place in response to the widespread gang violence enabled by such weapons. *See* The National Firearms Act of 1934, 26 U.S.C. ch. 53; H.R. Rep. No. 73-1780, at 1 (1934) ("The gangster as a law violator must be deprived of his most dangerous weapon, the machine gun."); *see also* H.R. Rep. 99-495 (expressing "need for more effective protection of law enforcement officers from the proliferation of machine guns and high-powered assault-type weapons" in prohibiting transfer or possession of machineguns). Federal law thus prohibits machineguns and "any part designed … for use in converting a weapon to a machinegun." 26 U.S.C. § 5845(b).

Nonetheless, in recent years, States have confronted a staggering proliferation of machinegun conversion devices (MCDs) that evade these restrictions. Firearms equipped with an MCD can fire automatically at speeds exceeding even military grade machineguns, causing mass devastation in seconds. Firearms tracing by law enforcement reveals an exponential increase in the use of MCDs in violent crimes, underscoring the public safety threat and law enforcement challenge they pose for Amici States. That especially includes Forced Reset Triggers ("FRTs"), which have recently proliferated across the country—with more than 100,000 sold by a single company since 2020. *See United States v. Rare Breed Triggers, LLC* ("*RBT*"), 690 F. Supp. 3d 51, 58, 120 (E.D.N.Y. 2023). FRTs replace the standard trigger assembly

on an AR-15-type rifle, allowing the shooter to achieve the same rapid, continuous fire as a machinegun by simply "pull[ing] the FRT-15 trigger once and maintain[ing] rearward pressure." *Id.* at 65. A firearm with an FRT can fire faster than an M16 military rifle in automatic mode, *see* ROA.2007, so shootings involving firearm equipped FRTs can increase the number of victims, injuries, and deaths.

FRTs are new, but the mechanical principles on which they operate are not. As far back as 1975, ATF has repeatedly classified devices that operate similarly to FRTs as machineguns because they allow a shooter to fire "automatically more than one shot, without reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also, e.g.*, ROA.2706-10, ROA.2714, ROA.2742-44, ROA.2760-61, ROA.2784-85, ROA.2820-22, ROA.2888-96, ROA.2233-45. Although the Eastern District of New York correctly concluded that FRTs are illegal "machineguns" under federal law, *see RBT*, 690 F. Supp. 3d at 58-59, the district court in this case held that FRTs do not qualify under *Garland v. Cargill*, 602 U.S. 406 (2024). ROA.3709. The court vacated and declared unlawful ATF's classification of FRTs as machineguns, and enjoined ATF from taking enforcement action regarding FRTs against a broad swath of entities. ROA.3724-25. The district court also ordered ATF to return many of the 11,884 FRTs it previously confiscated by February 22, 2025. *See* ROA.4056-57.

Amici States[1] submit this brief to lay out not only that the court below misread *Cargill* and adopted an unduly cramped interpretation of federal law, but to explain the many ways in which a federal enforcement gap against FRTs would harm Amici States—not only by stripping ATF of its ability to address this public-safety threat in the future, but by forcing ATF to put thousands of confiscated FRTs back onto American streets. Indeed, Amici States have relied on ATF's classification of FRTs as machineguns and its corresponding enforcement efforts, which have helped to protect Amici States' residents from the proliferation of these dangerous weapons. Absent federal enforcement, Amici States will have to incur greater costs to enforce state laws against FRTs or FRT-equipped firearms, pass legislation, and increase law enforcement and healthcare spending to respond to incidents involving firearms equipped with FRTs. Moreover, the health and well-being of Amici States' residents would be at greater risk from devastating violence caused by FRTs. The interests of Amici States and their residents will thus be seriously harmed if the vacatur of ATF's classification of FRTs is affirmed and ATF's enforcement actions involving FRTs continue to be enjoined. This Court should reverse the decision below.

---

[1] Amici States are New Jersey, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maryland, Massachusetts, Attorney General Dana Nessel on Behalf of the People of Michigan, Minnesota, Nevada, North Carolina, Oregon, Rhode Island, Vermont, and Washington.

