No. 24-10707

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.; PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,

v.

PAMELA BONDI, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE; DANIEL DRISCOLL, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-cv-830

## MOVANT STATES' RENEWED MOTION TO
## INTERVENE AS DEFENDANTS-APPELLANTS

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
JEREMY M. FEIGENBAUM
*Solicitor General*
SHANKAR DURAISWAMY
*Deputy Solicitor General*
MARIE V. CEPEDA MEKOSH
MAX G. LESSER
JUSTINE LONGA
AMANDA MCELFRESH
LUCY I. SPRAGUE
*Deputy Attorneys General*
New Jersey Attorney General's Office

33 Washington Street, 9th Floor
Newark, New Jersey 07102
*Attorneys for Movant States*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

<u>Movant States</u>

Matthew J. Platkin, Attorney General of New Jersey

Philip J. Weiser, Attorney General of Colorado

William Tong, Attorney General of Connecticut

Kathleen Jennings, Attorney General of Delaware

Anne E. Lopez, Attorney General of Hawai'i

Kwame Raoul, Attorney General of Illinois

Anthony G. Brown, Attorney General of Maryland

Andrea Joy Campbell, Attorney General of Massachusetts

Dana Nessel, Attorney General of Michigan

Keith Ellison, Attorney General of Minnesota

Aaron D. Ford, Attorney General of Nevada

Jeff Jackson, Attorney General of North Carolina

Dan A. Rayfield, Attorney General of Oregon

Peter F. Neronha, Attorney General of Rhode Island

Charity R. Clark, Attorney General of Vermont

Nicholas W. Brown, Attorney General of Washington

Counsel for Movant States

Jeremy M. Feigenbaum

Shankar Duraiswamy

Marie V. Cepeda Mekosh

Max G. Lesser

Justine Longa

Amanda McElfresh

Lucy I. Sprague

Counsel for Colorado

Shannon Stevenson

Counsel for Connecticut

James M. Belforti

Counsel for Delaware

Ian R. Liston

Vanessa L. Kassab

Counsel for Hawai'i

Ewan C. Rayner

Counsel for Illinois

Alex Hemmer

Counsel for Maryland

Jessica M. Finberg

Counsel for Massachusetts

Anna Lumelsky

Counsel for Attorney General Dana Nessel on behalf of the People of Michigan

Adam R. de Bear

Counsel for Minnesota

Liz Kramer

Counsel for Nevada

Heidi Parry Stern

Counsel for North Carolina

Daniel P. Mosteller

Counsel for Oregon

Brian Simmonds Marshall

Counsel for Rhode Island

Sarah W. Rice

Counsel for Vermont

Jonathan T. Rose

Rosemary M. Kennedy

Counsel for Washington

William McGinty

Defendants-Appellants

Pamela Bondi, U.S. Attorney General

United States Department of Justice

Daniel Driscoll, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives

Bureau of Alcohol, Tobacco, Firearms, and Explosives

Counsel for Defendants-Appellants

Bradley Hinshelwood

Laura Myron

Plaintiffs-Appellees

National Association for Gun Rights, Inc.

Texas Gun Rights, Inc.

Patrick Carey

James Wheeler

Travis Speegle

Counsel for Plaintiffs-Appellees

Michael A. Columbo

Whitney A. Davis

Glenn D. Bellamy

*Amici Curiae*

Brady Center to Prevent Gun Violence

Giffords Law Center to Prevent Gun Violence

Everytown for Gun Safety Support Fund

March For Our Lives

Alan Wilson, Attorney General of South Carolina

Andrew Bailey, Attorney General of Missouri

Ashley Moody, Attorney General of Florida

Austin Knudsen, Attorney General of Montana

Ben Toma, Speaker of the Arizona House of Representatives

Brenna Bird, Attorney General of Iowa

Bridget Hill, Attorney General of Wyoming

Christopher M. Carr, Attorney General of Georgia

Dave Yost, Attorney General of Ohio

Drew H. Wrigley, Attorney General of North Dakota

Gentner F. Drummond, Attorney General of Oklahoma

Jason Miyares, Attorney General of Virginia

John M. Formella, Attorney General of New Hampshire

Jonathan Skrmetti, Attorney General and Reporter of Tennessee

Ken Paxton, Attorney General of Texas

Kris Kobach, Attorney General of Kansas

Liz Murrill, Attorney General of Louisiana

Lynn Fitch, Attorney General of Mississippi

Marty J. Jackley, Attorney General of South Dakota

Michael T. Hilgers, Attorney General of Nebraska

Patrick Morrisey, Attorney General of West Virginia

Raúl R. Labrador, Attorney General of Idaho

Russell Coleman, Attorney General of Kentucky

Sean D. Reyes, Attorney General of Utah

Steve Marshall, Attorney General of Alabama

Tim Griffin, Attorney General of Arkansas

Theodore E. Rokita, Attorney General of Indiana

Treg Taylor, Attorney General of Alaska

Warren Peterson, President of the Arizona Senate

Jeffrey Rounds

Evan Jones

Counsel for *Amici Curiae*

Ian Simmons

David K. Roberts

Danielle N. Siegel

Douglas N. Letter

Shira Lauren Feldman

Esther Sanchez-Gomez

David Pucino

Eric Tirschwell

Aaron Esty

Everytown Law

Ciara Wren Malone

Christian B. Corrigan

Peter M. Torstensen, Jr.

Michael R. Williams

Flores Law PLLC

Chad Flores

/s/ Jeremy M. Feigenbaum

Jeremy M. Feigenbaum
*Counsel for Movant States*

# TABLE OF CONTENTS

**Pages**

INTRODUCTION ...................................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...............................2

ARGUMENT ........................................................................................8

    I.    MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT .................................................................................8

        A.    Movant States Have Substantial Interests That May Be Impaired By This Action ............................................9

        B.    Movant States' Interests Are Not Adequately Represented ..................................................................16

    II.    PERMISSIVE INTERVENTION IS APPROPRIATE ......................19

CONCLUSION ...................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982)......................................................................14, 15

*Brumfield v. Dodd*,
   749 F.3d 339 (5th Cir. 2014) ....................................8, 9, 10, 17, 18, 19

*California v. ATF*,
   718 F. Supp. 3d 1060 (N.D. Cal. 2024)............................................11

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ...........................................................14

*California v. Texas*,
   593 U.S. 659 (2021)........................................................................18

*Castillo v. Cameron Cty., Tex.*,
   238 F.3d 339 (5th Cir. 2001) ...........................................................15

*DeOtte v. State*,
   20 F.4th 1055 (5th Cir. 2021) .............................8, 9, 14, 17, 18

*Edwards v. City of Houston*,
   78 F.3d 983 (5th Cir. 1996) .......................................................17, 18

*Entergy Gulf States La. v. EPA*,
   817 F.3d 198 (5th Cir. 2016) .....................................................17, 18

*Field v. Anadarko Petro. Corp.*,
   35 F.4th 1013 (5th Cir. 2022) ............................................................8

*Garland v. Cargill*,
   602 U.S. 406 (2024).........................................................................6

*Gen. Land Office v. Biden*,
   71 F.4th 264 (5th Cir. 2023) ...........................................................11

*La Union del Pueblo Entero v. Abbott*,
   29 F.4th 299 (5th Cir. 2022) ..........................................................8, 9

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*,
659 F.3d 421 (5th Cir. 2011) ..............................................................11

*Local 53, Int'l Ass'n of Heat and Frost Insulators v. Vogler*,
407 F.2d 1047 (5th Cir. 1969) ............................................................20

*Louisiana State v. Nat'l Oceanic & Atmospheric Admin.*,
70 F.4th 872 (5th Cir. 2023) ..............................................................13

*Mandan, Hidatsa & Arikara Nation v. Dep't of the Interior*,
66 F.4th 282 (D.C. Cir. 2023).............................................................17

*Massachusetts v. EPA*,
549 U.S. 497 (2007).............................................................................15

*Massachusetts v. U.S. Dep't of HHS*,
923 F.3d 209 (1st Cir. 2019)...............................................................14

*Melone v. Coit*,
100 F.4th 21 (1st Cir. 2024)................................................................12

*Nat'l Ass'n for Gun Rts. v. Bondi*,
No. 23-830 (N.D. Tex.) (Feb. 19, 2025)............................................10

*Noatex Corp. v. King Const. of Hous. L.L.C.*,
732 F.3d 479 (5th Cir. 2013) .........................................................2, 20

*Newby v. Enron Corp.*,
443 F.3d 416 (5th Cir. 2006) ..............................................................19

*Paxton v. Dettelbach*,
105 F.4th 708 (5th Cir. 2024) .............................................................15

*Platkin v. Glock*,
N.J. Super Ct. No. ESX-C-286-24 (Dec. 12, 2024) .............................4

*Sierra Club v. City of San Antonio*,
115 F.3d 311 (5th Cir. 1997) ..............................................................14

*State v. Biden*,
10 F.4th 538 (5th Cir. 2021) ........................................................11, 14

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018)................................................11

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) .........................................8, 9, 10, 11, 19

*Texas v. United States*,
    No. 18-68, 2018 WL 11226239 (S.D. Tex. June 25, 2018) ........................ 15, 18

*Texas v. United States*,
    No. 18-167, 2018 WL 10562846 (N.D. Tex. May 16, 2018)...........................19

*United States v. Rare Breed Triggers, LLC*,
    690 F. Supp. 3d 51 (E.D.N.Y. 2023) ...........................................5, 6

*Va. House of Delegates v. Bethune-Hill*,
    587 U.S. 658 (2019)................................................................11

*Vasquez-De Martinez v. Garland*,
    34 F.4th 412 (5th Cir. 2022) .................................................2, 20

*Wal-Mart Stores v. Tex. Alc. Beverage Comm'n*,
    834 F.3d 562 (5th Cir. 2016) ....................................................9

**Statutes**

720 ILCS 5/24-1(a)(14) ...............................................................12

26 U.S.C. § 5845(b) ...............................................................3, 5

N.J. Stat. Ann. 18A:64G-6.1a ......................................................14

N.J. Stat. Ann. § 2C:39-1(i) .......................................................12

**Rules**

Fed. R. Civ. P. 24 .............................................................8, 11, 18, 19

**Other Authorities**

CRIME GUNS – VOLUME TWO, PART VII (Jan. 11, 2023)...........................................3

*Firearms Trace Data 2023*,
    ATF, https://tinyurl.com/4z6c2ex6.......................................................4

F.Y. 2024 CONGRESSIONAL BUDGET SUBMISSION, ATF
(MAR. 2023), https://tinyurl.com/3zz4abuw ......................................................4

F.Y. 2025 PERFORMANCE BUDGET CONG. SUBMISSION, U.S. DEP'T OF
JUSTICE – ATF (FEB. 2024), https://tinyurl.com/4ka7ubvv ................................3

Press Release, U.S. Dep't of Just., Department of Justice Announces
Settlement of Litigation Between the Federal Government and
Rare Breed Triggers (May 16, 2025),
https://tinyurl.com/329dr6m2 ..............................................................................7

Scott Glover & Curt Devine, *A Device that Can Turn a Semi
Automatic Weapon into a Machinegun in Moments Is Wreaking
Havoc on American Streets*, CNN (Aug. 30, 2022),
https://tinyurl.com/5n7t5v5m ...............................................................................4

# **INTRODUCTION**

Sixteen Movant States[1] renew their request to intervene in light of the parties' just-announced attempts to dismiss this appeal as part of a settlement agreement that would leave the district court's permanent injunction in place—directly harming Movant States. On May 16, 2025, the United States moved to voluntarily dismiss this appeal "in light of the parties' settlement of the claims at issue." ECF No. 135. Under the terms of the settlement (attached as Exhibit 5), the United States would abandon its appeal, return *all* Forced Reset Triggers (FRTs) in its possession to any owner—including those who may not lawfully possess firearms given their prior felony convictions under federal law, and even in States that prohibit FRTs—and obligate the United States not to enforce against *anyone* any statute or agency interpretation under which an FRT is "contended to be" a machinegun under the National Firearms Act. Ex. 5 at 3-5.

While this Court has previously denied intervention, the announcement of the settlement marks a dramatic shift from the previous posture of this case, in which the federal government had argued that FRTs were prohibited by federal law. There is now no dispute that the federal government cannot adequately represent the

---

[1] The States seeking to intervene are: New Jersey, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maryland, Massachusetts, Attorney General Dana Nessel on Behalf of the People of Michigan, Minnesota, Nevada, North Carolina, Oregon, Rhode Island, Vermont, and Washington. Movant States notified existing parties of the motion; Plaintiffs oppose; at time of filing, Defendants had not responded.

interests of the Movant States, and that intervention is critical to ensure that they have the opportunity to pursue review of the district court's broad injunction, which will flood their States with dangerous machinegun conversion devices (MCDs). The federal government's own filings make that threat to the States plain, as it acknowledged before the district court the significant challenges with returning FRTs to, *inter alia*, the States that have prohibited them—concerns that are now absent from its decision to seek dismissal of this appeal and sign the settlement agreement. The Court should therefore allow intervention so Movant States can oppose DOJ's motion to dismiss the appeal under Rule 42(b)(2)—a motion that this Court may deny "in the interest of justice or fairness," *Vasquez-De Martinez v. Garland*, 34 F.4th 412, 414 (5th Cir. 2022) (quoting *Noatex Corp. v. King Const. of Hous. L.L.C.*, 732 F.3d 479, 487 (5th Cir. 2013)), even without a formal opposition from any party—and continue pursuing the pending appeal of the district court's permanent injunction. Simply put, in light of this dramatic development and the federal government's inability to represent the States' interests, intervention is appropriate to allow Movant States to protect their proprietary and quasi-sovereign interests from the district court's injunction.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

A.    Prior History.

As Movant States previously explained, but repeat here for completeness, the States—just like the United States—are grappling with the recent and sharp rise of MCDs within their borders and the serious threat to public safety MCDs present. MCDs, which are growing cheaper and more accessible, enable semi-automatic firearms to fire automatically—oftentimes even exceeding the rate of fire of many machineguns. *See* Ex. 1 at 3 (declaration of Eric Barlow, Senior Investigator, Statewide Affirmative Firearms Enforcement Office). Semi-automatic weapons with an MCD can fire up to 20 bullets in one second. *Id.* at 4. This extraordinary rate of fire both decreases firing accuracy and increases the likelihood of multiple victims, including bystanders, and victim casualties. *Id.* at 4-5. For example, in New Jersey, one shooter fired 28 rounds from an MCD-equipped firearm in just over one second, seriously injuring three people. *Id.* at 5.