## **ARGUMENT**

## I.    **FRTS ARE MACHINEGUNS UNDER 26 U.S.C. § 5845(B).**

This Court should reverse the district court's erroneous finding that FRTs are

not machineguns under federal law. FRTs are machineguns because they convert

firearms to "shoot, automatically more than one shot, without manual reloading, by

a single function of the trigger." 26 U.S.C. § 5845(b). Specifically, when operating

an FRT-equipped firearm, a "shooter need only pull the FRT-15 trigger once and

maintain rearward pressure for the gun to rapidly fire multiple rounds, requiring no

additional input from the shooter." *RBT*, 690 F. Supp. 3d at 65. ATF has classified

devices that operate similarly to FRTs as machineguns for nearly five decades based

on this straightforward application of statutory text. *See* ROA.2706-10, ROA.2714,

ROA.2742-44,    ROA.2760-61,    ROA.2784-85,    ROA.2820-22,    ROA.2888-96,

ROA.2233-45.

*Garland v. Cargill* only reinforces the longstanding recognition that FRTs are

machineguns within the meaning of federal law. *See* 602 U.S. 406 (2024). *Cargill*

defined "function of the trigger" to mean "the mode of action by which the trigger

activates the firing mechanism." *Id.* at 416. Consistent with that understanding, the

Court delineated the federal distinction between machineguns and semi-automatic

weapons. On the one hand, machineguns allow "a shooter [to] fire multiple times,

or even continuously, by engaging the trigger only once." *Id.* at 410. On the other,

semiautomatic weapons allow the shooter to "fire only one time by engaging the trigger," and the shooter "must release and reengage the trigger to fire another shot." *Id.* at 411. In this way, the Court noted that "[t]he statutory definition [] hinges on how many shots discharge when the shooter engages the trigger." *Id.* at 422.

The Court determined that *non*-mechanical bump stocks did not qualify as machineguns because such devices did not fundamentally alter the weapon's "firing cycle." *Id.* at 421. Rather, "[f]or each shot, the shooter must [still] engage the trigger and then release the trigger to allow it to reset," and "[a]ny additional shot fired after one cycle is the result of a separate and distinct 'function of the trigger.'" *Id.* The Court reasoned that a weapon equipped with an external, non-mechanical bump stock still possesses a "standard trigger mechanism," *id.* at 416, and that the device simply makes the "bump firing" technique "easier," *id.* at 411-412, by reducing "the amount of time that elapses between separate 'functions' of the trigger," *id.* at 421. And the Court also found that non-mechanical bump stocks do not "automatically" enable repeated fire, but instead require "ongoing manual input" from the shooter above and beyond "engaging the trigger one time." *Id.* at 424.

*Cargill*'s reasoning reinforces that FRTs qualify as machineguns. In contrast with bump stocks, FRTs replace the trigger system of a semi-automatic rifle with a structurally different trigger assembly. *See RBT*, 690 F. Supp. 3d at 64-65 (detailing operation of FRTs). This modification "permits a shooter to fire multiple shots while

engaging the trigger only once," *Cargill*, 602 U.S. at 420 n.4, the core characteristic of a machinegun under the Court's analysis. *See id.* at 410. Just like a machinegun, the only input required of a shooter is to "simply engage the trigger one time" and maintain rearward pressure on the trigger. *Id.* at 426-27; *RBT*, 690 F. Supp. 3d at 65. In this way, an FRT modifies a weapon similarly to an auto sear, a device that "converts [a firearm] into a machinegun." *Cargill*, 602 U.S. at 420 n.4; *see also United States v. Camp*, 343 F.3d 743, 744-45 (5th Cir. 2003) (finding that a firearm equipped with a switch that, when pressed, activated an electric motor that "caused the original trigger to function in rapid succession" so that "[t]he weapon would fire until either the shooter released the switch or the loaded ammunition was expended" was a machinegun because it "required only one action—pulling the switch [the shooter] installed—to fire multiple shots").