MCDs are becoming a critical public safety issue for Movant States. Although federal law prohibits "any part designed … for use in converting a weapon to a machinegun," 26 U.S.C. § 5845(b), new technologies like 3D printing have led to a staggering proliferation of MCDs. ATF has recognized a "significant rise" in MCD recoveries, F.Y. 2025 Performance Budget Cong. Submission, U.S. Dep't of Justice – ATF, 11 (Feb. 2024), https://tinyurl.com/4ka7ubvv, recovering 5,454

MCDs from 2017 through 2021—a 570 percent increase over the prior five-year period. NAT'L FIREARMS COMMERCE & TRAFFICKING ASSESSMENT: CRIME GUNS – VOLUME TWO, PART VII 4 (Jan. 11, 2023).

This proliferation of MCD recoveries has contributed to increasing incidents of machinegun fire, which "exploded by about 1,400% from 2019 through [2021].'" Scott Glover & Curt Devine, *A Device that Can Turn a Semi-Automatic Weapon into a Machinegun in Moments Is Wreaking Havoc on American Streets*, CNN (Aug. 30, 2022), https://tinyurl.com/5n7t5v5m. ATF further reports a "dramatic increase in the use of [MCDs] in violent crimes over the last five years." F.Y. 2024 CONGRESSIONAL BUDGET SUBMISSION, ATF, 14 (MAR. 2023), https://tinyurl.com/3zz4abuw. And that includes an "approximately 400% increase" from 2022 to 2023 "in firearm traces involving an MCD in which the trace was also associated with a crime of violence," including homicides, assaults, and the murder of a police officer. ROA.2011.

Movant States have likewise seen a significant criminal footprint for MCDs. New Jersey has identified at least 26 criminal cases where MCDs have been recovered. *See* Complaint at 1, 4-6, 51-54, *Platkin v. Glock*, N.J. Super Ct. No. ESX-C-286-24 (Dec. 12, 2024). ATF reports that state and local law enforcement are encountering MCD-equipped firearms at crime scenes and requesting ATF's aid in tracing those weapons, including 22 MCDs recovered in New Jersey, 392 in Illinois,

and 130 in Michigan in 2023. *Firearms Trace Data 2023*, ATF, https://tinyurl.com/4z6c2ex6.

Recently, a new MCD has emerged: FRTs. FRTs replace the standard trigger on an AR-15-type rifle so that the shooter "need only pull the FRT-15 trigger once and maintain rearward pressure" to achieve rapid, continuous fire. *United States v. Rare Breed Triggers, LLC* ("*RBT*"), 690 F. Supp. 3d 51, 65 (E.D.N.Y. 2023); *see* Ex. 1 at 7-8 (noting other guns can be configured or modified to allow installation of FRTs). An FRT-equipped firearm can fire even faster than an M16 military rifle operating in automatic mode. *See* ROA.2007. Since at least 1975, ATF has classified devices that operate akin to FRTs as machineguns under federal law, as they allow a shooter to fire "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Strikingly, ATF has conducted 71 criminal examinations of FRTs from January 2021 through October 2023 as part of cases involving a wide range of criminal conduct. ROA.2008.

Although FRTs are hard to track because they typically do not make visible modifications to their firearm, there is significant evidence that FRTs have proliferated across the country. *See* ROA.2007-08 (ATF noting "law enforcement agencies may not be well-informed to ascertain whether a recovered AR-type firearm has been retrofitted with a drop-in trigger device such as the FRT-15 or WOT," meaning FRT recoveries are "likely underreported"). For example, one

manufacturer—Rare Breed Triggers ("RBT")—sold 100,000 FRTs across the United States in two years, *see RBT*, 690 F. Supp. 3d at 58, shipping packages to at least 47 States. *See* Ex. 2 at 2 (declaration submitted in *RBT*, No. 23-cv-369 (E.D.N.Y.)). The impact on Movant States is clear: among other shipments, RBT made 364 deliveries to New Jersey addresses in 2021 and 2022, Ex. 1 at 6, and shipped at least 560 FRT-15s to a dealer in Massachusetts, *see* Ex. 3 at 2 (declaration in *RBT*, No. 23-cv-369 (E.D.N.Y.)); *see also* ROA.2007-08 (prosecution for FRT possession in the District of Massachusetts). And another FRT manufacturer, Wide Open Triggers, shipped 25 packages containing one or more suspected WOTs—a version of an FRT—to addresses in New Jersey in 2021. *See* Ex. 1 at 6. Indeed, at least 23 FRTs shipped to individuals in New Jersey have been recovered by law enforcement authorities. *See id.* at 7.

ATF sued RBT in the Eastern District of New York in 2023, where it obtained a preliminary injunction against any continued distribution. 690 F. Supp. 3d 51. That court concluded the government was likely to succeed on its claim that an FRT is a "machinegun" under federal law. *Id.* at 58. The court also found that since December 2020, defendants had "sold approximately 100,000 illegal machinegun conversion devices (known as 'FRT-15' triggers)" and obtained "$39 million dollars from their

customers in under two years." *Id.* RBT appealed, but the case is currently stayed pending settlement discussions.[2]

In July 2024, the Northern District of Texas came to the opposite conclusion. That court held that FRTs do not qualify as machineguns under *Garland v. Cargill*, 602 U.S. 406 (2024). ROA.3709. The court vacated and declared unlawful ATF's classification of FRTs as machineguns—enjoining ATF from taking enforcement action regarding FRTs against a broad swath of entities. ROA.3724-25. The United States appealed, and this Court heard argument on December 9, 2024. Movant States sought to intervene before this Court before the change in presidential administration to ensure a seamless transition in the defense of the claims, but this Court denied the motion. ECF Nos. 83, 89, 98, 109.

B.    Subsequent Developments.

While the federal government at first continued to defend the policy following the change in administration, the parties moved on April 22, 2025, to stay further proceedings pending settlement discussions. ECF Nos. 125, 130. On May 16, 2025—just two days ago—the federal government then moved to voluntarily dismiss the appeal because it had reached a settlement agreement with appellees.

---

[2] As part of the same settlement agreement executed in this case, the Administration has agreed to dismiss the *Rare Breed Triggers* litigation in the Second Circuit. Ex. 5 at 3. On May 16, 2025, the parties filed a stipulation of dismissal before the district court, and the Administration has agreed to move to dismiss the appeal as moot after the district court grants dismissal. *Id.*

ECF No. 135; *see also* Press Release, U.S. Dep't of Just., Department of Justice Announces Settlement of Litigation Between the Federal Government and Rare Breed Triggers (May 16, 2025), https://tinyurl.com/329dr6m2.

The settlement agreement provides that within seven days of its execution, "the United States will dismiss their pending appeal" in this action pursuant to Fed. R. App. P. 42(b)(2). Ex. 5 at 3. Among other terms, the settlement provides that the United States will return FRTs seized by or voluntarily surrendered to ATF, and not enforce any statute or agency interpretation under which an FRT is "contended to be" a machinegun under the National Firearms Act. *Id.* at 3-5. On its face, the agreement is not limited to the parties, but instead purports to require the United States to return FRTs to all individuals, without even including express carve-outs for prohibited possessors or for the States in which FRTs are barred by state law. It also purports to obligate the United States not to enforce any statute or agency interpretation under which an FRT is "contended to be" a machinegun in perpetuity.[3]

## **ARGUMENT**

## **I.     MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT.**

Under Rule 24(a), a movant has the right to intervene where it "has an interest relating to … the subject of the action" and the outcome of the suit might "impair or

---

[3] Although the settlement is not before this Court—as this case is an appeal from the permanent injunction—it goes to adequacy of the parties' representation of Movant States' interests.

impede [their] ability to protect that interest"; existing parties cannot or will not adequately represent movant's interest; and the motion is timely. *Field v. Anadarko Petro. Corp.*, 35 F.4th 1013, 1017 (5th Cir. 2022); *see La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 305 (5th Cir. 2022). Rule 24 is "liberally construed" in favor of intervention, and courts accept a movant's factual allegations as true for purposes of the motion. *Texas v. United States*, 805 F.3d 653, 656-57 (5th Cir. 2015) (quoting *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014)); *see DeOtte v. State*, 20 F.4th 1055, 1070 (5th Cir. 2021). This Court has a "broad policy favoring intervention," under which movants have a "minimal burden," *La Union*, 29 F.4th at 305, and "allow[s] intervention where no one would be hurt and the greater justice could be attained," *Texas*, 805 F.3d at 657.

For completeness, this motion reiterates the points Movant States have previously made regarding the harms the district court's permanent injunction works on their proprietary and quasi-sovereign interests, including in light of the United States's own filings below, which acknowledge the challenges with returning FRTs to prohibited possessors and in States where they are unlawful. The motion then discusses intervening developments that conclusively prove there is no longer a current party capable of adequately representing their interests.

### A. Movant States Have Substantial Interests That May Be Impaired By This Action.

Intervenors must have a "direct, substantial, legally protectable interest in the proceedings," *Texas*, 805 F.3d at 657; *accord La Union*, 29 F.4th at 305, that "may" be "impair[ed] or impede[d]" by "the disposition of the action," *Brumfield*, 749 F.3d at 344-45. Movants must have more than "ideological" interests, *La Union*, 29 F.4th at 305 (quoting *Texas*, 805 F.3d at 657), but can meet that showing in multiple ways. *See DeOtte*, 20 F.4th at 1070 (assessing whether interest "goes beyond a generalized preference that the case come out a certain way"). Proprietary interests "are almost always adequate" to support intervening, *Texas*, 805 F.3d at 658, as are "economic interests … directly related to the litigation," *Wal-Mart Stores v. Tex. Alc. Beverage Comm'n*, 834 F.3d 562, 568 (5th Cir. 2016). But the interests need not be proprietary, *Texas*, 805 F.3d at 657, and include quasi-sovereign interests. In all events, movants' interests should be "judged by a more lenient standard if the case involves a public interest question." *Brumfield*, 749 F.3d at 344.

The disposition of this case threatens Movant States' proprietary and quasi-sovereign interests. Plaintiffs-Appellees demanded, and the district court granted them, vacatur of ATF's classification and a permanent injunction barring enforcement against them. The Court's permanent injunction would even require ATF to return many of the 11,884 FRTs it confiscated—potentially without regard for whether recipients may lawfully possess the devices, and as the United States

10

explained in its filings before the district court, potentially even in States that have prohibited FRTs independently under their own state law. *See* ECF No. 115 (letter notifying that Appellants had begun process of returning FRTs); Notice of Compliance at 2, ECF No. 126, *Nat'l Ass'n for Gun Rts. v. Bondi*, No. 23-830 (N.D. Tex.) (Feb. 19, 2025) (explaining significant challenges posed by the FRT return requirement, including identifying whether individuals may legally possess a firearm or are located in States that ban FRTs); Mem. Supp. Mot. Stay at 2-5, ECF No. 105, *Nat'l Ass'n for Gun Rts. v. Bondi*, No. 23-830 (N.D. Tex.) (Aug. 1, 2024); ROA.4056-57 (order); ROA.2011-12 (ATF projecting court order will worsen proliferation of FRTs); *see also* Ex. 5 at 3-4. That would injure Movant States in multiple ways:

State Law Enforcement Costs. Absent a federal prohibition against FRTs as machineguns, and particularly paired with the return of thousands of unlawful FRTs inside their borders, Movant States would need to expend substantial resources enforcing state laws banning FRTs or FRT-equipped firearms—even as to any individuals who may not lawfully possess any firearms in their States. *See, e.g.*, *Gen. Land Office v. Biden* (*GLO*), 71 F.4th 264, 274 (5th Cir. 2023) (holding States have an "interest in [their] fiscal policy" that suffers when States must "redirect resources" due to change in federal policy); *California v. ATF*, 718 F. Supp. 3d 1060, 1073-78 (N.D. Cal. 2024) (finding "increased cost of policing and law enforcement" based

on gaps in federal regulation of ghost guns was an "injury"); *Texas v. United States*, 328 F. Supp. 3d 662, 700 (S.D. Tex. 2018) (finding standing based on increased costs of law enforcement and other services); *cf. State v. Biden*, 10 F.4th 538, 546-47 (5th Cir. 2021) (finding increased "correctional costs" from probable increase in crime to be "cognizable, imminent injury"), *rev'd on other grounds*, *Biden v. Texas*, 597 U.S. 785 (2022).[4] The threatened costs are substantial. ATF estimates that RBT alone has distributed at least 100,000 FRTs across the United States, ROA.2001-02, and other companies have already begun to produce copycats, ROA.2003. Indeed, ATF retrieved at least 11,884 FRTs—many of which the permanent injunction will require be returned, thus recirculating into Movant States' borders. ROA.3739-40. ATF's evidence indicates each FRT retrieval takes approximately 16 to 24 hours, split between intelligence professionals and special agents. ROA.2004-07.