In addition to firing more than one shot "by a single function of the trigger," FRT-equipped firearms also do so "automatically." *Cargill*, 602 U.S. at 424. "If something more than a 'single function of the trigger' is required to fire multiple shots, the weapon does not satisfy the statutory definition." *Id.* The Supreme Court found that a non-mechanical bump stock "requires *more* than a single function of the trigger" due to the shooter's need to maintain continuous "*forward* pressure on the rifle's front grip with [their] nontrigger hand." *Id.* (emphasis added). There is no such additional, manual work that needs to be performed by the shooter with an

FRT-equipped firearm; the FRT does this work mechanically. *See id.* at 424-27; *RBT*, 690 F. Supp. 3d at 65. Rearward pressure on the trigger "is not manual input in addition to a trigger's function—it is what causes the trigger to function in the first place." *See Cargill*, 602 U.S. at 425. Moreover, the shooter of an FRT-equipped firearm does *not* need to "release and reengage" the weapon's trigger or "take[] pressure off" the trigger for each shot. *See id.* at 411, 420. Rather, the shooter of an FRT-equipped firearm only needs to engage the trigger once to initiate and sustain an automatic firing sequence. *See RBT*, 690 F. Supp. 3d at 65.

In short, firearms equipped with FRTs fire "more than one shot … by a single function of the trigger," and this process is "automatic[]." *See* 26 U.S.C. § 5845(b); *see Cargill*, 602 U.S. at 415-27. Accordingly, this Court should correct the district court's erroneous conclusion that FRTs are not machineguns under federal law, and reject the wide-reaching relief granted to Plaintiffs-Appellees.

## II.   THE DISTRICT COURT DECISION THREATENS PUBLIC SAFETY AND DIRECTLY HARMS AMICI STATES.

Amici States, like the United States, are grappling with the recent and sharp rise of MCDs, including FRTs, within their borders. Amici States have witnessed a proliferation of MCDs and their corresponding use in crime. And although data on FRTs is limited, a large number of FRTs have reached Amici States. As these MCDs continue to proliferate, they will only threaten public safety even further, and work even greater direct impacts on Amici States.

A.    <u>Proliferation and Public Safety Impact of MCDs and FRTs.</u>

MCDs are a critical public safety issue. Cheap and accessible MCDs enable semiautomatic firearms to fire automatically—so that they can match or exceed the rate of fire of military machineguns. *See* Ex. 1 at 3, ECF No. 84 (Exs. to Intervention Mot.) (Decl. of Eric Barlow). Semiautomatic weapons with an MCD can fire up to 20 bullets in one second. *Id.* at 4. This extraordinary rate of fire both decreases firing accuracy and increases the likelihood of multiple victims, including bystanders. *Id.* at 4-5; Ex. 4 at 3-4, ECF No. 84 (Decl. of Dr. Dennis Quinlan Jr.). For example, in New Jersey, a shooter fired 28 rounds from an MCD-equipped firearm in just over one second, seriously injuring three people. Ex. 1 at 5.

Although federal law prohibits "any part designed … for use in converting a weapon to a machinegun," 26 U.S.C. § 5845(b), new technologies like 3D printing have led to a massive proliferation of MCDs. For example, ATF found a "significant rise" in MCD recoveries, F.Y. 2025 PERFORMANCE BUDGET CONG. SUBMISSION, U.S. DEP'T OF JUSTICE – ATF, 11 (FEB. 2024), https://tinyurl.com/y283azsh, recovering 5,454 MCDs from 2017 through 2021—a 570 percent increase over the prior five-year period. NAT'L FIREARMS COMMERCE & TRAFFICKING ASSESSMENT: CRIME GUNS – VOLUME TWO, PART VII 4 (Jan. 11, 2023), https://tinyurl.com/yc2ujp6k.