---

[4] While these cases involved challenges by States against the Federal Government and thus turned on Article III standing rather than the Rule 24 intervention analysis, a movant that can "show standing is deemed to have a sufficiently substantial interest to intervene." *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434 n.17 (5th Cir. 2011). Indeed, standing is a *higher* burden than movants bear, because under Rule 24, "an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." *Texas*, 805 F.3d at 658-59; *see also, e.g.*, *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) (defendant-intervenor need not establish standing to provide defense against claims); *Melone v. Coit*, 100 F.4th 21, 28-29 (1st Cir. 2024) (same).

A substantial freeze of ATF enforcement against FRTs—especially nationwide and in conjunction with the required return of thousands of FRTs—would place a heavy strain on state law enforcement. Some States already prohibit the use of FRT-equipped firearms or FRTs standing alone. *See*, *e.g.*, N.J. Stat. Ann. § 2C:39-1(i) (New Jersey law definition of unlawful machinegun covers firearms equipped with FRTs); 720 ILCS 5/24-1(a)(14) (Illinois prohibition on devices that increase the rate of fire of semiautomatic weapons). But FRTs still end up within Movant States, and Movant States will not be able to rely on ATF assistance in confiscating them or bringing enforcement actions against possessors or distributors—to the contrary, in many cases, ATF would be the one *returning* these FRTs in the first place. *See* Ex. 1 at 7, 9. Said simply, the district court's ruling will force Movant States to bear the full responsibility and extensive financial costs of enforcing any prohibitions on the sale, distribution, and possession of FRTs and FRT-equipped firearms. *See id.* at 8-9 (explaining district court injunction would require State to "divert[] greater law enforcement resources to enforce" state ban).[5]

---

[5] This case is distinguishable from *Louisiana State v. Nat'l Oceanic & Atmospheric Admin.,* 70 F.4th 872 (5th Cir. 2023), where the summary judgment record failed to substantiate Louisiana's claim that a new regulation would trigger greater state law enforcement spending. *Id.* at 881. The court found not only that these assertions were "speculative" and "conclusory," but that they were contradicted by record evidence showing that the federal government would offset increased state costs. *Id*. at 884. Here, Movant States provide specific explanations of the increased law enforcement and healthcare costs—and there is no claim they will be offset.

Movant States will also suffer considerable additional costs associated with crimes involving FRTs. Absent a federal prohibition, more FRTs will be used in crimes within Movant States. *See id.* at 7 (explaining, based on patterns from other firearms and parts, that dissemination is certain absent federal prohibition even in States that bar FRTs—given significant interstate gun trafficking networks). And the use of FRTs in crime imposes special burdens on States. FRTs (like other MCDs) dramatically increase the rate of fire a perpetrator achieves, *supra* at 4-5, and Movant States "incur[] greater costs when responding to crime scenes involving devices that increase a firearm's rate of fire" even compared to other shooting crimes. Ex. 1 at 8. Because the "accelerated rate of fire [is] likely to cause increased casualties," law enforcement would need to commit further law enforcement officers to the scene to interview a "higher number of victims and witnesses"; send additional EMTs who can give "emergency medical care to more individuals injured"; and require more time from the medical examiner given the increased number of deaths. *Id.* And many States would additionally have to expend or divert resources to training officers on recognizing and safely handling firearms equipped with FRTs. *See id.* at 9.[6]

---

[6] Some Movant States would also incur legislative costs from having to enact their own laws to ban FRTs, as they will not be able to rely on federal enforcement given the substantial limits on enforcement the injunction imposes. *See* Ex. 6 (declaration of Todd W. Daloz, Director of Policy and Legislative Affairs); *GLO*, 71 F.4th at 274; *Texas v. United States*, 809 F.3d 134, 153-55 (5th Cir. 2015); *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015).

Healthcare Costs. Plaintiffs' demands would also impose considerable healthcare costs. *See DeOtte*, 20 F.4th at 1068, 1070 (finding States have interests to intervene based on "financial interest" in protecting "state fisc" from a "void" left by federal law where "reasonable probability" exists that this gap "would cause the state financial injury through strain on its healthcare programs"); *Biden*, 10 F.4th at 546-48 (injury to State from change in federal policy based on increased healthcare costs); *Massachusetts v. U.S. Dep't of HHS*, 923 F.3d 209, 223-26 (1st Cir. 2019); *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018). "The more significant injuries caused by firearms with an accelerated rate of fire and higher firing velocity leads to more medical complications for patients, which increases costs for hospitals and healthcare providers in treating patients." Ex. 4 at 3-4 (declaration of Dr. Dennis Quinlan Jr.). New Jersey, for example, has a state-owned hospital that would be affected by such projected cost increases. *See* N.J. Stat. Ann. 18A:64G-6.1a.

Quasi-Sovereign Interests. Movant States also have profound quasi-sovereign interests. This Court has repeatedly affirmed States' "quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents." *Castillo v. Cameron Cty., Tex.*, 238 F.3d 339, 351 (5th Cir. 2001) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)). And it has held that this quasi-sovereign interest in residents' physical health and safety can support intervention as-of-right. *See Sierra Club v. City of San Antonio*, 115 F.3d 311, 315

(5th Cir. 1997); *Texas v. United States*, No. 18-68, 2018 WL 11226239, at *1 (S.D. Tex. June 25, 2018) (granting State's motion to intervene to defend federal policy to protect "its unique proprietary, sovereign, and quasi-sovereign interests"); *cf. also Castillo*, 238 F.3d at 351 (allowing nonparty state to appeal injunction that harmed quasi-sovereign interest). Those quasi-sovereign interests especially include States' "legitimate interest in protecting" their residents' physical health and safety "from criminal elements." *Castillo*, 238 F.3d at 351.[7]

As explained above and in the attached declarations, the resolution of this case directly threatens to impair that quasi-sovereign interest. The permanent injunction, which prohibits ATF from taking certain enforcement actions and even mandates return of seized or surrendered FRTs—would, as noted above, dramatically expand

---

[7] *Paxton v. Dettelbach*, 105 F.4th 708 (5th Cir. 2024), which rejected one State's quasi-sovereign injury, is easily distinguishable. There, Texas joined individual plaintiffs in challenging an ATF rule that limited their access to silencers, claiming a quasi-sovereign right to aid those citizens in defeating the rule. 105 F.4th at 715. Here, by contrast, the Movant States are intervening to *defend* a federal policy, not to challenge it. Indeed, while Movant States acknowledge that "a State does not have standing as *parens patriae* to bring an action against the Federal Government," *Snapp*, 458 U.S. at 610 n.16, the so-called "*Mellon* bar" is no obstacle to a State's assertion of standing to *defend* federal action based on its quasi-sovereign interests in the health and well-being of its residents. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (explaining "critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)"). Further, Movant States do not rely on derivative claims regarding their individual residents' rights, *see Paxton*, 105 F.4th at 716; Movant States instead have identified significant public costs associated with the health and safety harms affecting their populations more broadly.

16

the proliferation of FRTs into Movant States. *See* ROA.2001 (indicating ATF's consistent classification as machineguns of parts like FRTs helps limit availability of such products). Indeed, even in States where FRTs or FRT-equipped firearms are unlawful, their spread—absent federal regulation—is inevitable. *See supra* at 5-6, 11-12; Ex. 1 at 7. And FRTs, especially the automatic fire they enable, will produce increased death and injury and long-term impacts on survivors and communities in Movant States. *See* Ex. 4 at 3-6. The direct expenditures and quasi-sovereign interests in protecting residents' lives and safety therefore support the same result: allowing Movant States to defend those interests.

## B. Movant States' Interests Are Not Adequately Represented.

Because the United States has reached a settlement to return all seized FRTs, cease any FRT-related enforcement efforts, and abandon any defense of ATF's classification of FRTs as machineguns, existing parties have shown they no longer adequately represent Movant States' interests. The prospective intervenor's "burden of demonstrating inadequate representation … is 'minimal.'" *Entergy Gulf States La. v. EPA*, 817 F.3d 198, 203 (5th Cir. 2016) (quoting *Brumfield*, 749 F.3d at 345). As this Court has explained, a quintessential case in which intervention is proper is one in which the government defendants have "abandoned any defense" of the challenged policy. *DeOtte*, 20 F.4th at 1070.

Given the significant developments on May 16, this appeal now easily fits the bill. Movant States previously described the significant risk that, given the change in federal administration, the federal defendants would no longer defend ATF's past classification of FRTs as machineguns. That concern has come to pass: the current administration has agreed not only to cease its defense of the FRT's classification, but has also moved to dismiss the appeal to allow the broad permanent injunction to take effect, while separately agreeing via a settlement to return FRTs regardless of whether they are otherwise legal to possess and to bind future presidential administrations from enforcing a ban on FRTs. While that settlement is not itself before this Court, which has before it only the appeal from the injunction, it nevertheless confirms the federal defendants' inability to represent Movant States' interests. Despite "having started out as an ally," federal defendants have thus now become Movant States' "adversary." *Mandan, Hidatsa & Arikara Nation v. Dep't of the Interior*, 66 F.4th 282, 284-85 (D.C. Cir. 2023).

The "presumptions of adequate representation" are inapplicable. *Edwards v. City of Houston*, 78 F.3d 983, 1005 (5th Cir. 1996). While this Court presumes adequate representation if an existing party is a "governmental body or officer charged by law" with representing the putative intervenor's interests, federal defendants are not "charged by law" with representing Movant States' interests. *Id.*; *Entergy*, 817 F.3d at 203. To the contrary, States have a "heightened" interest here

18

"because the [federal] Defendants have abandoned any defense" of the challenged policy on the merits. *DeOtte*, 20 F.4th at 1070. Second, although representation is presumptively adequate if an existing party "has the same ultimate objective" as the intervenors, *Edwards*, 78 F.3d at 1005, the Administration no longer shares the Movant States' objective to defend ATF's classification of FRTs as machineguns. *See Entergy*, 817 F.3d at 203 (any "adversity of interest" undermines adequacy); *Brumfield*, 749 F.3d at 346 (adding that even "lack of unity in all objectives" can "suffic[e]"). Movant States have repeatedly participated in appeals before this Court as intervenors-defendants-appellants to defend federal policies that federal defendants would not. *See*, *e.g.*, *Texas*, 2018 WL 11226239, at *1 (defending Deferred Action for Childhood Arrivals); *California v. Texas*, 593 U.S. 659, 668 (2021) (defending Affordable Care Act). Movant States' participation fulfills the "very purpose of intervention" and allows these States "to air their views so that a court may consider them before making potentially adverse decisions"— including whether to let the district court's order below stand, and whether to grant the dismissal of this appeal, which this Court maintains the legal discretion to deny. *Brumfield*, 749 F.3d at 345.

## II.  PERMISSIVE INTERVENTION IS APPROPRIATE.

Although this Court need not reach Rule 24(b) if it grants intervention as-of-right, permissive intervention is also warranted. Rule 24(b) allows courts to approve

permissive intervention where (1) the applicant "has a claim or defense that shares with the main action a common question of law or fact"; (2) the motion is timely; and (3) intervention will not delay or prejudice adjudication of the existing parties' rights. Fed. R. Civ. P. 24(b)(1)(B), (b)(3); *see also Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006) (Rule 24(b) "construed liberally"). Movant States' previous briefing explains in detail why the motion is timely and will not delay or prejudice existing parties, *see* ECF No. 83 at 17-19—and indeed, Movant States are renewing their motion less than one business day after the announcement of the parties' settlement and the filing of the federal government's motion to dismiss the appeal. And common questions exist because Movant States seek to defend the ATF classification at the heart of this case. *See Texas v. United States*, No. 18-167, 2018 WL 10562846, at *3 (N.D. Tex. May 16, 2018) (permitting States, including Movant States, to intervene to defend Affordable Care Act).

Beyond those formal requirements, permitting intervention would benefit this Court as well as Movant States. *See Texas*, 805 F.3d at 657 (asking if "the greater justice could be attained" through intervention). Intervention would of course ensure that a party can defend the ATF's prior interpretation of the National Firearms Act and challenge the permanent injunction below. But beyond that, this Court now has before it a pending Rule 42(b) motion to dismiss the appeal. This Court has exercised its discretion in certain circumstances to deny such a motion "in the interest of

justice." *Vasquez-De Martinez*, 34 F.4th at 414 (quoting *Noatex*, 732 F.3d at 487).

That has included circumstances in which this Court has "view[ed] with a jaundiced eye" a motion to dismiss where a party argued its "cessation" of its prior conduct was "sufficient reason to allow it to withdraw this appeal." *Local 53, Int'l Ass'n of Heat and Frost Insulators v. Vogler*, 407 F.2d 1047, 1055 (5th Cir. 1969). By allowing Movant States to participate as intervenors, this Court will benefit from adversarial briefing on whether to allow dismissal of the appeal—or whether the appeal can proceed, so that Movant States can protect their profound interests from the permanent injunction, and the return of FRTs the injunction requires.

## <u>CONCLUSION</u>

This Court should grant Movant States' motion to intervene as Defendants-Appellants.