This proliferation of MCD recoveries has contributed to increasing incidents of machinegun fire, which "exploded by about 1,400% from 2019 through [2021].'" Scott Glover & Curt Devine, *A Device that Can Turn a Semi-Automatic Weapon into a Machinegun in Moments Is Wreaking Havoc on American Streets*, CNN (Aug. 30, 2022), https://tinyurl.com/5n7t5v5m. ATF further reports a "dramatic increase in the use of [MCDs] in violent crimes over the last five years." F.Y. 2024 CONGRESSIONAL BUDGET SUBMISSION, ATF, 14 (MAR. 2023), https://tinyurl.com/445shfcw. That includes an "approximately 400% increase" from 2022 to 2023 "in firearm traces involving an MCD in which the trace was also associated with a crime of violence," including homicides, assaults, and the murder of a police officer. ROA.2011.

Amici States have also seen a significant criminal footprint for MCDs. New Jersey alone identified at least 26 criminal cases where MCDs have been recovered. *See* Complaint at 1, 4-6, 51-54, *Platkin v. Glock*, N.J. Super Ct. No. ESX-C-286-24 (Dec. 12, 2024). ATF reports that state and local law enforcement are encountering MCDs at crime scenes and requesting ATF's aid in tracing them, including in Amici States—392 in Illinois, and 130 in Michigan, and 60 in Colorado in 2023. *Firearms Trace Data - 2023*, ATF, https://tinyurl.com/4z6c2ex6.

FRTs, including the FRT-15 and Wide Open Trigger ("WOT"), have helped fuel this recent proliferation of MCDs and their criminal use. Strikingly, even though the proliferation of FRTs is underreported, *see* ROA.2007-08, ATF has conducted

71 criminal examinations of FRTs from January 2021 through October 2023 as part of cases involving a wide range of criminal conduct, ROA.2008-09. One manufacturer sold 100,000 FRTs across the United States in two years, *see RBT*, 690 F. Supp. 3d at 58; *see also* Ex. 2 at 2, ECF 84 (Decl. of Melissa Rodriguez in *RBT*, No. 23-cv-369 (E.D.N.Y.)), shipping packages to at least 47 States, *see* Ex. 3 at 2, ECF 84 (Decl. of Cheryl Harrell in *RBT*, No. 23-cv-369 (E.D.N.Y.)). The impact on Amici States is clear: among other shipments, RBT made 364 deliveries to New Jersey addresses in 2021 and 2022, *see* Ex. 1 at 6, and sold approximately 560 FRT-15s to a dealer in Massachusetts, *see* Ex. 3 at 2; *see also* ROA.2010 (prosecution for FRT possession in the District of Massachusetts); Ex. 1 at 6 (noting at least 25 packages containing one or more suspected WOTs shipped to New Jersey in 2021). Indeed, at least 23 FRTs shipped to individuals in New Jersey have been recovered by law enforcement authorities. *See* Ex. 1 at 7.

The resolution of this challenge risks furthering FRTs' proliferation to an even greater degree. Plaintiffs-Appellees demand, and the district court granted, vacatur of ATF's classification and a nationwide injunction against enforcement. That relief would eliminate or undermine ATF's ability to prevent dissemination of FRTs into Amici States and to enforce federal law against sellers and possessors, and require ATF to return, by February 22, 2025, many of the 11,884 FRTs it had confiscated. *See* ROA.4056-57 (order); ROA.2011-12 (ATF projecting court order will worsen

proliferation of FRTs). An order that prohibits ATF from taking enforcement actions to prevent dissemination of FRTs (let alone one, as below, that enjoins prosecutions) and mandates their return to dealers and possessors would dramatically expand the proliferation of FRTs into Amici States. *See* ROA.2001 (indicating ATF's consistent classification as machineguns of parts like FRTs helps limit the availability of such products). Even in States where FRTs or FRT-equipped firearms are unlawful, their spread—absent federal regulation—is inevitable. *See* Ex. 1 at 7.