Dated: May 18, 2025                    Respectfully submitted,

**MATTHEW J. PLATKIN**
*Attorney General of New Jersey*

*/s/ Jeremy M. Feigenbaum*
JEREMY M. FEIGENBAUM
Solicitor General
SHANKAR DURAISWAMY
Deputy Solicitor General
MARIE V. CEPEDA MEKOSH
MAX G. LESSER
JUSTINE LONGA
AMANDA MCELFRESH
LUCY I. SPRAGUE
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street
Trenton, NJ 08625
(609) 376-2690
jeremy.feigenbaum@njoag.gov

*Attorneys for the State of New Jersey*

**PHILIP J. WEISER**
*Attorney General of Colorado*

By: */s/ Shannon Stevenson*
SHANNON STEVENSON
Solicitor General
Office of the Colorado State Attorney General
1300 Broadway, Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
*Attorney General of Connecticut*

By: */s/ James M. Belforti*

JAMES M. BELFORTI
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06105
(860) 808-5450
james.belforti@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
*Attorney General of Delaware*

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
*Attorney General of Hawai'i*

By: */s/ Ewan C. Rayner*
EWAN C. RAYNER
Deputy Solicitor General

Department of the Attorney General, State of
Hawai'i
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
Ewan.Rayner@hawaii.gov

*Attorneys for State of Hawai'i*


**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ Alex Hemmer*
ALEX HEMMER
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

*Attorneys for State of Illinois*


**ANTHONY G. BROWN**
*Attorney General of Maryland*

By: */s/ Jessica M. Finberg*
JESSICA M. FINBERG
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6921
jfinberg@oag.state.md.us

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
*Attorney General, Commonwealth of Massachusetts*

By /s/ *Anna Lumelsky*
ANNA LUMELSKY
Deputy State Solicitor
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2334
anna.lumelsky@mass.gov

*Attorneys for the Commonwealth of Massachusetts*


**DANA NESSEL**
*Attorney General of Michigan*

By: */s/ Adam R. de Bear*
ADAM R. DE BEAR
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 335-7573
debeara@michigan.gov

*Attorneys for Attorney General Dana Nessel on behalf of the People of Michigan*


**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/ Liz Kramer*
LIZ KRAMER
Solicitor General
Office of the Minnesota Attorney General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010
liz.kramer@ag.state.mn.us

*Attorneys for State of Minnesota*


**AARON D. FORD**
*Attorney General of Nevada*

 /s/ Heidi Parry Stern
HEIDI PARRY STERN
(NV Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorneys for the State of Nevada*


**JEFF JACKSON**
*Attorney General of North Carolina*

By: */s/ Daniel P. Mosteller*
DANIEL P. MOSTELLER
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Attorneys for State of North Carolina*

**DAN RAYFIELD**
*Attorney General, State of Oregon*

By: */s/ Brian Simmonds Marshall*
BRIAN SIMMONDS MARSHALL
Oregon Bar No. #196129
Senior Assistant Attorney General
Trial Attorney
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
*Of Attorneys for the State of Oregon*


**PETER F. NERONHA**
*Attorney General of Rhode Island*

By: */s/ Sarah W. Rice*
SARAH W. RICE
Deputy Chief, Civil Division
Office of the Rhode Island Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 x2054
srice@riag.ri.gov

*Attorneys for State of Rhode Island*


**CHARITY R. CLARK**
*Attorney General of Vermont*

By: */s/ Jonathan T. Rose*
JONATHAN T. ROSE
Solicitor General
ROSEMARY M. KENNEDY
Assistant Attorney General

109 State Street
Montpelier, VT 06509
(802) 828-3171
jonathan.rose@vermont.gov
rosemary.kennedy@vermont.gov
*Attorneys for State of Vermont*


**NICHOLAS W. BROWN**
*Attorney General of Washington*

By: */s/ William McGinty*
WILLIAM MCGINTY
Assistant Attorney General
Washington State Office of the Attorney
General
P.O. Box 4011
Olympia, WA 98504-0111
(360) 709-6027
William.McGinty@atg.wa.gov

*Attorneys for State of Washington*

## <u>CERTIFICATE OF COMPLIANCE</u>

This motion complies with the word limit of <u>Fed. R. App. P. 27(d)(2)(A)</u> because, excluding the parts of the document exempted by <u>Fed. R. App. P. 32(f)</u> and <u>5th Cir. R. 5</u>, this document contains 5,168 words. This document complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type-style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because the document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

*/s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum
*Counsel for Movant States*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2025, I filed the foregoing Movant States' Motion to Intervene as Defendant-Appellants with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum
*Counsel for Movant States*

No. 24-10707

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.; PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,

v.

PAMELA BONDI, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE; DANIEL DRISCOLL, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

_____

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-cv-830

_____

## TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | Declaration of Eric Barlow |
| 2 | Declaration of Melissa Rodriguez, submitted in *U.S. v Rare Breed Triggers*, No. 23-cv-369 (E.D.N.Y.) |
| 3 | Declaration of Cheryl Harrell, submitted in *U.S. v Rare Breed Triggers*, No. 23-cv-369 (E.D.N.Y.) |
| 4 | Declaration of Dr. Dennis Quinlan Jr. |
| 5 | May 13, 2025 Settlement Agreement |
| 6 | Declaration of Todd W. Daloz |

Respectfully submitted,

**MATTHEW J. PLATKIN**
*Attorney General of New Jersey*

By:      /s/ Jeremy M. Feigenbaum
         JEREMY M. FEIGENBAUM
         *Solicitor General*
         SHANKAR DURAISWAMY
         *Deputy Solicitor General*
         MARIE V. CEPEDA MEKOSH
         MAX G. LESSER
         JUSTINE LONGA
         AMANDA MCELFRESH
         LUCY I. SPRAGUE
         *Deputy Attorneys General*
         New Jersey Attorney General's Office
         33 Washington Street, 9th Floor
         Newark, New Jersey 07102
         (609) 376-2690
         jeremy.feigenbaum@njoag.gov
         *Attorneys for Movant States*

# EXHIBIT 1

# Declaration of Eric Barlow

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

NO. 24-10707

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————————

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.;
PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,
V.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT
OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

———————————————

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-Cv-830

———————————————

**DECLARATION OF ERIC BARLOW**

I, Eric Barlow, hereby declare:

1. I am a Senior Investigator with the Statewide Affirmative Firearms Enforcement ("SAFE")
   Office of the New Jersey Office of the Attorney General, a position I have held since May
   2023. SAFE is a first-in-the-nation office with the specific mandate of bringing civil
   enforcement actions against firearm companies to hold them accountable for violations of the
   law that harm the health and safety of New Jersey residents. As a SAFE investigator I am
   responsible for conducting civil investigations into violations against gun industry members
   that may result in civil enforcement actions. This includes assisting State attorneys with the

1

gathering of information, synthesizing and analyzing relevant data, records, files, financial statements and correspondence to determine compliance with rules and regulations governing firearms and industry members within New Jersey. Furthermore, I assist with the facilitation and effective administration of laws pertaining to gun violence as directed by the New Jersey Attorney General.

2. Prior to holding this position, I was an enlisted sworn member of the New Jersey State Police ("NJSP") for twenty-five years. I began my career with NJSP in April 1995 as a member of the 115th State Police Class. I spent the majority of my tenure with NJSP in the Intelligence and Criminal Enterprise Section where I focused on long term criminal investigations that included gun and drug trafficking and official corruption. These investigations included witness interviews, surveillance work, drafting search warrants and communication data warrants, and reviewing information obtained from subpoenas and other court orders. I am also familiar, based on my training and experience, with firearms and after-market machine gun conversion devices. From 2006 – 2012, I worked as an NJSP Task Force Officer assigned to the Trenton Field Office of the New Jersey division of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), where I led multi-state gun trafficking investigations. From 2016 – 2020, I worked for the NJSP Office of Professional Standards Internal Affairs Investigations Bureau, where I led criminal and administrative investigations into members of the state police.

3. After finishing my NJSP tenure with the rank of Captain, I became a Sworn State Investigator ("SSI") with the Gloucester County Prosecutor's Office, where I conducted internal affairs investigations.

4.  I earned my Bachelor of Arts degree from Richard Stockton University in the field of criminal justice and I earned my Master of Education from Seton Hall University.

5.  I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information gathered by members of my staff, and upon conclusions and determinations reached and made in accordance therewith.

Unique Dangers of Forced Reset Triggers and Similar Machinegun Conversion Devices

6.  Gun violence is a significant threat to the safety and well-being of New Jersey's residents. In 2022, there were 468 gun deaths in New Jersey, including 235 homicides, 229 suicides, and 15 gun deaths involving children and teens. *State Data: New Jersey*, Johns Hopkins Bloomberg School of Public Health – Center for Gun Violence Solutions (2022) (citing 2022 data from the Center for Disease Control [CDC]). In 2022, there were 1,116 total shooting victims in New Jersey, and in 2023 there were 895. *See NJGUNStat Report – Weapon and Victim Breakdowns,* https://www.nj.gov/oag/njsp/njgunstat/index.shtml (compiling total shooting victims from January 2022-December 2022 and January 2023-December 2023).

7.  Machinegun conversion devices (MCDs) enable semi-automatic firearms to fire automatically, so that they can match or exceed the rate of fire of many military machineguns. Federal and state law prohibit certain MCDs. Federal law criminalizes both the possession of a machinegun and certain MCDs. 18 U.S. Code § 921(a)(24) and 922(a)(4) and 922(o)(1); 26 U.S. Code § 5845(b) (defining the term "machine gun" to include "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun.")  New Jersey regulates certain MCDs, either as independent parts or when attached to a firearm under its machinegun and assault weapon bans pursuant to N.J. Stat. Ann. §§ 2C:39-1(i), (w); 2C:39-3(i); 2C:39-5(a), (f). In

New Jersey, ATF's Firearms Trace Data reveals that 22 MCDs were recovered in 2023. *See* ATF, *Firearms Trace Data: New Jersey - 2023*, https://www.atf.gov/resource-center/firearms-trace-data-new-jersey-2023#total) (last updated Dec. 9, 2024).

8.  MCDs make firearms significantly more dangerous and destructive because of their increased rate of fire. For instance, semi-automatic weapons equipped with an MCD can fire up to 20 bullets in only one second with a single function of the trigger. *See FACT SHEET: President Biden and Vice President Harris Announce Additional Actions to Reduce Gun Violence and Save Lives*, The White House (September 26, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/09/26/fact-sheet-president-biden-and-vice-president-harris-announce-additional-actions-to-reduce-gun-violence-and-save-lives/. This high rate of fire decreases firing accuracy and increases risks to bystanders. *See* Marty Roney, *Police demonstrate dangers of handgun-to-machine gun 'Glock switches'*, Yahoo News – The Montgomery Advertiser (Dec. 2, 2024), https://www.yahoo.com/news/police-show-dangers-handgun-machine-095552253.html; STATE OF NEW JERSEY COMMISSION ON INVESTIGATION, ILLEGAL FIREARMS – USE & TRENDS IN NEW JERSEY 4 (SEPT. 2024) (MCD Glock 'switches' cannot control where the bullets go, leading to a greater likelihood of unintended targets.). For instance, Glock firearms equipped with an MCD "switch" "fire so fast, and with a recoil so difficult to control, that the result is typically an uncontrolled 'spray' of bullets over a wide area." Complaint at 2, *Platkin v. Glock, Inc.*, N.J. Super Ct Ch. Div. ESX-C-000286-24 (Dec. 12, 2024) (hereinafter "*Platkin v. Glock, Inc.*"). Consequently, law enforcement officials have noted that the rapid firing rate generated by MCDs is uniquely dangerous for public safety because it (1) "increases the likelihood that we're going to encounter *multiple victims* when these [modified weapons] are

used" and (2) "increases the likelihood that those incidents will be *fatal*." Norah O'Donnell, *Proliferation of modified weapons cause for alarm, officials say*, CBS News (Apr. 27, 2023), https://www.cbsnews.com/news/modified-weapons-switches-gun-violence-atf-washington-dc/ (quoting Washington, D.C. Metropolitan Police Department Commander LaShay Makal) (emphasis added).

9.  There are unfortunately numerous examples of this tragic dynamic in action. In Alabama, a firearm equipped with an MCD killed three teenagers and one adult and wounded thirty-two others at a sixteenth birthday party—leaving 89 shell casings at the scene. *Platkin v. Glock, Inc.* at 6-7. In New Jersey, a shooter fired 28 rounds from a firearm with an MCD in just over one second, seriously injuring three people. *Id.* at 1. New Jersey has identified at least twenty-six other criminal cases where numerous MCDs for Glock firearms have been recovered. *Id.* at 4-6, 51-54.

10. MCDs' unique dangerousness also poses "perilous" risks for law enforcement on the front lines responding to the carnage inflicted by these modified weapons. Memorandum from the Deputy Attorney General, *Combating Illegal Machine Gun Conversion Devices through Enhanced Enforcement, Training, and Intelligence Sharing*, U.S. Department of Justice (Sept. 6, 2024), https://www.justice.gov/dag/media/1366606/dl. In addition to their increased rate of fire, it is not always visually apparent or obvious that a firearm has been equipped with an MCD, which presents risks to members of law enforcement who encounter suspects armed with MCD-modified guns when responding to emergency calls. According to the ATF, MCDs have been utilized in many of the most dangerous crimes of violence that law enforcement responds to, including "homicides, aggravated assaults, robberies, [and]

carjackings." ROA.2011.  Tragically, an MCD was also used in the murder of a police officer. *Id.*

11. In recent years a new form of MCD has emerged that is principally intended for use with AR-15 style rifles called Forced Reset Triggers (FRTs). FRTs replace the standard trigger assembly on a firearm to allow a shooter to fire at a significantly increased rate. *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51, 59 (E.D.N.Y. 2023). Like other MCDs, FRTs pose unique dangers to law enforcement and the public based on their high rate of fire.