FRTs and the automatic fire they are designed to create will produce increased death, injury, and long-term impacts on survivors and communities in Amici States. *See* Ex. 4 at 3-6. "Firearms with an accelerated rate of fire often cause more severe injuries and damage for victims," as well as increase the "number of total victims" affected by a shooting. *Id.* at 3. Firearms that fire both at a rapid rate and with a high velocity—like AR-15s equipped with FRTs—are especially pernicious. *See id.* at 3-4. "Combining a rapid rate of fire with a high velocity means that a victim is more likely to receive multiple gunshot wounds while also increasing the probable severity of those wounds," and it also "increases the probability that a higher number of victims will experience these impacts." *Id.* at 3. That can also "lead[] to more medical complications for patients." *Id.* at 3-4.

B.    Impacts On Amici States.

Not only does the order worsen the public-safety threat presented by FRTs, but the district court's decision will force Amici States to fill the federal enforcement gap and combat the proliferation of FRTs to protect the safety of their residents. Absent federal enforcement, FRTs will proliferate in the Amici States—even in states where such devices are already fully or partly banned, given the patchwork of state firearms laws across the country. Ex. 1 at 7. And Amici States would no longer be able to rely on ATF's help in removing these MCDs from their communities. *See id.* at 7, 9. In order to effectively confront this threat, Amici States will be required to incur substantial law enforcement, healthcare, and legislative costs.

State Law Enforcement Costs. Absent full ATF enforcement against FRTs as machineguns, Amici States would need to expend greater resources enforcing state laws banning FRTs or FRT-equipped firearms. *See, e.g.*, *Gen. Land Office v. Biden* ("*GLO*"), 71 F.4th 264, 274 (5th Cir. 2023) (recognizing that States have an "interest in [their] fiscal policy" that suffers when States must "redirect resources" due to change in federal policy); *California v. ATF*, 718 F. Supp. 3d 1060, 1073-78 (N.D. Cal. 2024) (finding that a state was injured by the "increased cost of policing and law enforcement" based on gaps in federal regulation of ghost guns). The threatened costs are substantial. ATF estimates that RBT alone has distributed at least 100,000 FRTs, ROA.2001-02, and other companies produce copycats, ROA.2003. Indeed,

ATF has retrieved at least 11,884 FRTs. ROA.3739-40. And ATF's evidence indicates each FRT retrieval takes approximately 16 to 24 hours, split between intelligence professionals and special agents. ROA.2004-07.

The freeze of ATF enforcement against FRTs—especially nationwide and in conjunction with the required return of thousands of FRTs by February 22, 2025— would place a heavy strain on state law enforcement. A number of States already prohibit the use of firearms equipped with FRTs or prohibit FRTs standing alone. *See, e.g.*, N.J. Stat. Ann. § 2C:39-1(i) (New Jersey law definition of unlawful machinegun covers firearms equipped with FRTs); 720 Ill. Comp. Stat. Ann. 5/24-1(a)(14) (Illinois prohibition on devices that increase the rate of fire of semiautomatic weapons). But FRTs still end up within Amici States, and Amici States will no longer be able to rely on ATF assistance in confiscating them or bringing enforcement actions against possessors or distributors. *See* Ex. 1 at 7, 9. Said simply, the district court's ruling will force Amici States to bear the full responsibility and extensive financial costs of enforcing prohibitions on the sale, distribution, and possession of FRTs and FRT-equipped firearms. *See id.* at 8-9 (explaining district court order would require State to "divert[] greater law enforcement resources to enforce" state ban).