### New Jersey Law Banning FRT-Equipped Firearms

12. New Jersey law defines a machinegun as "any firearm, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the firearm, mechanism or instrument and fired therefrom." N.J. Stat. Ann. § 2C:39-1(i). The New Jersey Attorney General's Office interprets this provision as covering firearms equipped with an FRT.

### Prevalence of Forced Reset Triggers in New Jersey

13. SAFE has recently obtained records showing that in 2021 and 2022, Rare Breed Triggers LLC made 364 deliveries through a commercial shipping service to addresses in New Jersey.

14. SAFE has acquired information indicating that Wide Open Enterprises shipped 25 packages containing one or more suspected Wide Open Triggers (WOTs) to addresses in New Jersey in 2021. WOTs are a version of an FRT and operate based on the same mechanical principles as Rare Breed Triggers' FRT-15, *see National Association of Gun Rights, Inc. v. Garland*, No. 4:23-cv-00830, 2024 WL 3517504 at *3 (N.D. Tex. Jul. 23, 2023), making FRT-15's and WOTs effectively "identical." *United States v. Rare Breed Triggers, LLC*, 690 F.Supp.3d 51, 123 n.1 (E.D.N.Y. 2023) ("Defendants [Rare Breed Triggers LLC] also sell a trigger

called the "WOT" which all parties agree, for purposes of this litigation, is identical to the FRT-15.").

15. SAFE has acquired information indicating that at least 23 FRTs shipped to individuals in New Jersey have been recovered by law enforcement authorities.

16. If the federal government ceases enforcement against FRTs as machineguns as a result of this litigation, it is likely that the number of FRTs in the State will increase. Firearms or firearm-related devices that are prohibited in New Jersey are nonetheless recovered regularly in the State, especially when such devices are lawful in other states, in part due to the activities and presence of significant interstate firearms trafficking networks. For example, despite New Jersey's prohibitions on ghost gun parts and kits (N.J.S.A. 2C:39-9(k), -3(n), and -9(n)), these illegal items have nonetheless made their way into the State's borders with alarming ease. *See* Complaint at 41-46, *Platkin v. Patriot Enterprises Worldwide LLC d.b.a. JSD/Eagle Shows*, N.J. Super Ct. Ch. Div. MER-C-000093-23 (Dec. 12, 2023).

17. If ATF's classification of FRTs as machineguns is vacated nationwide as a result of this litigation, the legality of FRTs will similarly vary from state to state. Given the trends with other firearms and firearm-related devices outlined in the previous paragraph, even if FRTs are banned under New Jersey law, a greater number of FRTs will come into New Jersey from other states where FRTs are not banned.

18. FRT-15s and WOTs are both FRTs that are specifically designed for AR-15s, a gun model whose possession is banned in New Jersey under N.J. Stat. Ann. §§ 2C:39-1(w)(1), -5(f). However, FRTs are compatible with other types of firearms that are not illegal to possess under New Jersey law. For example, Rare Breed Triggers states that the FRT-15 it manufactures is compatible with some AR-9mm firearms. *Frequently Asked Questions*, Rare

Breed Triggers, https://rarebreedtriggers.com/frequently-asked-questions/ (last visited Dec. 30, 2024). Possession of the AR-9mm is not outlawed in New Jersey. *See* N.J. Stat. Ann. § 2C:39-1(w)(1). Additionally, other firearms may be modified in ways that allow them to be equipped with an FRT, *see, e.g.*, Gat Cat Till, *Rare Breed FRT-15 in a 22lr!*, YouTube (May 28, 2021), https://www.youtube.com/watch?v=94l6J8xeJHo, including base firearms that are otherwise legal under New Jersey law.

<u>Cost of Responding to Incidents Involving Forced Reset Triggers</u>

19. The State incurs greater costs when responding to crime scenes involving devices that increase a firearm's rate of fire, such as FRTs. As outlined above, crimes committed using weapons with an accelerated rate of fire are likely to cause increased casualties. As a result, the State must send more law enforcement officers to the scene, as such crimes typically involve a higher number of victims and witnesses that law enforcement officers will have to interview while investigating the crime. The crime scene itself would require additional personnel and time to process because increased numbers of shell casings and the damage from increased gun fire would require that more officers spend more hours locating and collecting evidence. Forensic ballistics examiners would likewise face an influx of evidence submitted for their expert and time-consuming analyses. The State would also require a greater response by emergency medical technicians (EMTs) to provide emergency medical care to more individuals injured during the shooting. In addition, medical examiners would have to devote more time and resources to forensically investigate the greater number of fatalities that are associated with such incidents. Accordingly, the State will likely need to divert more resources to respond to crime scenes as FRTs become more prevalent.

20. In addition, as new firearm technologies are introduced into the market, the State's law enforcement officers require additional training to be able to recognize, track, and safely handle such technologies. The lack of a nationwide prohibition on FRTs will lead to the greater proliferation of FRTs in New Jersey and a greater need for state-level enforcement. Consequently, law enforcement officers will require more extensive training on FRTs in the absence of federal regulation of these devices. For example, law enforcement officers must be able to recognize FRTs to know to recover them during firearm seizures, as must State ballistics lab technicians who need to be able to identify FRTs when analyzing firearms that come into the lab. Additionally, law enforcement must receive training on how to safely handle firearms equipped with FRTs. As a result, the State will likely be required to divert and expend additional State resources to be able to develop such training materials and provide such trainings to the State's law enforcement officers.

### Costs of Enforcing Laws Against Forced Reset Triggers

21. If there is a continuing freeze in federal enforcement against FRTs, States will have to address the ongoing federal enforcement gap against FRTs by diverting greater law enforcement resources to enforce New Jersey's own machinegun ban against FRT-equipped firearms.

22. The need for enforcement will be exacerbated by the lack of a uniform federal rule because weapons outfitted with FRTs that are lawful in other states will end up in New Jersey. This mirrors the historical trend through which other firearms or firearm-related devices that are banned in New Jersey, but lawful elsewhere, make their way into the State.

23. In all, we expect law enforcement costs borne by our state to increase if the vacatur of ATF's classification of FRTs as machineguns remains in effect.

9

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  15   day of January, 2025, in ___Trenton, NJ_____.

*Eric Barlow*
_____

Eric Barlow

New Jersey Office of the Attorney General

# EXHIBIT 2

**Declaration of Melissa Rodriguez, submitted in U.S. v. Rare Breed Triggers, No. 23-cv-369 (E.D.N.Y.)**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                 Plaintiff,

    - v. -

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; KEVIN MAXWELL,

                 Defendants.

1:23-CV-00369
(NRM) (RML)

## DECLARATION OF MELISSA RODRIGUEZ

I, Melissa Rodriguez, have personal knowledge of the following facts set forth below, and if called as a witness I would testify as follows:

1.      I serve as a Senior Forensic Auditor, with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I am currently assigned to the Financial Investigative Services Division and to the Tampa Field Division.

2.      The Financial Investigative Services Division (FISD) provides comprehensive financial investigative services in support of ATF investigations.

3.      The facts set forth in this declaration are based on my personal knowledge and experience; knowledge obtained during my participation in this investigation; information from other individuals, including other law enforcement officers conducting investigations into defendants; and my review of documents, public records, ATF records, and other sources of information.

4.      This investigation involves the Rare Breed Triggers model FRT-15, manufactured, marketed and sold by defendants Rare Breed Triggers, LLC (RBT), Rare Breed Firearms, LLC

(RBF), Kevin Maxwell (Maxwell), and Lawrence DeMonico (DeMonico).  The investigation also involves these Defendants' sale of the Wide Open Trigger (WOT).

5.      In part, my role in ATF's investigation into RBT includes reviewing financial records produced by JPMorgan Chase, N.A. and Fifth Third Bank.  The JP Morgan Chase, N.A documents were produced in response to a subpoena served by the United States on February 16, 2023 (JPMorgan Chase Records).  The Fifth Third Bank records were produced in response to a subpoena served by the United States on May 16, 2023.  This Declaration includes a summary of these financial records, a chart annexed as Exhibit A, bearing Bates Nos. USA_20530-38, which consists of a PowerPoint presentation summarizing the calculations set forth below, and a calculation of estimated profits resulting from the sale of the FRT-15s and Wide Open Triggers.

### FRT-15 Sales By Rare Breed Triggers

According to the Rare Breed Triggers LLC website, the triggers retailed for $380.00. Based on my review of the financial records described below, and using this retail sale price for an estimate, RBT sold over 103,000 triggers.  This was estimated by taking the total deposit amount of $39,388,838, as reflected by financial records I summarized, and dividing it by the retail sales price of $380.00 ($39,388,838/$380 = 103,654.8).  This figure does not take into account any discounts given or any wholesale sales made at a lower sales price or a higher sales price.

### RBT and Related Companies

10.      Rare Breed Triggers LLC was first registered to do business in the State of Florida in May 2020.  At that time there were four owners listed on the registration.  They were Lawrence Demonico, Michael Register, Cole Leleux, and Kevin Maxwell.   In December 2020, the registration was changed.  All the previous individuals were removed except for Kevin Maxwell.

*See* USA_16527-16533.  On or about the same time, seven additional companies were created.  In November 2021, the registration of RBT was moved to North Dakota.

11.     Business 1 – XYZ Distribution LLC DBA RB Trig LLC.  This business was registered in the state of Wyoming on November 24, 2020.  The DBA RB Trig LLC was filed on December 7, 2020.  *See* USA_18999-19002.

12.     Business 2 – ABC IP LLC.  This business was registered in the state of Delaware on November 25, 2020.  This business is owned by four other businesses.  *See* USA_17554-17555.  The businesses are Leleux LLC, Spider Hole LLC, AN 1861 LLC, and LAD LLC.  *See* USA_17235-17236.

13.     Business 3 – DEF Consulting LLC.  This business was registered in the state of Delaware.  This business is owned by four other businesses.  The businesses are Leleux LLC, Spider Hole LLC, AN 1861 LLC, and LAD LLC.

14.     Business 4 – Leleux LLC.  This business was registered in the state of Florida on 11/24/2020.  This business is owned solely by Cole Leleux.  *See* USA_18644.

15.     Business 5 – Spider Hole LLC.  This business was registered in the state of Florida.  This business is owned solely by Michael Register.

16.     Business 6 – AN 1861 LLC.  This business was registered in the state of Florida.  This business is owned solely by Kevin Maxwell.  *See* USA_17847.

17.     Business 7 – LAD LLC.  This business was registered in the state of Florida.  This business is owned solely by Lawrence Demonico.  *See* USA_18368-18379.

**RBT and Related Company Flow of Funds from Fifth Third Bank
and JP Morgan Records**

18.     The sales of FRT – 15 Triggers were deposited into Rare Breed Trigger's JP Morgan Account -1008.  The authorized signors on the account were Kevin Maxwell (Manager)

and Cole Leleux (Signor). *See* USA_15992. Lawrence Demonico was added as a Signor on 01/22/2021. *See* USA_15993. From 01/01/2021 to 12/01/2022, there was $39,388,838 deposited. *See* USA_15997-16525.

19.     During this same time frame, payments totaling $35,628,260 were paid from the JP Morgan account -1008 to XYZ Distribution LLC DBA RB Trig LLC. The following payments were also made from the Rare Breed Triggers LLC account:

    a.  Payments totaling $216,00 were paid to Kelly Leleux.

    b.  Payments totaling $216,00 were paid to Lawrence Demonico.

    c.  Payments totaling $192,372 were paid to Black Rifle Co.

    d.  Payments totaling $130,760 were paid to Kevin Maxwell.

    e.  Payments totaling $107,400 were paid to Jennifer Pierson.

    f.  Payments totaling $21,359 were paid to Brian Luettke – FTINC LLC.

    g.  Payments totaling $9,428 were paid to Dan O'Kelly – International Firearm Specialist Academy.

    h.  Payments totaling $6,000 were paid to Rick Vasquez – Rick Vasquez Firearms LLC.

    i.  On December 9, 2022, a transfer of $329,490 was made to Cadence Bank. The account balance after the transfer was $0.00 and the account was closed.

20.     XYZ Distribution LLC DBA RB Trig LLC's Fifth Third Bank Account -4747 was opened December 2020. The authorized signors on Fifth Third Bank Account -4747 were Cole Leleux (Managing Member/Signor), Michael Register (Managing Member/Signor), Lawrence Demonico (Managing Member/Signor), and Kevin Maxwell (Managing Member/Manager). *See* USA_19794 and 19803. This account was open a month until the JP Morgan Account -6295 was

opened. The remaining funds in Fifth Third Bank Account -7474 were transferred to JP Morgan Account -6295 and the Fifth Third Bank account was subsequently closed. The authorized signors on JP Morgan Account -6295 are Cole Leleux (Signor), Michael Register (Signor), Lawrence Demonico (Signor), and Kevin Maxwell (Manager). *See* USA_17231. From December 22, 2020 to April 28, 2023, there was $39,388,838 deposited into these accounts from Rare Breed Triggers LLC: $705,000 was deposited into Fifth Third Bank Account -4747 (*see* USA_19785-19805); and $35,628,260 was deposited into JP Morgan Account -6295. *See* USA_18736-18998. The account balance as of April 28, 2023 was $47,758.52. *See* USA_18993.

21.     During the same time period, payments totaling $28,150,030 were paid from JP Morgan account ended -6295 (held by XYZ Distrubution) to ABC IP LLC. The following payments were also made from JP Morgan account ended 6295 (held by XYZ Distrubution):

     a.  Payments totaling $7,224,809 were paid to Third Gen Manufacturing.

     b.  Payments totaling $524,596 were paid to DEF Consulting LLC.

     c.  Payments totaling $144,946 were paid to Black Spider Optics LLC.

     d.  Payments totaling $125,000 were paid to Janeway Machine INC.

     e.  Payments totaling $90,000 were paid to Work Holding Tools LLC.

     f.  Payments totaling $7,161 were paid to Brian Eicher.