Amici States will also suffer considerable additional costs associated with crimes that involve FRTs. Absent a federal prohibition, more FRTs will be used in

crimes within Amici States. *See id.* at 7 (explaining, based on patterns from other firearms and parts, that dissemination is certain absent federal prohibition even in States that bar FRTs—given significant interstate gun trafficking networks). And the use of FRTs in crime imposes special burdens on States. FRTs (like other MCDs) dramatically increase the rate of fire a perpetrator achieves, *supra* at 1-2, 8-11, and Amici States "incur[] greater costs when responding to crime scenes involving devices that increase a firearm's rate of fire" even compared to other shooting crimes. Ex. 1 at 8. Since the "accelerated rate of fire [is] likely to cause increased casualties," law enforcement would need to commit further law enforcement officers to the scene to interview a "higher number of victims and witnesses"; send additional EMTs who can give "emergency medical care to more individuals injured"; and require more time from the medical examiner given the increased number of deaths. *Id.* And many States would additionally have to expend or divert resources to training officers on recognizing and safely handling firearms equipped with FRTs. *See id.* at 9.

Healthcare Costs. Halting federal enforcement against FRTs would impose considerable healthcare expenditures too. *Cf. DeOtte v. Nevada*, 20 F.4th 1055, 1068, 1070 (5th Cir. 2021) (finding States have a "financial interest" in protecting "state fisc" from a "void" left by federal law where gap "would cause the state financial injury through strain on its healthcare programs"). Firearms with an

accelerated rate of fire, like FRT-equipped weapons, "often cause more severe injuries … [and] a higher number of total victims." Ex. 4 at 3; *see also supra* at 11. These impacts "place[] significant strain on the medical system," requiring a hospital to "call in additional staff[,] … increase security to protect the patients and staff[,] … [and] divert patients to other hospitals, which delays their ability to get much-needed care." Ex. 4 at 4. All told, "[t]he more significant injuries caused by firearms with an accelerated rate of fire and higher firing velocity leads to more medical complications for patients, which increases costs for hospitals and healthcare providers in treating patients." *Id.* at 3-4. State-owned hospitals in the Amici States would therefore be affected by such projected cost increases. *See, e.g.*, N.J. Stat. Ann. § 18A:64G-6.1a (law governing New Jersey's state-owned hospital).

Legislative Costs. If ATF cannot enforce federal law to address FRTs, some Amici States must expend resources enacting legislation to address that gap. *Cf. GLO*, 71 F.4th at 274 (finding, in the context of standing, that a State's need to "alter its laws" is an injury, since "pressure to change state law affects quasi-sovereign interest"); *accord California v. ATF*, 718 F. Supp. 3d at 1073-78 (agreeing, in challenge to federal ghost guns policy, that States suffer harm from "enactment and implementation of state legislation" if they "ha[ve] to incur costs to regulate because ATF is not regulating"). New Jersey is again illustrative. Although New Jersey law prohibits firearms equipped with FRTs, it does not restrict FRTs standing alone. *See*

N.J. Stat. Ann. §§ 2C:39-1(i); 2C:39-5(a). Absent federal enforcement, States would need to enact legislation to bar the dissemination and possession of FRTs directly to address this public-safety threat. *See* Ex. 5 at 6, ECF No. 84 (Decl. of B. Stephan Finkel); Ex. 6 at 2, ECF No. 84 (Decl. of Todd W. Daloz) (same for Vermont). New Jersey has initiated the process of drafting legislation to make clear that particular firearm parts, including FRTs, are illegal. Ex. 5 at 6-8. But enacting new statutes requires resources. *See id.* at 4-8. FRT-specific legislation and its costs are yet another consequence of the district court's decision because if ATF had the power to stop the distribution of FRTs, the need for such legislation would be mitigated.

## **CONCLUSION**

This Court should reverse the district court's order.