22.     ABC IP LLC's Fifth Third Bank Account -5900 was opened December 2020. The authorized signors on Fifth Third Bank Account -5900 were Cole Leleux (Managing Member/Signor), Michael Register (Managing Member/Signor), Lawrence Demonico (Managing Member/Signor), and Kevin Maxwell (Managing Member/Signor). *See* USA_19825-19826 and 19835. This account was only open a month until JP Morgan Account -6833 was opened. The remaining funds in Fifth Third Bank Account -5900 were transferred to JP Morgan Account -6833

and the Fifth Third Bank account was subsequently closed. The authorized signors on JP Morgan Account -6833 are Cole Leleux (Signor), Michael Register (Signor), Lawrence Demonico (Signor), and Kevin Maxwell (Signor). *See* USA_17226. From December 22, 2020 to April 28, 2023, there was $28,150,030 deposited into these accounts. Fifth Third Bank account ended -5900 received $307,164 (*see* USA_19815-19837) and JP Morgan Account ending in -6833 received $27,842,866 (*see* USA_17252-17553) from XYZ Distribution LLC DBA RB Trig LLC. The account balance as of April 28, 2023 was $46,104.64. *See* USA_17544.

23.     During the same time period, the following payments were made from the ABC IP LLC's account:

     a.  Payments totaling $6,836,782 were paid to LAD LLC.

     b.  Payments totaling $6,711,311 were paid to Leleux LLC.

     c.  Payments totaling $6,708,523 were paid to Spider Hole LLC.

     d.  Payments totaling $4,269,060 were paid to AN 1861 LLC.

     e.  Payments totaling $1,641,900 were paid to Wizard Labs.

     f.  Payments totaling $776,775 were paid to CRDB INC.

     g.  Payments totaling $12,056 were paid to Nicholas Gough.

     h.  Payments totaling $10,000 were paid to Brian Blakely.

     i.  Payments totaling $10,000 were paid to Wolf Tactical.

24.     Leleux LLC's Fifth Third Bank Account -7724 was opened December 2020. The authorized signor on Fifth Third Bank Account -7724 was Cole Leleux (Manager). *See* USA_20214. This account was only open a month until JP Morgan Accounts -0018 and -5756 were opened. The remaining funds in Fifth Third Bank Account -7724 were transferred to JP Morgan Account -0018 and the Fifth Third Bank account was subsequently closed. The authorized

signor on JP Morgan Account -5756 is Cole Leleux (Manager). *See* USA_17230. From December 22, 2020 to April 28, 2023, there was $6,854,518 deposited. $69,023 was deposited into Fifth Third Bank Account ended -7724 (*see* USA_20207-20222) and $6,785,495.34 was deposited into JP Morgan Account ended -5756. *See* USA_18425-18643. Based on my review of the financial records, $6,711,311 came from ABC IP LLC and $143,207 from DEF Consulting LLC. The account balance of JP Morgan Account ended 5756 as of 04/28/2023 was $66,318.38. *See* USA_18638. The account balance of JP Morgan Account ended -0018 as of 04/28/2023 was $202.58. *See* USA_18727. During this same time period, the following payments were made from the Leleux LLC's account ending -5756:

    a. Payments totaling $5,108,756 were paid to Cole Leleux.

    b. Payments totaling $418,358 were paid to Investments.

    c. Payments totaling $332,718 were paid to Kelly Leleux.

25. Spider Hole LLC's Fifth Third Bank Account -5314 was opened December 2020. The authorized signor on Fifth Third Bank Account -5314 is Cole Leleux (Managing Member/Signor). *See* USA_19992-19993 and 19994. On January 1, 2021 Amy Register was added as a Managing Member/Signor to the account. *See* USA_19994. From December 22, 202010 to April 8, 2023t, there was $6,851,730 deposited. *See* USA_19879-20205. Based on my review of the financial records, $6,708,523 came from ABC IP LLC and $143,207 from DEF Consulting LLC. The account balance as of March 31, 2023 was $4,327.84. *See* USA_19940. During the same time period, the following payments were made from the Spider Hole LLC's account:

    a. Payments totaling $3,610,325 were paid to Michael Register.

    b. Payments totaling $2,005,325 were paid to Amy Register.

7

    c.  Payments totaling $528,955 were paid to Investments.

26.    AN 1861 LLC's Fifth Third Bank Account -0901 was opened December 2020.  The authorized signor on Fifth Third Bank Account -0901 was Kevin Maxwell (Manager).  *See* USA_19863 and 19872.  This account was only open a month until JP Morgan Account -6782 was opened.  The remaining funds in Fifth Third Bank Account -0901 were transferred to JP Morgan Account -6782 and the Fifth Third Bank account was subsequently closed.  The authorized signor on JP Morgan Account -6782 is Kevin Maxwell (Manager).  *See* USA_17227.  From December 22, 2020 to April 28, 2023, there was $4,359,099 deposited.  $43,923 was deposited into Fifth Third bank account ended -0901 (*see* USA_19858-19877) and $4,315,176 was deposited into JP Morgan account ended -6782.  *See* USA_17598-17846. Based on my review of the financial records, $4,269,060 came from ABC IP LLC and $90,0039 from DEF Consulting LLC.  The account balance as of 04/28/2023 was $18,543.68.  *See* USA_17838.  During the same time period, the following payments were made from the AN 1861 LLC's account:

    a.  Payments totaling $1,510,762 were paid to Kevin Maxwell.

    b.  Payments totaling $1,298,124 were paid to Investments.

    c.  Payments totaling $14,000 were paid to Michael Register.

27.    LAD LLC's Fifth Third Bank Account -6338 was opened December 2020.  The authorized signor on Fifth Third Bank Account -6338 was Lawrence Demonico (Managing Member).  *See* USA_19847 and 19856.  This account was only open a month until JP Morgan Account -0757 was opened.  The remaining funds in Fifth Third Bank Account -6338 were transferred to JP Morgan Account -0757 and the Fifth Third Bank account was subsequently closed.  The authorized signor on JP Morgan Account -0757 is Lawrence Demonico (Manager).  *See* USA_17229.  From December 22, 2020 to April 28, 2023, there was $6,978,268 deposited.

$69,023 (was deposited) into Fifth Third Bank Account ended 6338 (*see* USA_19839-19856), $6,849,585 into JP Morgan Account ended 0757 (*see* USA_18084-18367), and $59,660 into an unknown account. Based on my review of the financial records, $6,836,782 came from ABC IP LLC, $525,000 from a Frost Bank Account, and $140,961 from DEF Consulting LLC. The account balance as of April 28, 2023 was $351,832.98. *See* USA_18361. During the same time period, the following payments were made from the LAD LLC's account:

    a.  Payments totaling $2,468,791 were paid to Lawrence Demonico.

    b.  Payments totaling $1,370,912 were paid to Investments.

    c.  Payments totaling $1,341,982 were paid to an Unknown Bank.

    d.  Payments totaling $286,825 were paid to Pipe Hitters Union.

    e.  Payments totaling $158,106 were paid to Karli Demonico.

    f.  Payments totaling $57,054 were paid to Amplify Credit Union.

**RBT and Related Company Owner's Money Received**

28.    Lawrence Demonico received payments totaling $2,684,791. These were payments from LAD LLC and Rare Breed Trigger LLC. Kari Demonico also received payments totaling $158,106 from LAD LLC.

29.    Cole Leleux received payments totaling $5,168,756. These were payments from Leleux LLC and Black Spider Optics (paid by Rare Breed Trigger LLC). Kelly Leleux also received payments totaling $548,718 from Leleux LLC and Rare Breed Trigger LLC.

30.    Kevin Maxwell received payments totaling $1,510,762. These were payments from AN 1861 LLC and Rare Breed Trigger LLC.

31.     Michael Register received payments totaling $3,830,922.  These were payments from Spider Hole LLC, LAD LLC, Black Spider Optics (paid by Rare Breed Trigger LLC), and AN 1861 LLC.  Amy Register also received payments totaling $2,005,325 from Spider Hole LLC.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 25, 2023.

By: MELISSA RODRIGUEZ
Digitally signed by MELISSA RODRIGUEZ
Date: 2023.07.25 15:22:12 -04'00'

Melissa Rodriguez
Senior Forensic Auditor
Executed July 25, 2023

# EXHIBIT 3

# Declaration of Cheryl Harrell, submitted in U.S. v. Rare Breed Triggers, No. 23-cv-369 (E.D.N.Y.)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

- v. -

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; KEVIN MAXWELL,

Defendants.

1:23-CV-00369
(NRM) (RML)

## DECLARATION OF SPECIAL AGENT CHERYL HARRELL

I, Cheryl Harrell, have personal knowledge of the following facts set forth below, and if called as a witness I would testify as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and am currently the Assistant Special Agent in Charge of the ATF Tampa Field Division. As part of my responsibilities, I routinely work with the Tampa Field Division's Crime Gun Intelligence Center for case support and intelligence products. As an ATF Special Agent, I have investigated violations of federal firearms law relating to firearm trafficking, violent crime, and the illegal use, possession, shipment, and transportation of firearms during my career.

2. The facts set forth in this declaration are based on my personal knowledge; knowledge obtained as a result of my supervisory role in the ATF Tampa Field Division; information from other individuals, including ATF Special Agents and intelligence personnel involved in the investigation into Defendants; ATF records; and other sources. The information contained in this declaration is a summary and does not incorporate all facts known to me regarding this investigation.

3.      This investigation involves the Rare Breed Triggers model FRT-15, manufactured, marketed and sold by defendants Rare Breed Triggers, LLC (RBF) and Rare Breed Firearms, LLC (RBF), Kevin Maxwell (Maxwell), and Lawrence DeMonico (DeMonico) (collectively, Defendants).   The investigation also involves the sale of the Wide Open Trigger (WOT) by Defendants.

4.      This Declaration serves as a supplement to the Declaration of Special Agent Daniel Koneschusky filed with the complaint in this action on January 19, 2023 (Koneschusky Decl.). (Dkt. 7), the Declaration of Special Agent Dean Conigliaro, dated February 23, 2023 (Dkt. 25), the Declaration of Special Agent Dean Conigliaro, dated March 29, 2023 (Dkt. 40-1), and the Declaration of Special Agent Dean Conigliaro, dated April 1, 2023 (Dkt. 43-1).

## DEFENDANTS HAVE SOLD PRODUCTS REQUIRING RETRIEVAL BY ATF SPECIAL AGENTS

5.      Both the FRT-15 and the WOT have been classified as machineguns by ATF as they are machinegun conversion devices (MCDs).   They are generally prohibited to possess or distribute, except under very limited circumstances.  *See e.g.,* 18 U.S.C. § 922(o).

6.      Between approximately November 28, 2022, and January 16, 2023, Defendants shipped 3,461 packages containing a suspected total of 7,700 WOT MCDs.  The shipments were sent to forty-seven states and U.S. territories.   These represent only a fraction of the MCDs suspected to have been sold or distributed by Defendants.

7.      Between March 17, 2021, and August 22, 2021, Defendants sold approximately 560 FRT-15s to a firearms dealer in Massachusetts ("MA Dealer") who subsequently resold the FRT-15s over the Internet to purchasers across the United States, including within the Eastern District of New York.

8.     When highly restricted devices or firearms are improperly distributed to the public, either because the devices or firearms were not registered under the provisions of the National Firearms Act, 26 U.S.C. § 5801 *et. seq*., or because they are generally prohibited from distribution because of 18 U.S.C. § 922(o), or for other comparable reasons, ATF must take steps to actively retrieve the items, or encourage and solicit their voluntary destruction or abandonment.  This is done to abate the illicit possession and distribution within the marketplace; to protect the public at large; and to mitigate the risk of unlawful possession by an unaware or misinformed recipient.

9.     The FRT-15 and WOT are post-86 machineguns, meaning they are machineguns that were manufactured after May 19, 1986, the effective date of the federal machinegun ban, 18 U.S.C. § 922(o).  It is generally unlawful for a member of the public to possess a post-86 machinegun.

10.     The MCDs sold by Defendants and the MA Dealer are the subject of an active retrieval effort by ATF, which is being coordinated by the ATF Tampa Field Division.

**RETRIEVAL RISK ASSESSMENT AND RESOURCE OBLIGATIONS**

11.     As part of the retrieval effort, ATF first conducts an assessment of each individual recipient for the purpose of prioritizing retrievals based on risk to the community and public safety. These assessments are also necessary for the safety of ATF Special Agents that are tasked with conducting the physical retrievals and our local law enforcement partners who may provide assistance.

12.     Retrievals are prioritized based on multiple factors, including, but not limited to, whether the recipient's criminal history requires heightened review, such as possession by suspected convicted felons, or whether the recipient has received multiple devices indicative of further re-selling or trafficking.

13. These assessments are often not definitive, and require further review and investigation to confirm. This further review and investigation is conducted by the ATF Field Division receiving the directive to conduct the specific retrieval based upon the geographic area in which the recipient received the MCD.

14. With respect to the retrievals associated with Defendants and the MA Dealer, there are approximately 164 recipients (as of the date this declaration was signed) requiring an enhanced review and prioritized retrieval. Included within these 164 recipients are, among others, individuals suspected of having previously been convicted of one or more felonies, as well as individuals suspected to be engaged in re-selling or trafficking.