Dated: January 24, 2025           Respectfully submitted,

**MATTHEW J. PLATKIN**
*Attorney General of New Jersey*

*/s/ Jeremy M. Feigenbaum*
JEREMY M. FEIGENBAUM
Solicitor General
SHANKAR DURAISWAMY
Deputy Solicitor General
MARIE V. CEPEDA MEKOSH
MAX G. LESSER
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street
Trenton, NJ 08625
(609) 376-2690
jeremy.feigenbaum@njoag.gov

*Attorneys for the State of New Jersey*

**PHILIP J. WEISER**
*Attorney General of Colorado*

By: */s/ Shannon Stevenson*
SHANNON STEVENSON
Solicitor General
Office of the Colorado State Attorney General
1300 Broadway, Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
*Attorney General of Connecticut*

By: */s/ James M. Belforti*

JAMES M. BELFORTI
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06105
(860) 808-5450
james.belforti@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
*Attorney General of Delaware*

By: /s/ *Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
*Attorney General of Hawai'i*

By: /s/ *Ewan C. Rayner*
EWAN C. RAYNER
Deputy Solicitor General
Department of the Attorney General, State of
Hawai'i
425 Queen Street
Honolulu, HI 96813
(808) 586-1360

18

Ewan.Rayner@hawaii.gov

*Attorneys for State of Hawai'i*


**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ Alex Hemmer*
ALEX HEMMER
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

*Attorneys for State of Illinois*


**ANTHONY G. BROWN**
*Attorney General of Maryland*

By: */s/ Jessica M. Finberg*
JESSICA M. FINBERG
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6921
jfinberg@oag.state.md.us

*Attorneys for the State of Maryland*


**ANDREA JOY CAMPBELL**
*Attorney General, Commonwealth of Massachusetts*

By /s/ *Anna Lumelsky*

ANNA LUMELSKY
Deputy State Solicitor
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2334
anna.lumelsky@mass.gov

*Attorneys for the Commonwealth of Massachusetts*


**DANA NESSEL**
*Attorney General of Michigan*

By: */s/ Adam R. de Bear*
ADAM R. DE BEAR
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 335-7573
debeara@michigan.gov

*Attorneys for Attorney General Dana Nessel on behalf of the People of Michigan*


**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/ Liz Kramer*
LIZ KRAMER
Solicitor General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010
liz.kramer@ag.state.mn.us

20

*Attorneys for State of Minnesota*

**AARON D. FORD**
*Attorney General of Nevada*

 /s/ Heidi Parry Stern
HEIDI PARRY STERN
(NV Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorneys for the State of Nevada*


**JEFF JACKSON**
*Attorney General of North Carolina*

By: */s/ Daniel P. Mosteller*
DANIEL P. MOSTELLER
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Attorneys for State of North Carolina*


**DAN RAYFIELD**
*Attorney General, State of Oregon*


By: */s/ Brian Simmonds Marshall*
BRIAN SIMMONDS MARSHALL
Oregon Bar No. #196129
Senior Assistant Attorney General

21

Trial Attorney
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
*Of Attorneys for the State of Oregon*


**PETER F. NERONHA**
*Attorney General of Rhode Island*

By: */s/ Sarah W. Rice*
SARAH W. RICE
Deputy Chief, Civil Division
Office of the Rhode Island Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 x2054
srice@riag.ri.gov

*Attorneys for State of Rhode Island*


**CHARITY R. CLARK**
*Attorney General of Vermont*

By:  */s/ Jonathan T. Rose*
JONATHAN T. ROSE
Solicitor General
ROSEMARY M. KENNEDY
Assistant Attorney General
109 State Street
Montpelier, VT 06509
(802) 828-3171
jonathan.rose@vermont.gov
rosemary.kennedy@vermont.gov
*Attorneys for State of Vermont*

**NICHOLAS W. BROWN**
*Attorney General of Washington*

By: */s/ William McGinty*
WILLIAM MCGINTY
Assistant Attorney General
Washington State Office of the Attorney General
P.O. Box 4011
Olympia, WA 98504-0111
(360) 709-6027
William.McGinty@atg.wa.gov

*Attorneys for State of Washington*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 5, this document contains 3,805 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

*/s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum
*Counsel for Amici States*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2025, I filed the foregoing Amici States'

Brief as Amicus Curiae in support of Defendant-Appellants with the Clerk of the

Court for the United States Court of Appeals for the Fifth Circuit using the appellate

CM/ECF system. I certify that all participants in the case are registered CM/ECF

users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum
*Counsel for Amici States*