15. Retrievals are resource intensive, requiring both a commitment in analytical resources to conduct records checks and retrieval assessments, as well as a commitment in Special Agent resources to locate and interview recipients, and retrieve the MCDs. For instance, the ATF Tampa CGIC analysts have expended approximately 2,910 working hours to conduct the required retrieval assessments. The ATF Tampa Special Agents have spent approximately 1,638 hours on the retrieval process. This does not include the hours spent by other ATF components assisting in the analytical work, related analytical work conducted by the ATF Tampa CGIC, or other associated resource demands placed on ATF in order to recover these MCDs from the general public.

16. These analytical and retrieval efforts are only the starting point. For instance, it is common for recipients to no longer be at the shipping address, and efforts have to be made to locate them. Additionally, with respect to suspected re-sellers and traffickers, ATF must attempt to identify the subsequent purchasers, and a compounding analytical and retrieval effort must then be undertaken.

4

17.     There are 25 ATF Field Divisions in the United States.  Every ATF Field Division received multiple retrieval referrals associated with either the sales by Defendants, the MA Dealer, or both.

18.     Further, despite ATF's best efforts, it is not likely ATF will be able to recover every MCD sold by Defendants.  Accordingly, these prohibited devices will remain in public circulation thereby jeopardizing public safety and exposing the possessor to adverse legal consequences, including possible criminal liability.

## THREATS AGAINST ATF SPECIAL AGENTS

19.     Retrieval of the MCDs can place ATF Special Agents and local law enforcement at considerable risk.

20.     As a foundational matter, the MCDs are designed to be installed in AR-variant rifles in order to convert them to fully automatic fire.  These are very dangerous weapons.  Every time an ATF Special Agent knocks on a door in order to retrieve an FRT-15 or WOT, there is the possibility that an ill-intentioned individual in possession of an illegal machinegun is waiting on the other side.  Further, multiple recipients have been assessed to be high-risk due to suspected criminal histories or other factors.

21.     These retrieval efforts also often garner significant negative attention by certain individuals.

22.     Indeed, ATF has observed an increase in threats made on social media platforms and other websites directly related to ATF's effort to recover the WOTs and FRT-15 sold or distributed by Defendants.

23.     In one post on a social media platform, the poster stated "Rare Breed gave up their customer data to ATF.  You can either bury the trigger when they come for it or use it."  Based

5

upon my training and experience, the individual is stating that recipients should either conceal the MCDs from ATF, or fire on ATF Special Agents with fully automatic firearms converted with the FRT-15 or WOT.

24.     In another post on a website, an individual stated the following:  *Start digging holes around your whole house in your yard (sic) make about a foot deep and put 2 pounds of Tannerite in each hole (sic) cover it back up with the grass perfect and then wait for the Agents to surround your house and have one of each family member shoot a pile and start watching the fuckers go to (sic) sky high (sic) then take the frts (sic) put them on mounted turrets and start suppressing them back (sic) while that's happening have some go to the second floor and start throwing onion bombs on them and have them also start taking some marksman shots from up there (sic) keep holding them off and trust me (sic) men will come to help"*  From my experience and training, the individual is encouraging the use of explosive materials as well as the use of the FRT-15s and WOTs to shoot, maim, and murder ATF Special Agents in connection with the retrieval of the MCDs sold by Defendants.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May 5, 2023.

By: _____
    CHERYL HARRELL   Digitally signed by CHERYL HARRELL
                     Date: 2023.05.05 15:56:57 -04'00'

    Cheryl Harrell
    Special Agent

# EXHIBIT 4

# Declaration of Dr. Dennis Quinlan Jr.

NO. 24-10707

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.;
PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees,*

V.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT
OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-Cv-830

## DECLARATION OF DR. DENNIS QUINLAN JR.

I, Dr. Dennis Quinlan Jr, hereby declare:

1. I am the Medical Director of the Bristol-Meyers Squibb Trauma Center ("Trauma Center") at
   Capital Health Regional Medical Center ("Capital Health"), a position I have held since
   2024. As Medical Director for the Trauma Center, I am responsible for the Center's
   operations as well as adherence to state and certifying bodies rules and regulations. Prior to
   holding this position, I served as associate medical director from 2017 to 2024. I received my
   medical degree from the University of Medicine and Dentistry of New Jersey (UMDNJ)—
   New Jersey Medical School in Newark, NJ. I completed my general surgery residency and

1

received fellowship training in cardiothoracic surgery at UMDNJ—New Jersey Medical School. I also completed a surgical critical care fellowship at Christiana Care in Newark, DE.

2. Prior to joining Capital Health in 2008, I held appointments at St. James Hospital (Newark, NJ), UMDNJ-University Hospital (Newark, NJ), Union Hospital (Union, NJ), Robert Wood Johnson University Hospital (Rahway, NJ), and Trinitas Hospital (Elizabeth, NJ).

3. I am board certified in general surgery, critical care and thoracic surgery. My triple board certification is unique among trauma surgeons in the state of New Jersey. I am a member of the New Jersey Medical Society and the American Medical Association. I am also an instructor in ATLS (Advanced Trauma Life Support).

4. As Medical Director, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by members of my staff.

### Bristol Myers Squibb Trauma Center at Capital Health Regional Medical Center

5. The Bristol Myers Squibb Trauma Center at Capital Health Regional Medical Center is a Level II New Jersey state-designated Trauma Center. One of only 10 designated trauma centers in New Jersey, Capital Health is the regional referral center for injured patients in Mercer County and adjacent parts of Somerset, Hunterdon, Burlington, and Middlesex counties as well as nearby areas of Pennsylvania. Capital Health provides comprehensive care from the time of injury through rehabilitation.

### Health Impacts of Gun Violence

6. Gun violence has a profound impact on the health and well-being of the communities Capital Health serves. Capital Health estimates that our Trauma Center treated 1,200 total

patients in year 2024, with 57 suffering from firearm-related injuries in New Jersey. The injuries that result from gun violence are extremely serious, and can include anything from a mere wound to the soft tissues of any extremity to a significant traumatic brain injury. These injuries can require a wide range of treatments, including the cleansing and repairing of wounds to a craniotomy for treatment of a traumatic brain injury.

## Health Impacts of Accelerated Fire

7. Firearms with an accelerated rate of fire often cause more severe injuries and damage for victims because a single victim is more likely to be hit by multiple bullets. The ability to more rapidly fire projectiles into a body causes more significant injury, organ, and tissue damage.

8. Firearms with an accelerated rate of fire often cause there to be a higher number of total victims as a result of a shooting. The ability to more rapidly fire projectiles increases the likelihood that a shooter will hit multiple victims, which also increases risks to bystanders. Due to the higher volume of projectiles there is greater risk to those not involved in the incident as well as to those trying to render aid.

9. Furthermore, firearms that fire projectiles into a body at a higher velocity, such as rifles, also cause more significant injury, organ, and tissue damage. The kinetic energy from these projectiles carry more energy, which produces more tissue damage.

10. Combining a rapid rate of fire with a high velocity means that a victim is more likely to receive multiple gunshot wounds while also increasing the probable severity of those wounds. In addition, it increases the probability that a higher number of victims will experience these impacts. The more significant injuries caused by firearms with an

accelerated rate of fire and higher firing velocity leads to more medical complications for patients, which increases costs for hospitals and healthcare providers in treating patients.

11. When a shooting involves a greater number of victims, it places significant strain on the medical system. Typically, only one trauma surgeon is staffed to the emergency department after hours, and hospitals typically have reduced staff. Therefore, when multiple traumatic injuries occur after hours, the hospital must call in additional staff. Other issues that arise from this is that the hospital has to increase security to protect the patients and staff. If the number of patients overwhelms a single institution then that hospital typically has to divert patients to other hospitals, which delays their ability to get much-needed care. These additional complications increase costs to the hospitals and healthcare providers treating such patients.

12. For example, Capital Health was called to respond to a devastating shooting at the Art All Night festival in Trenton, NJ, in 2018. Eighteen victims arrived at the hospital with injuries. The injuries ranged from simple sprains from people fleeing the scene to significant torso and brain injuries. Because there is only one doctor in the emergency department on a typical night, we were required to call in all available staff to respond to the demands of treating the victims of the shooting. In such a situation if multiple patients need operative interventions then multiple backup surgeons will need to be called in. In addition, because of the large number of patients with severe injuries from the Art All Night shooting, the hospital had to divert patients with other, less urgent injuries to the emergency departments of other local hospitals.

### Impacts of Gun Violence on Victims and Families

13. Gun violence has severe, often lifelong effects on victims, their families, and their communities.

14. Research demonstrates that survivors of firearm-related injuries suffer significant, long-term mental health impacts, including increased diagnoses of psychiatric disorders, substance abuse disorders, and pain. *See, e.g.*, Zurui Song, José R. Zubizarreta, Mia Giuriato, Erica Paulos, & Katherine A. Koh, *Changes in Health Care Spending, Use, and Clinical Outcomes After Nonfatal Firearm Injuries Among Survivors and Family Members: A Cohort Study*, 175 Annals of Internal Med. 795 (2022); Zurui Song, José R. Zubizarreta, Mia Giuriato, Katherine A. Koh, & Chana A. Sacks, *Firearm Injuries in Children and Adolescents: Health and Economic Consequences Among Survivors and Family Members*, 42 Health Affs. 1541 (2023). At Capital Health, all traumatic injury patients are screened for nightmares. Survivors of gunshot injuries often experience an acute stress reaction, which can develop into post-traumatic stress disorder if left untreated.

15. Research also shows that survivors of firearm-related injuries require increased healthcare and have significantly increased healthcare expenses. For example, one study that I am aware of found that survivors have increased office visits, emergency department visits, and hospitalizations and incur an average increase in healthcare expenses of approximately $30,000 in the first year. *See* Zurui Song, José R. Zubizarreta, Mia Giuriato, Erica Paulos, & Katherine A. Koh, *Changes in Health Care Spending, Use, and Clinical Outcomes After Nonfatal Firearm Injuries Among Survivors and Family Members: A Cohort Study*, 175 Annals of Internal Med. 795 (2022); *see also* Zurui Song, José R. Zubizarreta, Mia Giuriato, Katherine A. Koh, & Chana A. Sacks, *Firearm Injuries in Children and Adolescents:*

*Health and Economic Consequences Among Survivors and Family Members*, 42 Health Affs. 1541 (2023).

16. Family members of those who die in firearm-related incidents and of survivors of firearm-related injuries similarly experience severe, often lifelong impacts, including an increase in diagnoses of psychiatric disorders. *See, e.g.*, Zurui Song, José R. Zubizarreta, Mia Giuriato, Erica Paulos, & Katherine A. Koh, *Changes in Health Care Spending, Use, and Clinical Outcomes After Nonfatal Firearm Injuries Among Survivors and Family Members: A Cohort Study*, 175 Annals of Internal Med. 795 (2022); Zurui Song, José R. Zubizarreta, Mia Giuriato, Katherine A. Koh, & Chana A. Sacks, *Firearm Injuries in Children and Adolescents: Health and Economic Consequences Among Survivors and Family Members*, 42 Health Affs. 1541 (2023).

17. The long-term effects of gun violence lead to worsened health outcomes for victims and increased healthcare costs for their families and health care providers. Shootings can also have a broader impact on the communities Capital Health serves. In fact, the Surgeon General has issued an advisory documenting the collective impacts of firearm violence exposure in the United States. *See* Off. of the U.S. Surgeon General, *Firearm Violence: A Public Health Crisis in America: The U.S. Surgeon General's Advisory 2024*, at 14-18 (2024), https://tinyurl.com/2w3n7vjw.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _15_ day of January, 2025, in _Trenton, New Jersey_

Dr. Dennis Quinlan Jr., Medical Director

Bristol-Meyers Squibb Trauma Center at

Capital Health Regional Medical Center

# EXHIBIT 5

# May 13, 2025 Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made this 13th day of May, 2025, by and between the individuals and entities listed in Exhibit A ("Claimants") and the United States of America ("the United States"), acting by and through Pamela J. Bondi, in her official capacity as Attorney General of the United States and Daniel P. Driscoll, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") (collectively, the "Parties").  The term "Named Claimants" shall mean: Rare Breed Triggers, LLC, also referred to as "RBT"; Rare Breed Firearms, LLC, also referred to as "RBF"; National Association for Gun Rights Inc.; Texas Gun Rights, Inc.; Patrick Carey; James Wheeler; Travis Speegle; Lawrence DeMonico; and Kevin Maxwell.

## RECITALS

**WHEREAS,** the Second Amendment to the U.S. Constitution guarantees that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

**WHEREAS,** Congress amended the Gun Control Act of 1968 to prohibit, in most circumstances, the transfer, possession, and registration of new machineguns. 18 U.S.C. § 922(o)(1).

**WHEREAS,** The National Firearms Act of 1934 defines a "machinegun" as

any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

1

26 U.S.C. § 5845(b).

**WHEREAS,** during the previous Administration, the ATF's Firearms Technology Criminal Branch ("FTCB") issued an "Open Letter to All Federal Firearms Licensees" advising that the ATF "recently examined devices commonly known as 'forced reset triggers' (FRTs) and has determined that *some* of them are 'firearms' and 'machineguns'" as defined by the federal law.

**WHEREAS,** against this backdrop, there is now pending a series of lawsuits described in Exhibit B (collectively, the "Litigation"), concerning the classification of FRTs and the conduct of Rare Breed Triggers LLC ("RBT"), Rare Breed Firearms LLC ("RBF"), and other Claimants.

**WHEREAS,** on February 7, 2025, President Trump issued an Executive Order titled "Protecting Second Amendment Rights." E.O. 14,206, 90 Fed. Reg. 9503 (Feb. 7, 2025). Among other things, this Order directed the Attorney General to review all actions of executive departments and agencies to assess their impact on the right to bear arms. *Id.* at Sec. 2. As part of implementing the President's Executive Order, the Attorney General on April 8 created the Second Amendment Task Force ("Task Force"), which is devoted to protecting the Second Amendment rights of all Americans. Upon review of these cases by the Task Force, the government believes that continuing the Litigation described in Exhibit B is not in the public interest.

**NOW THEREFORE,** in consideration of the Recitals and mutual promises contained herein, including the discontinuation of the pending Litigation, and for other good and valuable consideration hereby deemed received, the Parties agree as follows:

**TERMS OF AGREEMENT**

1.      The Parties agree to resolve outstanding litigation as follows:

   a.   Within seven days of execution of this agreement, the parties will jointly move to dismiss with prejudice *United States v. Miscellaneous Firearms and Related Parts and Equipment Listed in Exhibit A,* No. 23-cv-17 (D. Utah), under Federal Rule of Civil Procedure 41(a)(1)(A)(ii).

   b.   Within seven days of execution of this agreement, the United States will file a stipulation of dismissal in No. 23-cv-369 (E.D.N.Y) with prejudice under Federal Rule of Civil Procedure 41(a), and within 2 business days of the above dismissal Appellants-Defendants, the Rare Breed Parties (RBT, RBF, DeMonico, and Maxwell) will dismiss their pending appeal in *United States v. Rare Breed Triggers LLC*, No. 23-cv-369 (E.D.N.Y), on appeal 23-7276 (2d Cir.) under Federal Rule of Appellate Procedure 42(b)(2) as moot.

   c.   Within seven days of execution of this agreement, the United States will dismiss their pending appeal in *NAGR v. Bondi*, 23-cv-830-O (N.D. Tex.), on appeal 24-10707 (5th Cir.) under Federal Rule of Appellate Procedure 42(b)(2).

2.      The Parties agree that, for purposes of litigation described in Exhibit B, each side shall bear its own costs and not seek attorneys' fees.

3.      The United States agrees, to the extent practicable, to return FRTs (as defined in paragraph 11, below) that it has seized or taken as a result of a voluntary surrender.  Such returns must be requested by individual owners by September 30, 2025, consistent with the instructions provided on ATF's public website.  With respect to FRTs seized or surrendered in connection with the litigation described in Exhibit B, the return of the FRTs shall be in full settlement and

3

satisfaction of all claims to the FRTs and all claims and causes of action that could result from the FRTs' seizure and inclusion in the litigation described in Exhibit B. This paragraph does not apply to FRTs that are evidence in criminal investigations or prosecutions or are subject to forfeiture pursuant to 27 C.F.R. § 478.152.

4.      The United States agrees to the prompt return of all bonds posted related to the litigations described in Exhibit B.

5.      Each Named Claimant agrees to hold harmless and fully and finally release the United States, and all of its agencies, including, but not limited to, ATF, the United States Marshals Service, and any other involved federal, state and local authorities, and their agencies, agents, officers, employees and servants from any claims (whether known or unknown, including claims for attorney's fees and costs, interest, and expenses of every kind and however denominated) that Named Claimants or that Named Claimants' heirs, successors, transferees, or assignees have asserted, could have asserted, or may assert in the future against the United States, any of the above departments, or their agencies, agents, officers, and employees related to the seizure of the FRTs and the United States' investigation and inclusion of the FRTs in the Litigation described in Exhibit B.

6.      Named Claimants waive all rights to file claims—constitutional, statutory, or otherwise—with respect to the seizure of the FRTs including any claim that the officers who seized the FRTs lacked probable cause for such seizure.

7.      RBT, RBF, Mr. DeMonico, and Mr. Maxwell agree that they will not develop or design FRTs for use in any handgun. Handgun is defined, for the purposes of this agreement, as a firearm whose magazine loads into the trigger-hand grip.

8.    RBT, RBF, Mr. DeMonico, and Mr. Maxwell will not market, advertise, or encourage individuals to put FRT triggers on any handgun.

9.    RBT, RBF, Mr. DeMonico, and Mr. Maxwell agree to take all reasonable efforts to engage in patent enforcement seeking prohibitory injunctions against any person or entity that manufacturers, sells, or distributes any FRT during the life of U.S. Patent No. 10,514,223 patent, provided RBT, Mr. DeMonico, and Mr. Maxwell have a good faith argument that the device is within the scope of the patent.  The United States will not bear litigation costs of any patent enforcement actions.

10.    ATF agrees to process RBF's Federal Firearms License and will not deny the license based on the interpretation of FRTs being machineguns or the possession, sale, transfer, transport or manufacturing of FRTs.

11.    The United States agrees not to enforce 18 U.S.C. § 922(o) and the requirements of the National Firearms Act, Gun Control Act of 1968 as amended by the Hughes Amendment to the 1986 Firearm Owners Protection Act, or any similar statute or agency interpretation of 26 U.S.C. § 5845(b) under which an FRT is contended to be a "machinegun" or otherwise unlawful against any person or organization for possessing or transferring FRTs under the following two conditions:

a.    The FRTs have the mode of operation described in the District Court's opinion in *NAGR v. Garland*, 741 F. Supp. 3d 568, 580 (N.D. Tex. 2024), as follows: (1) the FRT is forcibly reset to its forward reset state after each round fired; (2) the FRT is locked mechanically in its reset state preventing the trigger from moving until the firearm is safe to fire; (3) the hammer must be released from its sear surface for every round fired; (4) the trigger in an FRT-equipped firearm must reset after every round fired; and (5) preventing the reset will cause the weapon to malfunction.

b. The FRTs are not designed for use in and used in handguns as defined above.

12. The United States agrees to hold harmless and fully and finally release the Claimants, all of their/its members, agents, officers, employees, transferees, assigns, designees and servants from any claims that the United States could have asserted,  against the Claimants, their/its members, agents, officers, employees, transferees, assigns, designees, servants, or any of them, related to the manufacture, possession, sale, or ownership of any FRTs described in the preceding paragraph.

13. Each Named Claimant agrees to hold harmless and fully and finally release the United States, its agencies, components, agents, employees and former employees, both in their official and their individual capacities, and the United States from any and all claims, demands, and causes of actions of every kind, nature or description, whether for monetary or equitable relief, and whether currently known or unknown, that such Named Claimant may have had, may now have, or may hereafter have arising out of or in connection with actions or events related to the Litigation described in Exhibit B.

14. The United States agrees to consider filing statements in support of RBT's civil actions for injunctions against patent violators detailing the public interest to be served by the injunctions.

15. RBT agrees to promote the safe and responsible use of its devices including by displaying such material on its website and other online platforms.

16. Nothing in this Agreement is intended to create rights enforceable by persons other than Named Claimants as plaintiffs in civil litigation.

17. Nothing in this Agreement is intended to release or otherwise affect any claim or potential claim against any person who is a defendant in either Case No. 2022-CA-001715 or Case

6

No. 2022-CA-000533 in the Circuit Court the 18th Judicial Circuit, in and for Seminole County, Florida.

18.     This Agreement is governed by the laws of the United States. The exclusive venue for any dispute relating to this Agreement is the United States District Court for the Northern District of Texas. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

19.     The Parties hereby warrant and represent that the terms of this agreement have been completely read, fully understood, and voluntarily accepted following opportunity for review by legal counsel of their choice.  The Parties further warrant and represent that they are satisfied with their counsel, if any.

20.     This written agreement constitutes the entire agreement between the Parties, and supersedes and replaces all prior negotiations and agreements, whether written or oral, regarding the litigation described in Exhibit B and any claim Claimants may have in such litigation.

21.     No modification of this agreement is effective unless in writing and signed by all Parties.

22.     All signatories represent that they have authority to enter into this Agreement on behalf of their respective clients.

23.     This Agreement may be executed in counterparts.

**IN WITNESS WHEREOF,** this Agreement is executed as of the date and year first indicated above.

ON BEHALF OF CLAIMANTS

Kevin Maxwell
Manager and Owner
Rare Breed Triggers, LLC

Lawrence DeMonico
President, Rare Breed Firearms, LLC


Hannah Hill
Vice President, National Association for Gun Rights Inc.


Chris McNutt
President, Texas Gun Rights, Inc.


Jonathan M. Shaw
Counsel for Patrick Carey


Jonathan M. Shaw
Counsel for James Wheeler


Jonathan M. Shaw
Counsel for Travis Speegle

Lawrence DeMonico

Kevin C. Maxwell

8

ON BEHALF OF CLAIMANTS

_____

Kevin Maxwell
Manager and Owner
Rare Breed Triggers, LLC

_____

Lawrence DeMonico
President, Rare Breed Firearms, LLC

_____

Hannah Hill
Vice President, National Association for Gun Rights Inc.

_____

Chris McNutt
President, Texas Gun Rights, Inc.

_____

Jonathan M. Shaw
Counsel for Patrick Carey

_____

Jonathan M. Shaw
Counsel for James Wheeler

_____

Jonathan M. Shaw
Counsel for Travis Speegle

_____

Lawrence DeMonico

_____

Kevin C. Maxwell

8

ON BEHALF OF CLAIMANTS

_____
Kevin Maxwell
Manager and Owner
Rare Breed Triggers, LLC


_____
Lawrence DeMonico
President, Rare Breed Firearms, LLC


_____
Hannah Hill
Vice President, National Association for Gun Rights Inc.


_____
Chris McNutt
President, Texas Gun Rights, Inc.


_____
Jonathan M. Shaw
Counsel for Patrick Carey


_____
Jonathan M. Shaw
Counsel for James Wheeler


_____
Jonathan M. Shaw
Counsel for Travis Speegle


_____
Lawrence DeMonico


_____
Kevin C. Maxwell

8

ON BEHALF OF THE UNITED STATES OF AMERICA

Yaakov M. Roth
Acting Assistant Attorney General
Civil Division
U.S. Department of Justice


Robert J. Leider
Chief Counsel
Bureau of Alcohol, Tobacco, Firearms and Explosives
U.S. Department of Justice

ON BEHALF OF THE UNITED STATES OF AMERICA

_____
Yaakov M. Roth
Acting Assistant Attorney General
Civil Division
U.S. Department of Justice

_____
Robert J. Leider
Chief Counsel
Bureau of Alcohol, Tobacco, Firearms and Explosives
U.S. Department of Justice

## EXHIBIT A

For purposes of this Settlement Agreement, "Claimants" refers to the following organizations (including their members) and individuals, their subsidiaries, affiliates, successors, officers, and employees:

1. Rare Breed Triggers, LLC, also referred to as "RBT"

2. Rare Breed Firearms, LLC, also referred to as "RBF"

3. National Association for Gun Rights Inc.

4. Texas Gun Rights, Inc.

5. Patrick Carey

6. James Wheeler

7. Travis Speegle

8. Lawrence DeMonico

9. Kevin Maxwell

## EXHIBIT B

For purposes of this Settlement Agreement, "Litigation" refers to the following cases and their appeals:

1.　　*NAGR v. Bondi*, 23-cv-830-O (N.D. Tex.), on appeal 24-10707 (5th Cir.).

2.　　*United States v. Rare Breed Triggers LLC*, No. 23-cv-369 (E.D.N.Y), on appeal 23-7276 (2d Cir.).

3.　　*United States v. Miscellaneous Firearms and Related Parts and Equipment Listed in Exhibit A,* No. 23-cv-17 (D. Utah).

# EXHIBIT 6

# Declaration of Todd W. Daloz

NO. 24-10707

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.;
PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees*,

V.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT
OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants*

_____

On Appeal from the United States District Court for the
Northern District of Texas; No. 4:23-Cv-830
_____

## DECLARATION OF TODD W. DALOZ
_____

I, Todd W. Daloz, hereby declare:

1. I am the Director of Policy and Legislative Affairs in the Office of the Vermont Attorney
   General, a position I have held since September 2024. As Director of Policy and Legislative
   Affairs, I am responsible for developing the Attorney General's policy priorities, working
   with partners in the Legislature, the Governor's Office, and other advocates to realize those
   priorities, and representing the Attorney General's Office at public events, including on
   various boards and commissions. Prior to holding this position, I served as the Deputy
   Secretary of Human Services for the State of Vermont for two and half years, the General
   Counsel of the Vermont Agency of Human Services for one and a half years, and in the

General Counsel's office in the Vermont State Colleges.  I started my legal career as a Law Clerk for Vermont Supreme Court Justice Marilyn Skoglund and following that, spent five years as an Assistant Attorney General in the Office of the Vermont Attorney General.

2.  As Director of Policy and Legislative Affairs, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by members of my staff.

3.  Vermont law does not currently ban Forced Reset Triggers (FRTs), though Vermont has banned "bump stocks," which are similar devices used to simulate machineguns. In the absence of federal enforcement against FRTs as machineguns, the purposes of Vermont's law banning bump stocks would be undermined. To protect its citizens from the harm these weapons pose, Vermont would need to pass its own law banning FRTs as machinegun parts.

4.  Moreover, Vermont would need to incur expenses to inform the public about the difference between machinegun devices and the differences in legality of those devices under federal and state law. For example, when bump stocks were held not to be machineguns by the U.S. Supreme Court last term, the Attorney General had to use staff time to explain to the public that such devices are still prohibited under state law. If federal enforcement of FRTs is frozen as a result of this litigation, the State would similarly have to incur expenses to communicate the legal status of FRTs to its residents and would need to expend similar resources on such public communications efforts.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed this 14th day of January 2025, in Montpelier, Vermont.


*/s/ Todd W. Dalos*
Todd W. Daloz
Director of Policy and Legislative Affairs
Office of the Vermont Attorney General